**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| MARK E. MCKINNEY, derivatively on behalf of RESOURCE CAPITAL CORP., | : | Civil Action No.   17-CV-1381 |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| JONATHAN Z. COHEN, DAVID J. BRYANT, ELDRON C. BLACKWELL, DAVID E. BLOOM, STEVEN J. KESSLER, EDWARD E. COHEN, WALTER T. BEACH, GARY ICKOWICZ, RICHARD L. FORE, WILLIAM B. HART, MURRAY S. LEVIN, P. SHERRILL NEFF and STEPHANIE H. WIGGINS, | : | **JURY TRIAL DEMANDED** |
|  | : |  |
| Defendants, | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| RESOURCE CAPITAL CORP., | : |  |
|  | : |  |
| Nominal Defendant. | : |  |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Mark E. McKinney ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Resource Capital Corp. ("Resource Capital" or the "Company") against certain current and/or former members of its Board of Directors (the "Board"), as well as certain current and/or former executive officers seeking to remedy Defendants' (defined herein) breaches of fiduciary duties, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934, from

1

2012 to the present (the "Relevant Period").[1]

## NATURE OF THE ACTION

2.      According to its public filings, Resource Capital is a diversified real estate finance company that focuses on commercial real estate, commercial real estate-related assets, and, to a lesser extent, commercial finance assets.  The Company is organized as a real estate investment trust ("REIT").   During the Relevant Period, Defendants perpetrated a deception upon the investing public by failing to disclose a particularly risky and dangerous loan within the Company's portfolio.

3.      The loan in question was a mezzanine loan secured by a number of luxury hotels (the "Mezzanine Loan").  When initially acquired in 2007, the Mezzanine Loan was secured by 13 hotels owned by The Blackstone Group ("Blackstone").  Three of the hotels serving as collateral were located in Puerto Rico and, as time progressed, these three hotels came to be the only three assets securing the Mezzanine Loan.  Defendants never disclosed this information.

4.      Since 2006, however, Puerto Rico's economy has been suffering from a crippling recession.  Connected to this recession is a mammoth debt crisis.  Despite Puerto Rico's small population, if it were a state, its $73 billion in debt would rank third among separate states, behind only California and New York.  Puerto Rico's failing

---

[1] While Plaintiff and his counsel have conducted their own, independent investigation, many of the facts and allegations contained herein appear in the Amended Complaint for Violation of Federal Securities Laws (the "Securities Complaint") filed against the Company and certain of its officers related to the allegations contained herein.  *See Daren Levin v. Resource Capital Corp. et al.* (S.D.N.Y. filed February 12, 2016) (the "Securities Action").  On October 5, 2016, the Hon. Louis L. Stanton ("Judge Stanton"), of the United States District Court for the Southern District of New York, issued an order denying the defendants' Motion to Dismiss (the "Securities Motion") the Securities Complaint in the Securities Action (the "Securities Order").

economy has caused its debt to be downgraded to junk status, and returns on such debt to plummet.

5.      Indeed, the continuing degradation of Puerto Rico's economy and credit standing led the Secretary of the Commonwealth of Massachusetts, William Galvin ("Galvin"), to investigate several mutual fund families with high levels of investment in Puerto Rican debt, including OppenheimerFunds.  As reported by *The Wall Street Journal*, Mr. Galvin initiated the investigation because "he was concerned local investors may be unaware of all the risks they are taking on."  In Mr. Galvin's words, "[E]veryone knows there is a problem with Puerto Rican bonds."

6.      Without regard to the Puerto Rican economic crisis, and despite the Company's recognition that the value of real estate debt is sensitive to local economic trends, Defendants went years without disclosing the imminent need to write-down the value of the Mezzanine Loan.  In fact, Defendants never even disclosed the Company's exposure to the Puerto Rican economy until well into 2015.

7.      On August 4, 2015, after the market closed, Defendants caused Resource Capital to announce its financial results for the quarter ended June 30, 2015.  Defendants caused the Company to disclose a GAAP net loss of $31.0 million during the past quarter.  Contributing to the net loss--indeed the cause thereof--was the Company's recording of an allowance for loan losses on a mezzanine loan position of $41.1 million in total.  As disclosed in the August 4 press release, "[t]he last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved."

8.      As a result of the news, the price of Resource Capital's common stock declined from its closing price of $3.48 per share on August 4, 2015, to close at $3.05 per share on August 5, 2015, a single-day loss of more than 12%. Accordingly, the announcement wiped out approximately $54.6 million of Resource Capital's market capitalization.

9.      Resource Capital's stock would drop further as Defendants caused the Company to disclose more information concerning the Puerto Rico mezzanine loan, and the charges incurred as a result of the impairment of the debt. On August 5, 2015, Defendants caused the Company to hold a conference call with investment analysts to discuss Resource Capital's financial performance in the second quarter of 2015. During this call, Defendants disclosed more specific information about the Puerto Rico mezzanine loan, and the Company's business practices (under Defendants' direction and on their watch) relating to investments in mezzanine loans backed by commercial real estate.

10.     Following the earnings call, Resource Capital stock fell to close at $2.97 per share on August 6, 2015, from its closing price of $3.05 per share on August 5, 2015. In total, the trading price of the Company's stock had fallen $0.51 per share, or 15%, from its closing price of $3.48 per share on August 4, 2015, prior to the Company's disclosures regarding the Puerto Rico mezzanine loan position.

11.     In light of the foregoing, Plaintiff issued a Demand (further defined herein), pursuant to Maryland law, on the Board to investigate and take action against the Defendants named herein for violations of Maryland law, New York law, and/or federal law.

12.    It has now been over fifteen months since the Demand was issued, and Plaintiff has received no substantive response to the Demand whatsoever. As such, and for reasons set forth herein in greater detail, *infra*, the Demand has been refused.  Clearly, the Board's failure to fulfill its obligations with respect to the Demand, which resulted in its functional refusal, is improper, demonstrates the Board's lack of diligence and good faith, and is not entitled to the protections of the business judgment rule.  Thus, given the wrongful, bad-faith functional refusal of the Demand, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to: (1) 28 U.S.C. § 1331 in that this Complaint states a federal question; and (2) pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and the Defendants are citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District and the Company conducts business in and maintains its executive offices in this District. Further, Defendants either reside in this District, maintain or have maintained executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this

5

District.

## THE PARTIES

15. Plaintiff is a current shareholder of Resource Capital, and has continuously held Resource Capital stock since 2010. Plaintiff is a citizen of Arizona.

16. Nominal defendant Resource Capital is a Maryland corporation, with its principal executive offices located at 712 Fifth Avenue, 12th Floor, New York, NY 10019.

17. Defendant Jonathan Z. Cohen ("Cohen") served as the Company's President, Chief Executive Officer ("CEO"), and a director from 2005 until September 2016. Upon information and belief, defendant Cohen is a citizen of New York.

18. Defendant David J. Bryant ("Bryant") has served as the Company's Senior Vice President, Chief Financial Officer ("CFO"), and Treasurer since 2006. Upon information and belief, defendant Bryant is a citizen of Pennsylvania.

19. Defendant Eldron C. Blackwell ("Blackwell") has served as the Company's Vice President and Chief Accounting Officer since March 2014. Upon information and belief, defendant Blackwell is a citizen of Pennsylvania.

20. Defendant David E. Bloom ("Bloom") has served as the Company's Senior Vice President, Real Estate Investments, since 2005. Upon information and belief, defendant Bloom is a citizen of New Jersey.

21. Defendant Steven J. Kessler ("Kessler") has served as the Company's Chairman of the Board since November 2009. Previously, Kessler served as Senior Vice President Finance from September 2005 until November 2009, and prior to that that, served as CFO, Chief Accounting Officer and Treasurer from March 2005 to September

2005. Upon information and belief, defendant Kessler is a citizen of Pennsylvania.

22. Defendant Edward E. Cohen ("E. Cohen") served as a director of the Company from March 2005 until September 2016, and as Chairman of the Board from March 2005 until November 2009. Upon information and belief, defendant E. Cohen is a citizen of Florida.

23. Defendant Walter T. Beach ("Beach") has served as a director of the Company since March 2005. In addition, Beach served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period. Upon information and belief, defendant Beach is a citizen of New York.

24. Defendant Gary Ickowicz ("Ickowicz") has served as a director of the Company since February 2007. Upon information and belief, defendant Ickowicz is a citizen of New Jersey.

25. Defendant Richard L. Fore ("Fore") has served as a director of the Company since March 2013. Upon information and belief, defendant Fore is a citizen of Nevada.

26. Defendant William B. Hart ("Hart") has served as a director of the Company since March 2005. In addition, Hart served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Hart is a citizen of Virginia.

27. Defendant Murray S. Levin ("Levin") has served as a director of the Company since March 2005. Upon information and belief, defendant Levin is a citizen of Pennsylvania.

28. Defendant P. Sherrill Neff ("Neff") has served as a director of the

7

Company since March 2005.  In addition, Neff served as Chair of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Neff is a citizen of Pennsylvania.

29.      Defendant Stephanie H. Wiggins ("Wiggins") has served as a director of the Company since June 2013.  In addition, Wiggins served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Wiggins is a citizen of Virginia.

30.      Collectively, defendants Cohen, Bryant, Blackwell, Bloom, Kessler, E. Cohen, Beach, Ickowicz, Fore, Hart, Levin, Neff and Wiggins shall be referred to herein collectively as the "Defendants."

31.      Collectively, defendants Beach, Hart, Neff and Wiggins shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

32.      By reason of their positions as officers, directors, and/or fiduciaries of Resource Capital, and because of their ability to control the business and corporate affairs of Resource Capital and its subsidiaries, Defendants owed Resource Capital, and its shareholders, fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Resource Capital, and its subsidiaries, in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Resource Capital and its shareholders so as to benefit all shareholders equally, and not act in furtherance of their personal interests or benefits.  Each director and officer of the Company owes to Resource Capital, and its shareholders, the fiduciary duty to exercise good faith and diligence in the

8

administration of the business and financial affairs of the Company (and its subsidiaries), and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

33.     Defendants, because of their positions of control and authority as directors and/or officers of Resource Capital, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Resource Capital, each of the Defendants had knowledge of material non-public information regarding the Company.

34.     To discharge their duties, the officers and directors of Resource Capital, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Resource Capital were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company (and its subsidiaries) were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company (and its subsidiaries) was operated in a diligent, honest and prudent manner, and that it complied with all applicable federal and state laws, rules, regulations and requirements, as well as all contractual obligations, including acting only within the scope of their legal authority; and

    c. When put on notice of problems being experienced with the Company's (and its subsidiaries') business practices and operations,

9

exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

35.    The Company's Code of Business Conduct and Ethics ("Code of Conduct"), which expressly applies to all of the Defendants, states, in relevant part:

**Compliance with Laws, Rules and Regulations**
Obeying the law, both in letter and in spirit, is the foundation on which Resource's ethical standards are built. All employees must respect and obey the laws of the cities and states in which we operate. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers or other appropriate personnel. All employees must cooperate fully with the people responsible for preparing reports filed with the Securities and Exchange Commission and all other materials that are made available to the investing public to make sure the people responsible for preparing such reports and materials are aware in a timely manner of all information that might have to be disclosed in those reports or other materials or that might affect the way in which information is disclosed in them.

\*      \*      \*

**Record-Keeping**
Resource requires honest and accurate recording and reporting of information in order to make responsible business decisions. Many employees regularly use business expense accounts, which must be documented and recorded accurately. If you are not sure whether a certain expense is legitimate, ask your supervisor or the CFO. All of Resource's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect Resource's transactions and must conform both to applicable legal requirements and to Resource's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos, and formal reports.

36.    Pursuant to the terms of the Audit Committee's Charter (the "Audit Committee Charter"), the Audit Committee Defendants were responsible for, *inter alia*,

10

monitoring the integrity and ensuring the transparency of the Company's financial reporting processes and  systems of internal controls regarding finance, accounting and regulatory compliance.

## SUBSTANTIVE ALLEGATIONS

### A.    Overview of the Company

37.    Resource Capital is a diversified real estate finance company that focuses on commercial real estate, commercial real estate-related assets, and, to a lesser extent, commercial finance assets.  The Company is organized as a REIT.

38.    According to the Company's Annual Report for Fiscal Year 2014 on Form 10-K filed with the U.S. Securities and Exchange Commission (the "SEC") on March 2, 2015 (the "2014 10-K"), the commercial real estate-related investments held by Resource Capital included mezzanine loans.  Mezzanine loans constitute approximately 5% of the Company's loan portfolio.  Mezzanine loans are "loans that are senior to the borrower's equity in, and subordinate to a first mortgage loan on, a property."  Defendants caused the Company to explain that "[m]ezzanine loans typically have maturities that match the maturity of the related mortgage loans but may have shorter or longer terms [and the Company] expect[s] to hold these investments to maturity."

39.    As Defendants have caused Resource Capital to acknowledge in the 2014 10-K, investing in commercial real estate mezzanine loans is "subject to the risks inherent in the real estate securing or underlying those investments[.]"  Specifically, "[t]he ability of a borrower to repay a loan secured by or dependent upon an income-producing property typically depends primarily upon the successful operation of the property . . . . If the net operating income of the property is reduced, the borrower's ability to repay the

11

loan may be impaired." In turn, the Company was warned that the "property location and condition; . . . changes in national, regional or local economic conditions and/or the conditions of specific industry segments in which [the Company's] lessees may operate; declines in regional or local real estate values; . . . [and] the availability of debt or equity financing" can affect the net operating income of the underlying properties, and hence, the performance of Resource Capital's mezzanine loan portfolio.

40. Accordingly, with respect to Resource Capital's investments secured by properties within Puerto Rico (*i.e.*, the Mezzanine Loan), Puerto Rico's economy was of material relevance.

### B. Background of the Puerto Rico Economic Recession

41. The Puerto Rican economy has been stuck in a recession since 2006. According to an analysis of the Puerto Rican economy by former World Bank Chief Economist Anne Krueger, Ranjit Teja, and Andrew Wolfe (the "Krueger Report"), from 2004 through 2014, investment in the Puerto Rican economy, as a portion of gross national product, fell by more than ten percentage points. The following chart illustrates the declining investment in the Puerto Rican economy overall, and specifically, in construction:



42.    The Krueger Report further explains that the Puerto Rican economy historically has tracked the economy of the United States mainland.  Accordingly, Puerto Rico was significantly harmed during the downturn in the United States economy between 2007 and 2009.  As the following chart illustrates, however, while the United States mainland's economy began to recover following fiscal year 2011, Puerto Rico's economy resumed its descent:



43.      The residential real estate market in Puerto Rico has also been seriously damaged.  As detailed in the Krueger Report, house prices have fallen sharply, with the downturn preceding the similar phenomenon on the United States mainland. Indeed, the median sales price for existing homes fell 38% between fiscal year 2004 and 2014.

44.      In conjunction with Puerto Rico's economic decline and failing residential real estate market, Puerto Rico's banking sector has come under serious stress. According to the Krueger Report, between 2005 and 2015, commercial bank assets fell by 30% "as banks reduced their balance sheets in response to the hit to their capital from lower asset prices.  The distress in the banking sector would have been worse were it not for the backstop provided by [the Federal Deposit Insurance Corporation], which had to intervene [in] several banks, and for initiatives such as [the Troubled Asset Relief Program]."

45.      Puerto Rico's economic woes are further illustrated by the extreme levels

of public debt.  The Krueger Report points to the crisis-level debt incurred by Puerto Rico, observing that "[p]ublic sector debt has risen every year since 2000, through good years and bad ones, reaching 100 percent of [gross national product] by end-[fiscal year] 2014. . . . The fact that debt was rising even in years before the economy started to contract says something about the weakness in public finances."  Indeed, the Krueger Report highlighted the failure of the Puerto Rican government to stabilize the Commonwealth's balance sheet when asking rhetorically, "[H]ow could debt continue climbing in the face of one emergency measure after another to 'balance the budget' – from the sales tax in FY2006 to staff cuts in FY2009 to pension reform in FY2013?" Further evidence of the continual decline of Puerto Rico's fiscal health is the decline in tax revenues, which "slid markedly relative to nominal GNP, from over 15% of GNP prior to 2006 to around 12% despite new measures implemented in the intervening period."

46.     In April 2013, the president of the Government Development Bank for Puerto Rico, which is tasked with "safeguard[ing] the fiscal stability of Puerto Rico and promot[ing] its competitiveness to transform [the Commonwealth's] economy into one of the most developed economies in the world," described the bank's position as "fragile" before resigning three months later.

47.     In the Krueger Report's analysis, piecemeal fiscal reforms in Puerto Rico have left "a decade of stagnation and the cutoff of market access, which experience tells us has severe negative effects on credit, investment, and consumption."

48.     By the spring of 2013, Puerto Rico's fiscal crisis was well-known and obvious, eliciting negative reactions from the investing community.  On August 26, 2013,

the investing periodical *Barron's* ran a cover story entitled "Troubling Winds", that discussed Puerto Rico's failing economy and crisis-level debt. The article noted that at the time of publication, Puerto Rico carried "$53 billion of tax-supported debt outstanding from more than a dozen issuers, according to Moody's Investors Service, and nearly $70 billion of total debt, according to the Commonwealth." The article went on to note that "[e]ven using the lower figure, Puerto Rico's debt load would rank third among the states, behind only California and New York." Puerto Rico's debt burden, however, was severely disproportionate to normative measures of the Commonwealth's financial health, such as gross domestic product, personal income, and population. Indeed, Puerto Rico carried a debt burden of $14,324 per capita, 10 times the average of the 50 states, and more than five times that of California, the state with the highest debt burden. Accordingly, as of August 2013, Puerto Rico's general-obligation bonds received the lowest investment grade ratings available from both Moody's and Standard & Poor's, and both maintained "negative outlooks on Puerto Rico's credit rating, meaning there is a possibility that its debt could get downgraded to junk in the coming year."

49.    The *Barron's* article also noted that "[a] closely watched index of economic activity compiled by the Government Development Bank for Puerto Rico[] shows a year-over-year decline of 4.5% in June [2013]. This indicator, which reflects gasoline consumption, payroll employment, electricity generation, and cement sales, has a high correlation with GDP."

50.    An article published by *Kiplinger* on September 17, 2013, entitled Beware Puerto Rican Bonds Hiding in Your Portfolio, also noted that Puerto Rico's gross domestic product declined by 5% in July 2013, as compared to July 2012. This was the

16

fastest rate of decline for the Puerto Rican economy in 41 months, according to the Government Development Bank for Puerto Rico.

51.     Further, according to the *Kiplinger* article, between May 1, 2013 and September 17, 2013, the "Standard & Poor's Puerto Rico Municipal Bond index . . . plunged 19%[.]"  Indeed, given the overwhelming debt owed by Puerto Rico, the article's author opined that "[m]anagers who loaded up on these bonds should be fired—as should their supervisors."  Goldberg noted that nine of the ten funds most heavily laden with Puerto Rican bonds were managed by Oppenheimer, and that eight of the nine Oppenheimer funds lost between 11% and 15% over the three months leading up to the article's publication, which was "almost enough to wipe out the previous three years of positive returns."

52.     Investors in Puerto Rico's bonds noticed the Commonwealth's financial crisis, which was reflected in the performance of Puerto Rican municipal bonds.  A *Bloomberg* article, published on September 13, 2013, entitled "OppenheimerFunds Loses Most as Puerto Rico Tumbles: Muni Credit," highlighted the losses incurred by mutual funds with significant investments in Puerto Rican bonds.  The *Bloomberg* article noted that "OppenheimerFunds Inc. is the biggest loser as mutual funds investing in municipal debt get pummeled by the worst year for Puerto Rican bonds since at least 2000."  Specifically, an Oppenheimer municipal debt unit with 26% of its $6.5 billion in assets invested in Puerto Rican debt, lost almost 12% from January 2013 through September 2013.

53.     The decline in Puerto Rico's economy, and the resulting fallout for United States investors, prompted Mr. Galvin (the Secretary of the Commonwealth of

17

Massachusetts) to investigate several mutual fund families with high levels of investment in Puerto Rican debt, including OppenheimerFunds. As reported by *The Wall Street Journal* on October 9, 2013, in an article entitled "Massachusetts Probes Sales of Puerto Rico Bonds," Mr. Galvin initiated the investigation because "he was concerned local investors may be unaware of all the risks they are taking on." In Mr. Galvin's words, "[E]veryone knows there is a problem with Puerto Rican bonds."

54.    Puerto Rico's economic decline, and its concomitant debt crisis, ultimately resulted in all three major credit rating agencies downgrading the Commonwealth's debt to junk status in the first two weeks of February 2014. As noted in a *MarketWatch* report, dated February 12, 2014, entitled "Puerto Rico bond turmoil sparks warning from muni fund," from February 2013 to February 2014, the "Standard & Poor's Puerto Rico muni index dropped 21.3%, rare losses for the municipal bond market, which is often sought for its perceived safety." As a result of the downgrades, the OppenheimerFunds unit with heavy investment in Puerto Rican bonds, referred to above, amended its disclosures. One such disclosure was amended to state: "If the economic situation in Puerto Rico persists or worsens, the volatility, liquidity, credit quality, and performance of the Fund could be adversely affected[.]"

55.    The Standard & Poor's Municipal Bond Puerto Rico Index failed to recover fully following the downgrades. As of June 30, 2014, the index closed at 163.61, up from 157.55 on February 7, 2014, but still down 17.8% from February 4, 2013. Similarly, as of September 30, 2014, the index closed at 171.52, slightly higher than June, but still down 13.8% from February 4, 2013. By December 30, 2014, the index would drop to 170.44, down 14.3% compared to February 4, 2013. By March 31, 2015, the

index dropped further to 168.25, down 15.4% compared to February 4, 2013.

56.     On January 4, 2016, Puerto Rico defaulted on $174 million of debt payments.   According to an article posted on *The New York Times* business blog *DealBook* on January 4, 2016, entitled "Puerto Rico Defaults on Debt Payments," Puerto Rico defaulted on the payment in order to pay the Commonwealth's "general obligation bondholders, who are entitled to be paid first, according to the Puerto Rican constitution." While using the cash to pay the general obligation bonds, the Puerto Rican government put its other bonds into default.   Although the other bonds could be paid out of reserves, "drawing on a reserve without replenishing it is also considered a form of default." Furthermore, bonds issued by the Puerto Rico Infrastructure Financing Authority and the Public Finance Corporation do not have reserves.   As a result, Standard & Poor's downgraded "the infrastructure authority's rating from CC to D."   According to Standard & Poor's, "[a]n obligation rated 'D' is in default or in breach of an imputed promise. . . . The 'D' rating also will be used upon the filing of a bankruptcy petition or the taking of similar action and where default on an obligation is a virtual certainty, for example due to automatic stay provisions."

57.     As detailed in a *Reuters* article, dated January 8, 2016, entitled "Bond insurers sue Puerto Rico over debt default, clawbacks," insurers of the Puerto Rico's bonds sued the Commonwealth following the default, alleging that the Puerto Rican government's decision to divert payment to the general obligation bondholders was unconstitutional.

**C.**     **Defendants Cause Resource Capital to Invest in the Mezzanine Loan**

58.     In 2007, Defendants caused Resource Capital to acquire a position in a

mezzanine loan backed by a portfolio of 13 luxury hotels (*i.e.*, the Mezzanine Loan). Of the 13 hotels, three were located in Puerto Rico—the El San Juan Hotel & Casino, the El Conquistador Golf Resort & Casino in Fajardo, and the Condado Plaza Hotel & Casino in San Juan. The portfolio of 13 luxury hotels backed $742.5 million of debt securitized through the Wachovia Bank Commercial Mortgage Trust, 2007-WHALE8 (the "2007-WHALE8 Trust").

59. As Puerto Rico's economy declined, the 2007-WHALE8 Trust suffered. On August 20, 2012, Moody's downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Specifically, the LXR-1 class of the Trust was downgraded from B2 to Caa1, and the LXR-2 class was downgraded from Caa1 to Caa3. According to Moody's, a rating of "Caa" means that the obligations "are judged to be speculative of poor standing and are subject to very high credit risk." The addition of a numerical modifier "1 indicates that the obligation ranks in the higher end of its generic rating category; . . . and the modifier 3 indicates a ranking in the lower end of that generic rating category."

60. In or around September 2012, Blackstone, the owner of the hotels within the portfolio, was unable to meet its payment obligations to its specialty servicer, CWCapital Asset Management. Accordingly, Blackstone entered into a forbearance agreement. Pursuant to the terms of the agreement, Blackstone would need to sell its hotels before March 24, 2014, and then refinance the remaining debt before maturity on September 9, 2014.

61. Fitch Ratings also downgraded the 2007-WHALE8 Trust. According to a May 1, 2014 release by Fitch, 68% of the 2007-WHALE 8 Trust was composed of the

20

LXR Hospitality Pool, which included the Puerto Rican hotels, described above.  The

Fitch Ratings release noted that only eight of the original hotels remained as of May 1,

2014.  Fitch described the LXR portfolio accordingly:

> Performance overall is significantly below issuance expectations and the
> loan transferred to the special servicer in April 2012 in advance of its June
> 2012 maturity. In September 2012 the special servicer entered into a
> Forbearance Extension and Property Disposition Agreement with the
> Borrower. The plan requires certain properties to be sold or refinanced by
> specific dates to repay principal, and requires the special servicer to trap
> all excess cash flow generated from the properties for further principal
> reduction. The loan de-levered since Fitch's last rating action with the sale
> of the two properties and additional principal paydown from trapped
> excess cash flow. Four properties (out of the original 12 at issuance) have
> been sold to date. The Fitch adjusted net operating income (NOI) year-
> ended (YE) 2013 for the eight remaining properties has improved from
> YE 2012 by over 24%. The current NOI remains significantly lower than
> that at issuance.

62.    Fitch rated the LXR-1 and LXR-2 classes "Csf." According to Fitch

Ratings, a structured finance product rating of "C" represents "Exceptionally high levels

of credit risk" in which "[d]efault appears imminent or inevitable."

63.    By April 2015, the LXR-2 class of the 2007-WHALE8 Trust was backed

by only four hotels: the three hotels in Puerto Rico listed above, and The Boulders Resort

& Golden Door Spa in Carefree, Arizona.  On April 23, 2015, Fitch upgraded the LXR-2

class from CCsf to Bsf.  In connection with the ratings upgrade, Fitch noted that the

Boulders Resort was "under contract for sale with an anticipated closing date at the end

of April 2015, with proceeds sufficient to repay the non-pooled LXR-2 rake bond in full

on the May payment date."  Essentially, the class within the 2007-WHALE8 Trust that

contained the three Puerto Rican hotels securing Resource Capital's mezzanine loan

position was upgraded only when the sale of the other remaining property was nearly

closed, providing sufficient funds to repay the class's obligation.

21

64.     As properties from the portfolio were sold off in order to repay principal, Resource Capital's Mezzanine Loan became increasingly riskier due to its over-concentration in Puerto Rico, and its complete dependency upon Puerto Rico's economy.

**D.     Defendants' False and Misleading Statements**

65.     During the Relevant Period, Defendants made a number of material misleading statements and/or omissions concerning the Company's exposure to the Puerto Rican economy.  Indeed, despite numerous events reflecting the severe decline of the Puerto Rican economy and Puerto Rico's credit, Defendants failed to disclose the risks that they had caused the Company to become subjected to by way of the investment in the Mezzanine Loan.   Further, Defendants misrepresented the adequacy of the Company's disclosure controls (which were made under their direction and on their watch).

66.     On October 31, 2012, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's third quarter 2012 financial performance.  During the call, defendant Cohen stated the following:

> Our portfolio of loans continued to perform well. During 2012, we have grown our real estate loan portfolio by over $150 million net. We expect this trend to continue as we continue to find good opportunities to lend money against good real estate. We have greatly strived to grow our origination channel in real estate and we believe that the investments we have made in our team and systems will start to pay off.
>
> While our portfolio stayed constant for the quarter due to repayments from a legacy $28 million loan, legacy meaning made before the crisis, and another $6.5 million loan made in 2011, we underwrote and funded a series of, in my opinion, very attractive loans. We are picking up pace and expect this portfolio to grow tremendously in the next few quarters, net of payoffs. Dave Bloom will elaborate on this in the real estate portfolio momentarily.

67.     Additionally, defendant Bloom stated the following:

22

> Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes. The majority of the properties securing our loans are continuing to realize improved cash flow on a quarter-over-quarter basis. And the entire portfolio remains performing with no defaults. As assets are recapitalized or sold and paid off, the few legacy positions that require extra asset management attention grows smaller each quarter. And we remain extremely focused on the ultimate resolution of the limited number of situations.

68.     The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By October 31, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  In light of the true status of the Mezzanine Loan, defendant Cohen's description that the Company's loan portfolios were "performing well" was materially misleading. Further, defendant Bloom's statements concerning the Company's "legacy positions," which included the Mezzanine Loan, and representations that the Company's "entire portfolio remains performing with no defaults" were also materially misleading.

69.     Ultimately, as would later be disclosed, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment charge due to non-performing assets comprising the underlying portfolio.

70.     On November 9, 2012, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2012 (the "November 9, 2012 10-Q"), which was signed by defendants Cohen and Bryant.

23

71.     The November 9, 2012 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio.   Specifically, the November 9, 2012 10-Q incorporated the "Risk Factors" disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2011 (the "2011 10-K").   While the 2011 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it failed to disclose the Company's exposure to the Puerto Rican economic crisis.  The November 9, 2012 10-Q (by incorporating the 2011 10-K) provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. . . . Where we have any kind of concentration risk in our investments, an adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

72.     Defendants' statement above was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As disclosed by Defendants on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the November 9, 2012 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By November 9, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer

24

because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure (issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

73. Similarly, in the November 9, 2012 10-Q, Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**
The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

25

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2012:** | | | | | | |
| Whole loans | $ 415,782 | $ 7,000 | $ 98,874 | $ — | $ 34,000 | $ 555,656 |
| B notes | 16,357 | — | — | — | — | 16,357 |
| Mezzanine loans | 23,322 | — | 44,500 | — | — | 67,822 |
| | $ 455,461 | $ 7,000 | $ 143,374 | $ — | $ 34,000 | $ 639,835 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

All of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011.

74.     Defendants' statements above were materially misleading because they mischaracterized the credit quality of the Mezzanine Loans, and omitted material information concerning the weakness of the Mezzanine Loan, and the risks it created for the Company. The $44.500 million in mezzanine loans represented by the Company (under Defendants' direction and on their watch) as "Rating 3" as of September 30, 2012 (which consisted of the Mezzanine Loan), was essentially unchanged from the $44.509 million represented by the Company (under Defendants' direction and on their watch) as "Rating 3" as of June 30, 2012, $44.517 million as of March 31, 2012, and $44.527 million as of December 31, 2011, notwithstanding that Blackstone had entered into a forbearance agreement, and the Company had stopped receiving cash income from the loan in September 2012. Indeed, Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.

75.     In addition, the November 9, 2012 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of September 30, 2012[.]" Defendants represented this despite the fact that by November 9,

2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

76.     Similarly, the November 9, 2012 10-Q also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i).   Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

77.     Finally, the November 9, 2012 10-Q was misleading with respect to the Company's then-existing internal controls.   The November 9, 2012 10-Q was accompanied by certifications, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Cohen and Bryant, which set forth:

> 1. I have reviewed this report on Form 10-Q for the quarter ended September 30, 2012 of Resource Capital Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial

information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial

information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

78. Defendants' statements were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure, and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio.

79. On March 5, 2013, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's fourth quarter and full year 2012 financial performance. During the call, defendant Cohen stated the following:

Our credit quality is stable and improving and other than the legacy loans we have sold in our syndicated bank loan facility, we feel like the credit environment for us is excellent. We took a modest provision on real estate loans in fourth quarter of $400,000. However, all 43 of our outstanding real estate loans are performing and we see a trend of improving property performance underlying these loans beginning in 2011 through the year-end 2012 and continuing into 2013. That is, our real estate loss is shrinking.

*       *       *

Our liquidity remains excellent. We had approximately $180 million of cash including $94 million of unrestricted cash as of December 31, even after making considerable investment during the quarter. Stay tuned for more investments. Our portfolio of real estate loans continued to perform well. During 2012, we have grown our real estate loan portfolio by over $175 million. We expect this trend to continue as Dave Bloom and his real estate team continue to find out good opportunities from that money against good real estate. We have generally strived to grow our origination channel and we believe that the investments we have made in our team and system, will start to pay off or have started to pay off and will continue to start to pay off.

29

80.     The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By March 5, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

81.     On March 18, 2013, Defendants caused Resource Capital to file an annual report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"). The 2012 10-K was signed by defendants Cohen, Bryant, Kessler, Beach, E. Cohen, Hart, Ickowicz, Levin and Neff.

82.     The 2012 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio.  While Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis.  Furthermore, the 2012 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The 2012 10-K provided the following risk

disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

83.    The 2012 10-K also contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico:



**Geographic Area by State**

84.    Defendants' statements above were materially misleading in that they

misrepresented the Company's existing exposure to the Puerto Rican economic crisis. Not only did Resource Capital's 2012 10-K completely withhold the fact that it was even invested in Puerto Rico, but as disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the 2012 10-K, Puerto Rico was in the midst of a historic economic downturn. By March 18, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure (issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

85. Similarly, in the 2012 10-K, Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

> **Commercial Real Estate Loans**
> We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest,

32

structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

All of our commercial real estate loans were performing as of December 31, 2012 and 2011.

86.    Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Remarkably, the $44.490 million in mezzanine loans represented by the Company (under Defendants' direction and on their watch) as "Rating 3" as of December 31, 2012 was essentially unchanged from the $44.500 million represented by the Company as "Rating 3" as of September 30, 2012.   Defendants caused Resource Capital to maintain its prior rating on the mezzanine loans despite the forbearance agreement entered into by Blackstone, and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued.  Indeed, Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.  In addition, the 2012 10-K was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of December 31, 2012[.]"  Defendants

represented this, despite the fact that by March 18, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

87.     Similarly, the 2012 10-K also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i).   Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.   Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

88.     Finally, the 2012 10-K was misleading with respect to the Company's then-existing internal controls.   The 2012 10-K was accompanied by SOX Certifications signed by defendants Cohen and Bryant, which set forth:

> 1. I have reviewed this report on Form 10-K for the year ended December 31, 2012 of Resource Capital, Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the

34

registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

89. The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio.

90. On May 8, 2013, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's first quarter 2013 financial performance. During the call, defendant Cohen stated the following:

Our portfolio of real estate loans continue to perform well. During the last 12 months we have grown our real estate loan portfolio by over $223 million on a gross origination basis. We expect this trend to continue as our real estate debt team continues to find good opportunities to lend money against good real estate. We have greatly strived to grow our origination channel and we believe the investments we have made in our team and systems will start to pay off.

91. During the call, defendant Bloom stated the following:

We note improving metrics across all asset classes with the majority of the properties securing our loans realizing improved cash flow year-over-year and continuing to trend in an upward direction. In addition we are pleased to see that the majority of the asset-specific business plans across the portfolio are well on track and progressing towards the realization of borrowers' plans for value creation and the entire portfolio remains performing with no defaults.

92. The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By May 8, 2013, the date the above statements were made, Moody's had already

36

downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

93. On May 10, 2013, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2013 (the "May 10, 2013 10-Q"), which was signed by defendants Cohen and Bryant. The May 10, 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio. Specifically, the May 10, 2013 10-Q incorporated the "Risk Factors" disclosed in the 2012 10-K. While Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The May 10, 2013 10-Q (by incorporating the 2012 10-K) provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or

indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

94.     Defendants' statement above was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As of the date of the May 10, 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By May 10, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure (issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

95.     Similarly, in the May 10, 2013 10-Q, Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**
The Company uses a risk grading matrix to assign grades to commercial

real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31, 2013** | | | | | | |
| Whole loans | $ 497,052 | $ — | $ 53,362 | $ — | $ — | $ 550,414 |
| B notes | 16,293 | — | — | — | — | 16,293 |
| Mezzanine loans | 44,704 | — | 38,072 | — | — | 82,776 |
| | $ 558,049 | $ — | $ 91,434 | $ — | $ — | $ 649,483 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012.

96.     Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Remarkably, the $38.072 million in mezzanine loans represented by Defendants as "Rating 3" as of March 31, 2013, maintained the same rating on the Puerto Rico mezzanine loan position. Defendants caused Resource Capital to maintain its prior rating on the mezzanine loan, despite the forbearance agreement entered into by Blackstone, and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued. Indeed, Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to

determine the credit rating of Resource Capital's loan portfolio.  In addition, the May 10, 2013 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of March 31, 2013 and December 31, 2012."  Defendants represented this despite the fact that by May 10, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

97.    Similarly, the May 10, 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  Defendants should have disclosed Resource Capital's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

98.    Finally, the May 10, 2013 10-Q was misleading with respect to the Company's then-existing internal controls.  The May 10, 2013 10-Q was accompanied by SOX Certifications signed by defendants Cohen and Bryant, which set forth:

1. I have reviewed this report on Form 10-Q for the quarter ended March 31, 2013 of Resource Capital, Corp.;

2. Based on my knowledge, this report does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's

board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

99. The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio.

100. On August 7, 2013, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's second quarter 2013 financial performance. During the call, defendant Bloom stated the following:

Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes. The majority of the properties securing our loans are continuing to realize improved cash flow and we are seeing borrowers' plans for value creation on or ahead of budget. Once again I am pleased to report that the entire portfolio is performing with no defaults.

101. During the call, defendant Bryant stated the following:

Overall real estate credit has been excellent and to reiterate Jonathan's point, I characterize our bank loan portfolio credit as improving. Five bank loans totaling $12.6 million are delinquent out of a total portfolio of $1.1 billion and remarkably, all of our 49 real estate loans are current and performing.

102. The statements above were materially misleading because they omitted

and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By August 7, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

103. On August 9, 2013, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2013 (the "August 9, 2013 10-Q"), which was signed by defendants Cohen and Bryant. The August 9, 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio. Specifically, the August 9, 2013 10-Q incorporated the "Risk Factors" disclosed in the 2012 10-K. While Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2012 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The August 9, 2013 10-Q (by incorporating the 2012 10-K) provided the following risk disclosure:

Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.

We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

104. Defendants' statement above was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the August 9, 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn. By August 9, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure (issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

105. Similarly, in the August 9, 2013 10-Q, Defendants also materially

44

misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2013** | | | | | | |
| Whole loans | $ 553,333 | $ — | $ 55,374 | $ — | $ — | $ 608,707 |
| B notes | 16,265 | — | — | — | — | 16,265 |
| Mezzanine loans | 28,938 | — | 38,072 | — | — | 67,010 |
| | $ 598,536 | $ — | $ 93,446 | $ — | $ — | $ 691,982 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ — | 34,000 $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ — | 34,000 $ 667,051 |

All of the Company's commercial real estate loans were performing as of June 30, 2013 and December 31, 2012.

106.    Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Remarkably, the $38.072 million in mezzanine loans represented by the Company (under Defendants' direction and on their watch) as "Rating 3" as of June 30, 2013

maintained the same rating on the Puerto Rico mezzanine loan position. Defendants caused Resource Capital to maintain its prior rating on the mezzanine loan, despite the forbearance agreement entered into by Blackstone, and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued. Indeed, Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the August 9, 2013 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of June 30, 2013 and December 31, 2012." Defendants caused the Company to represent this despite the fact that by August 9, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

107. Similarly, the August 9, 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

46

108. The August 9, 2013 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of June 30, 2013:

**Troubled-Debt Restructurings**
The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended June 30, 2013:** | | | |
| Whole loans | — | $ — | $ — |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | — | $ — | $ — |
| | | | |
| **Three Months Ended June 30, 2012:** | | | |
| Whole loans | — | $ — | $ — |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | — | $ — | $ — |
| **Six Months Ended June 30, 2013:** | | | |
| Whole loans | 2 | $ 56,328 | $ 56,328 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 3 | $ 62,920 | $ 62,920 |
| | | | |
| **Six Months Ended June 30, 2012:** | | | |
| Whole loans | 3 | $ 92,912 | $ 76,597 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 4 | $ 100,709 | $ 84,394 |

_____

As of June 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

47

109.    Defendants' statements above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments was actually $41.1 million.  Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, Defendants caused the August 9, 2013 10-Q to actually give the impression that the quality of Resource Capital's mezzanine loan portfolio improved compared to the previous quarter, which disclosed a single TDR of $38.072 million.  This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by August 9, 2013.  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

110.    Finally, the August 9, 2013 10-Q was misleading with respect to the Company's then-existing internal controls. The August 9, 2013 10-Q was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which set forth:

> 1. I have reviewed this report on Form 10-Q for the quarter ended June 30, 2013 of Resource Capital, Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial

48

information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial

49

information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

111.  Defendants' statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio.

112.  On November 6, 2013, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's third quarter 2013 financial performance.  During the call, defendant Bloom stated the following:

We are improving metrics across all asset classes with the majority of the property securing our loans realizing improved cash flow on a year-over-year basis and continuing to trend in upward direction. In addition, we are pleased to see that the majority of the asset specific plans across the portfolio are well on track and progressing towards realization ultimately of the borrowers' plans for value creation and the entire portfolio remains performing with no defaults. We are very particular about markets in which we lend, sponsor quality and asset-specific business plans and the resilience of the assets I just described is a daily reminder that validates our keen focus on credit first approach to our business.

113.  During the call, defendant Bryant stated the following:

Overall, real estate credit has been excellent and I characterize the bank loan portfolio credit as very benign. Three bank loans totaling $3.6 million are delinquent out of a portfolio of approximately $940 million and remarkably, all of our real estate loans are current and performing.

114.  The statements above were materially misleading because they omitted

50

and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By November 6, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

115. On November 12, 2013, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2013 (the "November 12, 2013 10-Q"), which was signed by defendants Cohen and Bryant.

116. The November 12, 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio. Specifically, the November 12, 2013 10-Q incorporated the "Risk Factors" disclosed in the 2012 10-K. While Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, in the 2012 10-K, Defendants portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. Defendants caused the November 12, 2013 10-Q (by incorporating the

51

2012 10-K) to provide the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

117.    Defendants' statement above was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the November 12, 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn. By November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure (issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

118.    Similarly, Defendants also caused the November 12, 2013 10-Q to materially misrepresent the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

> The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.
>
> Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2013** | | | | | | |
| Whole loans | $ 591,105 | $ 44,943 | $ 32,067 | $ — | $ — | $ 668,115 |
| B notes | 16,238 | — | — | — | — | 16,238 |
| Mezzanine loans | 57,574 | — | — | — | — | 57,574 |
| | $ 664,917 | $ 44,943 | $ 32,067 | $ — | $ — | $ 741,927 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

> All of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012.

119.    Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Notably, the November 12, 2013 10-Q represented and categorized all of the Company's mezzanine loan portfolio under its best credit risk category, Rating 1.

Defendants represented this despite the fact that by November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio. Defendants represented this despite the fact that by November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

120.    Similarly, the November 12, 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

121.    In the November 12, 2013 10-Q, Defendants also misrepresented

54

Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of September 30, 2013:

### Troubled-Debt Restructurings

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Three Months Ended September 30, 2013:** | | | | |
| Whole loans | 2 | $ | 48,374 | $ | 52,716 |
| B notes | — | | — | | — |
| Mezzanine loans | — | | — | | — |
| Bank loans | — | | — | | — |
| Loans receivable - related party | — | | — | | — |
| Total loans | 2 | $ | 48,374 | $ | 52,716 |
| | | | | |
| **Three Months Ended September 30, 2012:** | | | | |
| Whole loans | 2 | $ | 42,550 | $ | 42,550 |
| B notes | — | | — | | — |
| Mezzanine loans | 1 | | 38,072 | | 38,072 |
| Bank loans | — | | — | | — |
| Loans receivable | — | | — | | — |
| Loans receivable - related party | — | | — | | — |
| Total loans | 3 | $ | 80,622 | $ | 80,622 |
| **Nine Months Ended September 30, 2013:** | | | | |
| Whole loans | 4 | $ | 104,702 | $ | 109,044 |
| B notes | — | | — | | — |
| Mezzanine loans | — | | — | | — |
| Bank loans | — | | — | | — |
| Loans receivable - related party | 1 | | 6,592 | | 6,592 |
| Total loans | 5 | $ | 111,294 | $ | 115,636 |
| | | | | |
| **Nine Months Ended September 30, 2012:** | | | | |
| Whole loans | 5 | $ | 168,708 | $ | 151,422 |
| B notes | — | | — | | — |
| Mezzanine loans | 1 | | 38,072 | | 38,072 |
| Bank loans | — | | — | | — |
| Loans receivable | — | | — | | — |
| Loans receivable - related party | 1 | | 7,797 | | 7,797 |
| Total loans | 7 | $ | 214,577 | $ | 197,291 |

As of September 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

122.    Defendants' statements above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the

Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As Defendants disclosed on August 5, 2015, the loan loss allowance for the Company's Puerto Rican investments was actually $41.1 million. Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the November 12, 2013 10-Q actually gave the impression that quality of Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million. This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by November 12, 2013. Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

123. Finally, the November 12, 2013 10-Q was misleading with respect to the Company's then-existing internal controls. The November 12, 2013 10-Q was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which set forth:

> 1. I have reviewed this report on Form 10-Q for the quarter ended September 30, 2013 of Resource Capital, Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the

registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

57

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

124. The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio.

125. On February 26, 2014, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's fourth quarter and full year 2013 financial performance. During the call, defendant Bryant stated the following:

> We added 700,000 to our real estate loan reserve primarily for our previously impaired loan. Overall, real estate credit has been excellent and I characterized our bank loan portfolio as very benign. Three bank loans totaling $3.6 million are delinquent out of a portfolio of $580 million and all 57 of our real estate loans are current and performing.

126. The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By February 26, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the

58

Mezzanine Loan.  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

127.    On March 3, 2014, Defendants caused Resource Capital to file an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2013 (the "2013 10-K"), which was signed by defendants Cohen, Bryant, Blackwell, Kessler, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff and Wiggins.

128.    The 2013 10-K (issued under Defendants' direction and on their watch) was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio.   While Defendants admitted in the 2013 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis.  Furthermore, in the 2013 10-K, Defendants portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby failing to disclose any exposure to the Puerto Rican economic crisis.  The 2013 10-K provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make

distributions.

129.    Defendants also caused the 2013 10-K to contain the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to the Puerto Rico economy:



**Geographic Area by State**

130.    The 2013 10-K's Management Discussion and Analysis section (issued under Defendants' direction and on their watch) contained the following statement, which similarly misrepresented Resource Capital's real estate-related assets as being solely located in the United States, and that all necessary provisions for loan loss and impairments had been made by the Company:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. Over a

period of several years, we entered into loan modifications with respect to 17 of our outstanding commercial real estate loans. During the past three years, we have added to our provision for loan losses to reflect the effect of these conditions on our borrowers and have recorded both temporary and other than temporary impairments in the market valuation of CMBS and ABS in our investment portfolio. However, during 2012 and into December 31, 2013, the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly for 2013. We expensed provisions of $3.0 million for the year ended December 31, 2013 as compared to provisions of $16.8 million for the year ended December 31, 2012. Our asset impairments have increased slightly, we recognized asset impairments of $863,000 for the year ended December 31, 2013 as compared to $180,000 for the year ended December 31, 2012. We also saw a marked improvement in other comprehensive income with respect to our available for sale securities portfolio and interest rate derivatives, which declined to a loss of $14.0 million at December 31, 2013 from a loss of $27.1 million at December 31, 2012. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2013, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

131. The statements above were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. Not only did Defendants cause Resource Capital's 2013 10-K to completely withhold the fact that the Company was even invested in Puerto Rico, but as disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the 2013 10-K, Puerto Rico was in the midst of a historic economic downturn. By March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure

(issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

132.    Similarly, in the 2013 10-K, Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

> **Commercial Real Estate Loans**
> We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.
>
> Credit risk profiles of commercial real estate loans were as follows (in thousands):

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
|  | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
|  | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

> All of our commercial real estate loans were performing as of December 31, 2013 and 2012.

133.    Defendants' statements above were false and misleading because they

mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, in the 2013 10-K, Defendants represented and categorized all of the Company's mezzanine loan portfolio under its best credit risk category, Rating 1. Defendants represented this despite the fact that by March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio. Defendants represented this despite the fact that by March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations", and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

134. Similarly, the 2013 10-K also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it

was likely to (and did) have a negative material impact on the Company's operations.

135.    The 2013 10-K also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of December 31, 2013:

**Troubled-Debt Restructurings**
The following tables show troubled-debt restructurings in our loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Year Ended December 31, 2013:** | | | | |
| Whole loans | 5 | $ | 143,484 | $ 147,826 |
| B notes | — | | — | — |
| **Mezzanine loans** | — | | — | — |
| Bank loans | — | | — | — |
| Residential mortgage loans | — | | — | — |
| Loans receivable - related party | 1 | | 6,592 | 6,592 |
| Total loans | 6 | $ | 150,076 | $ 154,418 |
| | | | | |
| **Year Ended December 31, 2012:** | | | | |
| Whole loans | 6 | $ | 143,261 | $ 126,946 |
| B notes | — | | — | — |
| Mezzanine loans | 1 | | 38,072 | 38,072 |
| Bank loans | — | | — | — |
| Loans receivable - related party | 1 | | 7,797 | 7,797 |
| Total loans | 8 | $ | 189,130 | $ 172,815 |

As of December 31, 2013 and 2012, there were no troubled-debt restructurings that subsequently defaulted.

136.    Defendants' statements above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As Defendants caused the Company to disclose on August 5, 2015, the loan loss allowance for its Puerto Rican investments was actually $41.1 million.  Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the 2013 10-K actually gave the impression that the quality of

Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million.  This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by March 3, 2014. Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

137.    Finally, the 2013 10-K was misleading with respect to the Company's then-existing internal controls. The 2013 10-K was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which set forth:

1. I have reviewed this report on Form 10-K for the year ended December 31, 2013 of Resource Capital Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

65

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

138.    The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the

66

performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio.

139.    On March 13, 2014, defendant Bloom, the Company's Senior Vice President for Commercial Real Estate, filed a Form 4 with the SEC disclosing the sale of Resource Capital stock. The Form 4 disclosed that on March 11, 2014, Mr. Bloom sold 29,000 shares of Resource Capital stock at prices ranging from $5.78 per share to $5.80 per share.  The Form 4 further disclosed that on March 12, 2014, defendant Bloom sold an additional 8,165 shares of Resource Capital stock at prices ranging from $5.76 per share to $5.79 per share.  These sales took place at prices that were nearly double the $2.97 per share to which Resource Capital stock fell following the truth publicly emerging.  Accordingly, by selling when he did, defendant Bloom effectively inflated his proceeds by more than 48%.

140.    Defendant Bloom's stock sales were irregular and atypical in terms of timing and size and, therefore, indicative of scienter.  First, these sales followed by mere weeks the three major credit rating agencies' downgrade of Puerto Rican debt, and only one week after the filing of the materially misleading 2013 10-K.  Second, prior to defendant Bloom's sale on March 11, 2014, he had not sold a single share of Resource Capital stock in the prior three years.  Third, in the aggregate, the transactions represented a sale of 20% of defendant Bloom's vested shares, or more than 11% of his total holdings in the Company.  As the Company's Senior Vice President for Real Estate Investments, and a key spokesperson for the Company on matters relating to the value of its commercial real estate loan portfolio, defendant Bloom was in a position to understand the effects of the Puerto Rican economic crisis on Resource Capital's mezzanine loans

backed by certain Puerto Rican hotels, perhaps better than anyone else at the Company. Indeed, as Senior Vice President for Real Estate Investments, defendant Bloom was responsible for the Company's quarterly evaluations for loan loss impairments, and most often affirmed his commitment to "credit quality." Defendant Bloom's access to information pertaining to the mezzanine loan at issue, along with his material insider sale of stock, is highly suspicious.

141. On May 7, 2014, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's first quarter 2014 financial performance. During the call, defendant Cohen stated the following:

Our credit quality continues to be very solid, our real estate watch-list is shrinking and we reverse $4.6 million of the specific allowance in the first quarter as a result of the pending sale by the borrower on the property of a legacy the whole loan that will pay down the existing balance and further reduce our legacy loan portfolio.

142. During the call, defendant Bloom stated the following:

Credit across the portfolio continues to trend in very positive direction, with improving metrics across all assets classes. The majority of the properties securing our loans are continuing to realize improved cash flow and receiving borrower's plans for value creation well on or ahead of track. Once again, I'm pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.

143. The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By May 7, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was

68

actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Additionally, as of May 1, 2014, Fitch Ratings downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

144. On May 9, 2014, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2014 (the "May 9, 2014 10-Q"), which was signed by defendants Cohen and Bryant.

145. In the May 9, 2014 10-Q, Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

> **Commercial Real Estate Loans**
> The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.
>
> Credit risk profiles of commercial real estate loans were as follows (in thousands):

69

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31 2014** | | | | | | |
| Whole loans | $ 768,243 | $ 32,500 | $ 33,110 | $ — | $ — | $ 833,853 |
| B notes | 16,168 | — | — | — | — | 16,168 |
| Mezzanine loans | 51,832 | 12,467 | — | — | — | 64,299 |
|  | $ 836,243 | $ 44,967 | $ 33,110 | $ — | $ — | $ 914,320 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
|  | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013.

146.    Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.    Incredibly, the May 9, 2014 10-Q represented and categorized all of the Company's mezzanine loan portfolio under its best credit risk category, Rating 1. Defendants represented this despite the fact that by May 9, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

147.    Similarly, in the 2013 10-K, Defendants also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican

economic crisis. 17 C.F.R. §229.303(a)(3)(i).    Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

148.    In the May 9, 2014 10-Q, Defendants also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of March 31, 2014:

**Troubled-Debt Restructurings**
The Company had no troubled-debt restructurings during the three months ended March 31, 2014.

The following table shows troubled-debt restructurings in the Company's loan portfolio (in thousands) during the three months ended March 31, 2013:

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| Whole loans | 6 | $ 153,958 | $ 136,672 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 8 | $ 199,827 | $ 182,541 |

As of March 31, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.

149.    Defendants' statements above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As Defendants disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments alone was actually $41.1 million.    Moreover, by misrepresenting the

Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the May 9, 2014 10-Q actually gave the impression that the quality of Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million. In addition, in the May 9, 2014 10-Q, Defendants misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company did not receive any interest income (other than on an accrual basis) since September 2012. Defendants represented this despite the fact that by May 9, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

150. Finally, in the May 9, 2014 10-Q, Defendants issued misleading statements with respect to the Company's then-existing internal controls. The May 9, 2014 10-Q was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which set forth:

> 1. I have reviewed this report on Form 10-Q for the quarter ended March 31, 2014 of Resource Capital Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

72

statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

151. The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio.

152. On August 6, 2014, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's second quarter 2014 financial performance.  During the call, defendant Bloom stated the following:

> We also note improving credit metrics across all asset classes represented in our commercial real estate portfolio. The majority of the properties securing our loans are continuing to realize improved cash flow with borrowers plans for value creation well on track. I'm once, again, pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.

153. During the call, defendant Bryant stated the following:

> Only one bank loan for $1.6 million is delinquent out of a portfolio of $765 million and again all of our real estate loans totaling $1,00,043,000 are current. Our leverage stands at 1.7 times at June 30. When we treat our TruPs issuances which have a remaining term of approximately 22 years as equity, our leverage is 1.6 times.

154. The statements above were materially misleading because they omitted

74

and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By August 6, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

155. On August 8, 2014, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2014 (the "August 8, 2014 10-Q"), which was signed by defendants Bryant and Blackwell.

156. The August 8, 2014 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio. Specifically, the August 8, 2014 10-Q incorporated the "Risk Factors" disclosed in the 2013 10-K. While Defendants admitted in the 2013 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, in the 2013 10-K, Defendants portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby failing to disclose any exposure to the Puerto Rican economic crisis. The August 8, 2014 10-Q (by incorporating the 2013 10-K), provided the following risk disclosure:

75

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

157.    The statement above was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the August 8, 2014 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio. Accordingly, Resource Capital's risk disclosure (issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican

investments had already materially negatively impacted the Company's financial position.

158.     The August 8, 2014 10-Q also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which failed to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**
The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2014** | | | | | | |
| Whole loans | $ 900,246 | $ 32,500 | $ 22,000 | $ — | $ — | $ 954,746 |
| B notes | 16,138 | — | — | — | — | 16,138 |
| Mezzanine loans | 45,460 | 21,800 | — | — | — | 67,260 |
| | $ 961,844 | $ 54,300 | $ 22,000 | $ — | $ — | $ 1,038,144 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were current as of June 30, 2014 and December 31, 2013.

159.     Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican

assets.  Incredibly, in the August 8, 2014 10-Q, Defendants represented and categorized all of the Company's mezzanine loan portfolio under the Company's best credit risk category, Rating 1. Defendants characterized the portfolio in this way despite the fact that by August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

160.    Similarly, the August 8, 2014 10-Q also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

161.    The August 8, 2014 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of June 30, 2014:

> **Troubled-Debt Restructurings**
> The Company had no troubled-debt restructurings during the three months

ended June 30, 2014 and 2013, or during the six months ended June 30, 2014.

The following table shows troubled-debt restructurings in the Company's loan portfolio during the six months ended June 30, 2013 (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Six Months Ended June 30, 2013** | | | | |
| Whole loans | 2 | $ | 56,328 | $ 56,328 |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Residential mortgage loans | — | | — | — |
| Loans receivable - related party | 1 | | 6,592 | 6,592 |
| Total loans | 3 | $ | 62,920 | $ 62,920 |

As of June 30, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.

162.   Defendants' statements above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As Defendants disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments alone was actually $41.1 million.  In addition, the August 8, 2014 10-Q misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company had not received any interest income (other than on an accrual basis) since September 2012.  Defendants represented this despite the fact that by August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1,

2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

163. Finally, the August 8, 2014 10-Q was misleading with respect to the Company's then-existing internal controls. The August 8, 2014 10-Q was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which set forth:

> 1. I have reviewed this report on Form 10-Q for the quarter ended June 30, 2014 of Resource Capital Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally

80

accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

164. The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio.

165. On November 4, 2014, Defendants caused Resource Capital to hold a

81

conference call with stock analysts to discuss the Company's third quarter 2014 financial performance.  During the call, defendant Bloom stated, "I'm once again pleased to report that the entire commercial real estate portfolio is performing with no defaults."  Further, defendant Bryan stated "two bank loans for $2.3 million are delinquent out of a portfolio of $712 million, just 32 basis points, and all of our 65 real estate loans totaling $1.1 billion are current."

166.   The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By November 4, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

167.   On November 10, 2014, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2014 (the "November 10, 2014 10-Q"), which was signed by defendants Bryant and Blackwell.

168.   The November 10, 2014 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio.  Specifically, the November 10, 2014 10-

Q incorporated the "Risk Factors" disclosed in the 2013 10-K. While the 2013 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2013 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The November 10, 2014 10-Q (by incorporating the 2013 10-K) provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

169. The statement above was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the November 10, 2014 10-Q, Puerto Rico was already experiencing a historic economic downturn. By November 10, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment

obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio. Accordingly, Defendants' risk disclosure failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

170. In the November 10, 2014 10-Q, Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

> **Commercial Real Estate Loans**
> The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers factors such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.
> Credit risk profiles of commercial real estate loans were as follows (in thousands):

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2014** | | | | | | |
| Whole loans | $ 990,471 | $ 32,500 | $ — | $ — | $ — | $ 1,022,971 |
| B notes | 16,107 | — | — | — | — | 16,107 |
| Mezzanine loans | 45,447 | 21,858 | — | — | — | 67,305 |
| | $ 1,052,025 | $ 54,358 | $ — | $ — | $ — | $ 1,106,383 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were current as of September 30, 2014 and December 31, 2013.

171. Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the November 10, 2014 10-Q represented and categorized mezzanine loans involving Puerto Rican assets under its best credit risk category, Rating 1, despite the forbearance agreement entered into by Blackstone, and the fact that the Company stopped receiving cash income from the loan in September 2012, two years prior, as interest merely accrued. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the November 10, 2014 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were current as of September 30, 2014 and December 31, 2013", despite the fact that the Company stopped receiving cash income from the loan in September 2012. Defendants characterized the portfolio in this way despite the fact that by November 10, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it

85

was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

172. Similarly, the November 10, 2014 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

173. Finally, the November 10, 2014 10-Q was misleading with respect to the Company's then-existing internal controls. The November 10, 2014 10-Q was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which set forth:

> 1. I have reviewed this report on Form 10-Q for the quarter ended September 30, 2014 of Resource Capital Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's

87

internal control over financial reporting.

174.    The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio.

175.    On February 26, 2015, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's fourth quarter and full-year 2014 financial performance.  During the call, defendant Bloom stated the following:

> We will continue to utilize our $600 million term financing facilities to support the growth of our new loan originations and we plan to access the CLO market to optimally match-fund our assets on a regular basis. We note improving credit metrics across all asset classes represented in our commercial real estate loan portfolio, the majority of the properties securing our loans continuing to realize improved cash flow with borrowers' plans for value creation well on track. I am once again pleased to report the entire commercial real estate portfolio is performing with no defaults.

176.    During the call, defendant Bryant stated the following:

> Two bank loans $1.4 million are delinquent out of a portfolio of $323 million, 41 basis points and all 78 of our real estate loans are current. Of note, for Q4 we were able to sell off two remaining real estate properties for gains of $3.2 million bringing 2014 gains to $6.1 million.

177.    The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By February 26, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its

servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

178.   On March 2, 2015, Defendants caused Resource Capital to file the 2014 10-K, which was signed by defendants Cohen, Bryant, Blackwell, Kessler, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff and Wiggins. The 2014 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan portfolio. While Defendants admitted in the 2014 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2014 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The 2014 10-K provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our

89

investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

179.    The 2014 10-K also contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to the Puerto Rico economy:



180.    Defendants caused the 2014 10-K's Management Discussion and Analysis section to contain the following statement, which similarly misrepresented Resource Capital's real estate-related assets as being solely located in the United States, and that all necessary provisions for loan loss and impairments had been made by the Company:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. Over a period of several years, we entered into loan modifications with respect to 14 of our remaining outstanding commercial real estate loans. During the past 21 months, we have adjusted our provision for loan losses to reflect the effect of these conditions on our borrowers as well as, where necessary, market-related temporary adjustments to the market valuations of both CMBS and ABS in our investment portfolio. However, during 2013 and continuing through December 31, 2014, the improved economic

conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly in 2014. For the year ended December 31, 2014, we have a net recovery in the provision for loan losses of $1.8 million, primarily due to the successful refinancing of a commercial real estate loan position on which we had previously established a significant reserve for credit loss. Also, other comprehensive income saw an increase of $20.1 million at December 31, 2014. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2014, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

181.    Defendants' statements above were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the 2014 10-K, Puerto Rico was already experiencing a historic economic downturn. By March 2, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Further, Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio. Accordingly, Defendants' risk disclosure failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

91

182.   Similarly, in the 2014 10-K, Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We value loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |
| | | | | | | |
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of our commercial real estate loans were performing as of December 31, 2014 and 2013.

183.   Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.   Incredibly, the 2014 10-K represented and categorized all of the Company's mezzanine loans involving Puerto Rican Assets under its best credit risk category, Rating

1.    Defendants represented this despite the forbearance agreement entered into by Blackstone, and the fact that the Company stopped receiving cash income from the loan in September 2012, as interest merely accrued.  Indeed, Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the 2014 10-K was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of December 31, 2014 and December 31, 2013."  Defendants characterized the loan portfolio in this way, despite the fact that by March 2, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

184.    Similarly, the 2014 10-K also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it

was likely to (and did) have a negative material impact on the Company's operations.

185.   Finally, the 2014 10-K was misleading with respect to the Company's then-existing internal controls. The 2014 10-K was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which set forth:

1. I have reviewed this report on Form 10-K for the year ended December 31, 2014 of Resource Capital, Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such

94

evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

186.    The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio.

187.    On May 6, 2015, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's first quarter 2015 financial performance.  During the call, defendant Bloom stated the following:

I am once again pleased to report that the entire commercial real estate loan portfolio is performing with no defaults. The broader real estate recovery has taken hold and we remain optimistic about fundamentals, but are cautiously on the lookout for markets that we feel are outpacing

normal sustainable growth. The positive performance of our portfolio is a daily reminder that validates the credit first approach to lending and selectivity we apply to markets, asset classes and sponsors in our origination process.

188.    During the call, defendant Bloom stated the following:

We ended the period with $4 million in commercial real estate allowances and $3.2 million in commercial financial allowances. With the lone exception of the one specific middle market position that began impaired our credit has been very good. One bank loan where a mere $251,000 is delinquent out of a portfolio of $298 million, all of our middle market loans are current and as Dave Bloom mentioned, all 79 of our real estate loans totaling $1.5 billion are current.

189.    The statements above were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By May 6, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."   Ultimately, Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

190.    On May 11, 2015, Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2015 ("May 11, 2015 10-Q"), which was signed by defendants Bryant and Blackwell.  The May 11, 2015 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rico economy within its commercial real estate loan

portfolio. Specifically, the May 11, 2015 10-Q incorporated the "Risk Factors" disclosed in the 2014 10-K. While the 2014 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, in the 2014 10-K, Defendants portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The May 11, 2015 10-Q (by incorporating the 2014 10-K) provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

191.    The statement above was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the May 11, 2105 10-Q, Puerto Rico was already experiencing a historic economic downturn. By May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a

forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio. Accordingly, Resource Capital's risk disclosure (issued under Defendants' direction and on their watch) failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

192.    In the May 11, 2015 10-Q, Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**
The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31, 2015** | | | | | | |
| Whole loans | $ 1,329,882 | $ 32,500 | $ — | $ — | $ — | $ 1,362,382 |
| B notes | 16,031 | — | — | — | — | 16,031 |
| Mezzanine loans | 45,417 | 22,054 | — | — | — | 67,471 |
| | $ 1,391,330 | $ 54,554 | $ — | $ — | $ — | $ 1,445,884 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |

All of the Company's commercial real estate loans were current as of March 31, 2015 and December 31, 2014.

193. Defendants' statements above were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the May 11, 2015 10-Q represented and categorized all of the Company's mezzanine loan portfolio under its best credit risk category, Rating 1. Defendants misrepresented this fact despite the forbearance agreement entered into by Blackstone, and the fact that the Company stopped receiving cash income from the loan in September 2012, as interest merely accrued. Indeed, Defendants specifically caused the Company to note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the May 11, 2015 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were current as of March 31, 2015 and December 31, 2014." Defendants characterized the portfolio in this way despite the fact that by May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold.

99

194.    Similarly, the May 11, 2015 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

195.    In the May 11, 2015 10-Q, Defendants also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of March 31, 2015:

**Troubled-Debt Restructurings**
The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

|  | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended March 31, 2015:** | | | |
| Whole loans | 2 | $ 67,459 | $ 67,459 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Middle market loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $ 67,459 | $ 67,459 |

The Company had no troubled-debt restructurings during the three months ended March 31, 2014. As of March 31, 2015 and 2014, there were no commercial real estate loan troubled-debt restructurings that subsequently defaulted.

196.    Defendants' statements above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, the existence of a troubled-debt restructuring in the Company's mezzanine loan portfolio, and the actual amounts that the Company would be able to recover from its real estate loan investments.

As disclosed on August 5, 2015, the loan loss allowance for Resource Capital's Puerto Rican investments alone was actually $41.1 million.  Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the May 11, 2015 10-Q actually gave the impression that the quality of Resource Capital's mezzanine loan portfolio improved compared to the previous quarter, which disclosed a single TDR of $38.072 million.  In addition, in the May 11, 2015 10-Q, Defendants misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company did not receive any interest income (other than on an accrual basis) since September 2012.  Defendants represented this despite the fact that by May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

197.    Finally, the May 11, 2015 10-Q was misleading with respect to the Company's then-existing internal controls.  The May 11, 2015 10-Q was accompanied by SOX Certifications, signed by defendants Cohen and Bryant, which stated:

> 1. I have reviewed this report on Form 10-Q for the quarter ended March 31, 2015 of Resource Capital Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based

on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

198.     The statements above were materially false and misleading in that they contained certifications as to: (i) the quality of the Company's internal controls, despite their failure; and (ii) the completeness of the disclosures, despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio.

### E.     The False and Misleading Proxies

199.     In addition to the above false and misleading statements issued and/or caused to be issued by Defendants, Defendants likewise caused the Company to issue numerous false and misleading proxy statements, which sought shareholder votes for, *inter alia*, director re-election and executive compensation policies.

200.     For instance, on April 16, 2014, Defendants caused Resource Capital to file with the SEC and disseminate to shareholders, a Proxy Statement on Form DEF 14A (the "2014 Proxy") in connection with the Company's annual shareholder meeting. Defendants drafted, approved, reviewed and/or signed the 2014 Proxy before it was filed

103

with the SEC and disseminated to Resource Capital's shareholders. Defendants knew, or were deliberately reckless in not knowing, that the 2014 Proxy was likewise materially false and misleading.

201.    Among other things, the 2014 Proxy sought shareholder approval for the election of directors, the adoption of the Resource Capital Corp. Amended and Restated Omnibus Equity Compensation Plan, and an advisory vote on compensation for certain of the Company's executive officers (including certain of the Defendants named herein).

202.    With respect to the compensation of the Company's executives, the 2014 Proxy set forth the following:

> ***For 2013, our Compensation Committee approved the awards discussed below, based upon our performance and the individual performance of our NEOs.*** Among the factors considered by our Compensation Committee were our continued growth, expansion of business units, distributions to our shareholders and our ability to raise and deploy capital. Our Compensation Committee considered these stock awards in addition to considering the total compensation that Resource America proposed for our NEOs. [Emphasis added.]

203.    Defendants' statements in the 2014 Proxy, which touted a purported pay-for-performance policy were false and misleading because they failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2014 Proxy was issued, the Puerto Rico Mezzanine Loan was already impaired, and the Company's purported financial performance (issued under Defendants' direction and on their watch) that the executive compensation was based upon was materially misstated.

204.    Further, the 2014 Proxy was false and misleading because Defendants omitted any disclosures reflecting the known and already emerged financial risks associated with the Mezzanine Loan, or the fact that the Company would need to record an allowance for loan loss on the Mezzanine Loan.

104

205.    On April 23, 2015, Defendants caused Resource Capital to disseminate to shareholders and file with the SEC, a Proxy Statement on Form DEF 14A (the "2015 Proxy") in connection with the Company's annual shareholder meeting.  Defendants drafted, approved, reviewed and/or signed the 2015 Proxy before it was filed with the SEC, and was disseminated to Resource Capital shareholders.  Among other things, the 2015 Proxy sought a shareholder vote on the election of directors.  Defendants knew, or were deliberately reckless in not knowing, that the 2015 Proxy was likewise materially false and misleading.

206.    The 2015 Proxy was false and misleading because Defendants omitted any disclosures reflecting the known and already emerged financial risks associated with the Mezzanine Loan, or the fact that the Company would need to record an allowance for loan losses on the Mezzanine Loan.

207.    Collectively, the 2014 Proxy and the 2015 Proxy are referred to hereinafter as the "Proxies".  As set forth above, the Proxies were false and misleading when issued.

### F.    The Truth Emerges

208.    After several years of failing to disclose Resource Capital's exposure to the Puerto Rican economy, and the true credit risk profile of its mezzanine loan portfolio (all occurring under Defendants' direction and on their watch), Defendants finally revealed the truth about Resource Capital's hidden investments in August 2015.

209.    The truth first began to emerge on August 4, 2015, after the market closed, when Defendants caused Resource Capital to announce its financial results for the quarter ended June 30, 2015.  Defendants caused the Company to disclose a GAAP net loss of

$31.0 million during the quarter.  Contributing to the net loss, indeed the cause thereof, was the Company's recording of an allowance for loan losses on a mezzanine loan position of $41.1 million in total.  As disclosed in the August 4, 2015 press release, "[t]he last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved."

210.    On August 5, 2015, Defendants caused Resource Capital to hold a conference call with stock analysts to discuss the Company's second quarter 2015 earnings.  During the call, certain of the Defendants addressed the Puerto Rico mezzanine loan position.  Defendant Cohen discussed the Puerto Rico mezzanine loan, its impact, and described the Company's acquisition of the position:

> [A] legacy mezzanine loan that we purchased in 2007, one of the last two mezzanine positions in our portfolio deteriorated suddenly due to its exposure to Puerto Rico and we were forced to impair that asset. We stopped investing in this type of loan in 2007 and the remaining mezzanine loan in our portfolio is a very good credit, a $7 million position secured by property in New York City and we expected to pay off within the next 18 months. This impairment causes our book value to decrease to $4.56 leaving us trading at approximately 78% of GAAP book value.

> *        *        *

> Obviously a large and very disappointing element of our result this quarter was the loan loss reserve that we recognize on our position in a mezzanine loan whose borrower is an affiliate of one of the world's largest private equity firms. The loan we impair was one where we had a small percentage of a subordinated mezzanine position in a complicated multi-tranche $2.8 billion transaction that financed luxury hotels.

> Our investment was purchased in 2007 as a very well capitalized and committed borrower went through several restructurings over the years to provide a runway for the borrower to complete its business plan and we expected to be paid off when that happens.

> But the last three assets are in Puerto Rico. The borrower's ability to

106

favorably refinance its senior loans was impacted by economic and credit conditions in Puerto Rico and the new loan which closed in May meaningfully reduced the borrower's time to achieve its plan. On such a highly leveraged transaction even small changes in value can have a large impact on the subordinated tranches which unfortunately is where we were.

Accordingly we have fully reserved for it.

211. Later in the call, defendant Bloom discussed the Puerto Rico mezzanine loan position further, acknowledging that the position essentially provided no benefit to the Company since September 2012:

Jonathan addressed the specific reserve that we took this quarter on a mezzanine loan that was part of a very large multi-tranche financing that included a $1.3 billion first mortgage and $625 million of mezzanine debt split into eight tranches, many with multiple participants and over $830 million of borrower act equity into the transaction. It's important to note that this loan dates back to mid-2007 and was restructured and amended in 2012 and since that time, interest was on an accrual basis, so it has not contributed to our income since September of 2012 in any meaningful way.

Pursuant to the terms of the extension the loan has not come due, nor is it in default, that said in the ordinary course of closing our quarters we review all of our loan positions and after a review of the subject transaction the determination was made to impair the position in the current quarter as we have serious doubts about the ultimate collectability of the loan upon maturity. That said, markets can change suddenly and with almost a year until the loan matures, no one can be absolutely certain about the ultimate resolution of this impaired loan.

By way of brief history RSO's commercial real estate business plan has always been to directly originate, floating rate whole loans unlikely transitional properties across the country. Having commenced operations in mid-2005 during the time that we were building out our national origination team, we still recognized relative value in certain mezzanine loans and B note investments. Markets were extremely liquid and the majority of these subject positions paid off in relatively short order, that said we were always cognizant of the fact that multi-tranche debt transactions involved other lenders which results in a lack of unilateral control should a problem arise.

212. During the question-and-answer portion of the call, defendants Cohen and

107

Bloom engaged in a discussion with Steve Delaney ("Delaney"), an analyst from JMP Securities, relating to the Puerto Rico mezzanine loan position, and recognized the previously undisclosed risk associated with a mezzanine loan secured by real estate located in the embattled Commonwealth of Puerto Rico, as follows:

DeLaney:
Good morning John. I know this is a tough call for you guys and I appreciate you stepping up addressing the stock situation right upfront for us. Thank you. I'd like to clarify for starters not that -- we'll come back to those large mez loans but at March you were carrying 67.5 million of mez loans with the 38 million impaired suggesting maybe 29 million to 30 million of other mez loans. Now I wanted to compare that you mentioned there was one remaining of 7 million in New York. Can you just clarify what is left in the mez bucket beyond this hotel loan?

Defendant Bloom:
Steve, this is Dave, let me reconcile that for you. So you're right it was 67 less 38 gets you to about 29, about 13 paid off in Q2 on one position. And another nine or nine and half paid off in July right after the quarter ended. So that's why we're now left with little over seven from that one position.

DeLaney:
That's helpful. Appreciate you clarifying that and the characteristics of the remaining seven and look we recognize you guys have done an amazing job over last two or three years just shedding mez where you could and just getting back to the large problematic loan. I guess it sounds like to me that it was a combination of both the structure, the original loan structure, and what became sort of an idiosyncratic situation with respect to what you ended up with as residual credit, and that's really the only question I have is you started off with 13 loans and it sounds like you're ending up with three loans that are, happen to be in Puerto Rico, you used the term the last loans. So help me understand as payoffs were made collateral was released; did you benefit from any of the pay down as these other 10 hotel properties were sold or did all that cash flow go to senior tranches. Let's start there?

Defendant Bloom:
To be clear the priority of payment is sequential so the senior loan is retired first and then tranches of mezzanine loan are retired in a specific order after that.

DeLaney:
Yeah, that's, that's what was going through my mind. So, you end up

going from, it's almost like adverse selection. The most liquid properties I guess, go out first and as a subordinate investor you're kind of left with, you're really lending on the weaker loans in the pool I guess and you acknowledge that that was the weakness in that structure and one reason why you guys ceased doing that business. Okay, so and just to be clear there is three hotels left and they're all in Puerto Rico. Correct?

Defendant Bloom:
There are now two, they are all in Puerto Rico.

DeLaney:
So let me suggest this and maybe other analysts will have questions after this, but just a thought, this is very complicated. I think look, there is a $0.31 hit to book that's all fine, we know you're not in this business, I think investors will like to make their own decision about the possibility of any type of recovery, it can't hurt you any more now, right? But a thought I had is -- because it is so detailed and involved, I think people might want to know, how many room keys, what RevPAR, would you at least consider, and you don't have to answer this, but I'm going to suggest that you consider putting in information piece together on the two loans or whatever you can disclose publicly and maybe put that out on an 8-K, and then sophisticated real estate investors can kind of draw their own conclusions as to whether there is any possibility of a recovery or what would have to develop, so just a suggestion there if I may.

Defendant Cohen:
This is Jonathan and thank you Steve and we will take that under consideration.

DeLaney:
You are very welcome. When you have these legacy situations, John, where you could end up in effect with a $40 million credit loss, is there any reach back on prior incentive fees that may have been paid, is there any adjustment to that for the benefit of shareholders, how would you and the Board address that if this becomes a real loss?

Defendant Cohen:
Well first of all we haven't, unfortunately for us made very many incentive fees over the years. So I don't think there is many to reach back to but obviously when it becomes real loss it goes into that calculation.

213.    On August 7, 2015, Defendants caused Resource Capital to file its quarterly report on Form 10-Q for the quarter ended June 30, 2015 (the "August 7, 2015 10-Q"). The August 7, 2015 10-Q included the following disclosure, which finally

acknowledged: (i) the Company's exposure to the Puerto Rican economy through its mezzanine loan position; and (ii) the extent of the credit risk to the Company's mezzanine loan portfolio:

> During the quarter ended June 30, 2015, the Company recorded an allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. An impairment analysis showed that the fair value of the underlying collateral declined from that as of March 31, 2015. Contributing to this decline was a modification of the senior mortgage that accelerated the time horizon for disposing of the three remaining properties collateralizing the loan. Compounding this fact, the remaining three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that realizable values had declined rapidly and that the troubled debt restructuring should be fully reserved as of June 30, 2015.
>
> Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2015** | | | | | | |
| Whole loans | $1,467,901 | $ 32,500 | $ — | $ 2,202 | $ — | $1,502,603 |
| B notes | 15,997 | — | — | — | — | 15,997 |
| Mezzanine loans | 16,750 | — | — | 38,072 | — | 54,822 |
| | $1,500,648 | $ 32,500 | $ — | $ 40,274 | $ — | $1,573,422 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $1,231,092 | $ 32,500 | $ — | $ — | $ — | $1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $1,292,596 | $ 54,434 | $ — | $ — | $ — | $1,347,030 |

> The Company had no delinquent commercial real estate loans as of June 30, 2015 and December 31, 2014.

214.   Notably, Defendants again changed the language used in connection with this disclosure—the August 7, 2015 10-Q stated that "[t]he Company had no delinquent commercial real estate loans", rather than affirmatively stating that all of the Company's

loans were "current" or "performing," like all of Resource Capital's disclosures (issued under Defendants' direction and on their watch) issued previously during the Relevant Period.

215.    Defendants also caused the Company to disclose the effects of its allowance for loan losses associated with the Puerto Rico mezzanine loan position in the August 7, 2015 10-Q's Management Discussion and Analysis section, finally acknowledging publicly the effects of the Puerto Rican economy on its mezzanine loan investment:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reversed against interest income for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan is impaired. In our bank and middle market loan portfolios, we recorded reserves of approximately $4.7 million for the six months ended June 30, 2015, which was primarily due to a significant increase in our middle market loan portfolio relating to a specific loan which had continued deterioration and defaulted in the second quarter of 2015. While we have recognized these losses in 2015, our credit quality on the balance of our loan portfolio is benign. In terms of delinquencies; only two bank loans, or $474,000, are delinquent out of a portfolio of $181.8 million; all but one, or $5.0 million, of our middle market loans are current out of a portfolio of $331.0 million; and none of our 87 CRE loans, totaling $1.6 billion, are delinquent.

216.    In addition, Defendants disclosed the Company's allowance for loan losses had increased to $46.319 million as of June 30, 2015, compared to $7.385 million as of March 31, 2015, and $4.613 million as of December 31, 2014.

111

**G.**     **The Related Securities Action is Sustained**

217.     On October 5, 2016, Judge Stanton of the United States District Court for the Southern District of New York issued the Securities Order, which denied the Securities Motion.  In the Securities Order, Judge Stanton stated:

> To describe the Mezzanine Loan as "performing" or "current" without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5 " ... to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading .... " That pleads a prima facie violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).
>
> Defendants raise issues, but each is rebuttable (in parentheses). They say the omission was not material in comparison to Resource's overall assets (it was material to the truth of the statements they made in the 1 OQs, and the stock fell 12% on the announcement of the need for 100% reserve against the debt). Defendants' argue that they lacked scienter (the relevant facts were well known to them, and the omission gave Resource Capital the advantage of maintaining the impression that all was well in the portfolio). They assert that the non-disclosure accorded with generally Accepted Accounting Principles (the Financial Accounting Standards Board does not grant exemptions from making disclosures required to avoid misleading under the Exchange Act).
>
> Much in the surrounding circumstances may lead to a defendants' verdict at trial, but one cannot at this point enter judgment dismissing the complaint against them as a matter of law.

218.     Significantly, Judge Stanton found that the actionable statements alleged in the Securities Action met the heightened pleading standards imposed upon the plaintiffs to the Securities Action by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"),[2] which are inapplicable in this action.

---

[2]  The PSLRA imposes significantly heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir. 2002).  To meet these heightened standards, a complaint must specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.  *Id.* at 1085.  With respect to pleading scienter, the PSLRA requires

219.    As a result of Defendants' actions, the Company has suffered damages. These damages include (but are not limited to) severe loss of reputation and credibility, being named as a defendant in the Securities Action, and a decline in the Company's share price.

## DERIVATIVE AND DEMAND ALLEGATIONS

220.    In light of the foregoing, on October 31, 2015, Plaintiff issued a demand letter pursuant to Maryland law (the "Demand") on the Board to investigate, and if warranted, commence an action against certain current and/or former directors and executive officers of the Company for violations of Maryland law, New York law and/or federal law.  A true and correct copy of the Demand is attached hereto as Exhibit A.

221.    Thereafter, Plaintiff's counsel received a letter, dated November 12, 2015, from Michael Yecies ("Yecies") (Resource Capital's Senior Vice President, Chief Legal Officer and Secretary), which requested evidence of Plaintiff's ownership of Resource Capital stock.  A true and correct copy of the November 12, 2015 letter is attached hereto as Exhibit B.

222.    Even though Mr. Yecies' letter provided no legal authority to condition a response and/or investigation of the Demand on the receipt of proof of Plaintiff's stock holdings, on November 16, 2015, Plaintiff provided Mr. Yecies with redacted proof of Plaintiff's ownership of Resource Capital stock.

---

plaintiffs to state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind.  15 U.S.C. § 78-u4(b)(2).  The inference of scienter must be more than merely reasonable – it must be cogent and compelling, meaning that a complaint will only survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Tellabs, Inc. v. Makor Issue & Rights, Ltd.,* 127 S. Ct. 2499, 2502 (2007). Notably, the PSLRA's heightened pleading standards do not apply to the instant shareholder derivative action.

223.    Thereafter, Plaintiff's counsel received a letter from Mr. Yecies, dated January 29, 2016, which stated that the Board had "appointed an independent Evaluation Committee that is in the process of evaluating the substance of [the Demand].  When the work of the independent Demand Evaluation Committee is completed, it will respond to your letter."  Mr. Yecies letter then asked whether Plaintiff would agree to toll the filing of any potential suit against Management (as defined in the Demand) until the Demand Evaluation Committee "responds" to the Demand, and the United States District Court for the Southern District of New York rules on the motion to dismiss in the Securities Action.

224.    Plaintiff's counsel responded to Mr. Yecies in a letter, dated February 8, 2016.  Plaintiff's counsel informed Mr. Yecies that under Maryland law, directors were duty-bound upon receipt of a shareholder demand to investigate, and that whether the members of Management (as defined in the Demand) breached their fiduciary duties was independent from whether they engaged in fraud, as alleged in the Securities Action. Nonetheless, Plaintiff's counsel informed Mr. Yecies that Plaintiff would agree to toll the filing of a potential suit if the Board was agreeable to very reasonable conditions.  A true and correct copy of Plaintiff's February 8, 2016 letter is attached hereto as Exhibit C. Plaintiff's counsel never received a response from Mr. Yecies.  Instead, on February 12, 2016, Plaintiff's counsel received a letter from Michael D. LiPuma, Esq. ("LiPuma"), who stated that he wrote on behalf of a "Special Litigation Committee ("SLC")" of the Board.  According to Mr. LiPuma, the SLC consisted of "Murray Levin, Richard Fore, and Gary Ickowitz [sic]."

225.    Plaintiff then heard nothing for the next six months, until August 10, 2016.

114

On that date, Plaintiff's counsel received a letter from Mr. LiPuma, who stated that he represented the "Demand Evaluation Committee appointed by [the Company](hereinafter the "Committee").[3]  Mr. LiPuma's letter stated that the "Committee is close to finishing its investigation."  Mr. LiPuma's letter also "offered" Plaintiff the opportunity to speak to the Committee in person, or to submit additional materials in writing.  A true and correct copy of Mr. LiPuma's August 10, 2016 letter is attached hereto as Exhibit D.

226.    On August 22, 2016, Plaintiff's counsel sent a letter to Mr. LiPuma setting forth certain reasonable, equitable conditions under which Plaintiff, or Plaintiff's counsel, would be willing to accept Mr. LiPuma's offer to meet (as set forth in the August 10, 2016 letter).  A true and correct copy of the August 22, 2016 letter is attached hereto as Exhibit E.

227.    On September 13, 2016, Mr. LiPuma informed Plaintiff's counsel that Plaintiff's counsel's proposed conditions contained in the August 22, 2016 letter were unacceptable.  Indeed, it was readily apparent that the Board and/or Committee were unwilling to provide Plaintiff's counsel with any additional information whatsoever, while at the same time expecting Plaintiff to come forth with additional information for the Board and Committee.  A true and correct copy of Mr. LiPuma's September 13, 2016 letter is attached hereto as Exhibit F.

228.    On October 7, 2016, nearly a year after the Demand was issued, and subsequent to the Securities Action being sustained by the Court (as set forth above), Plaintiff's counsel sent a letter to Mr. LiPuma requesting that the Board and/or the Demand Evaluation Committee respond to the Demand within the next thirty (30) days.

---

[3] It is currently unclear to Plaintiff whether Mr. LiPuma intended to use the defined terms SLC and Committee interchangeably.

229. On October 26, 2016, Plaintiff's counsel received a letter from Mr. LiPuma, which stated that "although the Demand Evaluation Committee estimates that its investigation and report will not be completed by the November 6 deadline you have suggested, the Committee is working diligently to finish its work and expects that you will have a response to [the Demand] within a reasonable time." Notably, this contention was nearly identical to that of Mr. LiPuma's August 10, 2016 letter issued over two months prior thereto.

230. Thus, Plaintiff's counsel was forced to send another letter to Mr. LiPuma, and did so on November 4, 2016. This letter informed Mr. LiPuma that he made nearly identical contentions in his letter of August 2016 and October 2016, that he provided no definition of the term "reasonable time," and that he gave no indication of when a response would be issued. As such, Plaintiff's counsel requested a specific date by which Plaintiff and Plaintiff's counsel could expect to receive a response to the Demand.

231. Plaintiff's counsel then received a letter from Mr. LiPuma, dated November 14, 2016, wherein Mr. LiPuma stated the he could not give a fixed date by which the Committee expected to complete its investigation, but "I estimate, however, that it will be around *early January 2017, if not sooner*." [Emphasis added.] A true and correct copy of the November 14, 2016 letter is attached hereto as Exhibit G. This is the last correspondence Plaintiff's counsel has received from Mr. LiPuma.

232. It has now been three months since Mr. LiPuma's most recent letter, (during which time period there has been radio silence from Mr. LiPuma, and/or anyone else associated with the "investigation"), over fifteen months have elapsed since the Demand was issued, and it is now well beyond the "early January 2017, if not sooner"

116

timeframe that Mr. LiPuma set forth in his most recent letter. It is readily apparent that Defendants have failed in their duty to appropriately investigate and respond to the Demand. Time and again, Plaintiff's counsel's requests for updates and specifics regarding the purported "investigation" were met with non-responsive answers and ambiguous statements.

233. As such, the Plaintiff's Demand has been functionally refused, and the Plaintiff has been forced to file this Complaint.

234. Clearly, the Board's failure to fulfill its obligations with respect to the Demand, which resulted in its functional refusal, is improper, demonstrates the Board's lack of due diligence and good faith, and is not entitled to the protections of the business judgment rule.

235. Thus, given the wrongful, bad-faith functional refusal of the Demand by the Board, this shareholder derivative action should be allowed to proceed.

## COUNT I
## AGAINST DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

236. Plaintiff incorporates by reference all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

237. As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company and its subsidiaries were operated in a lawful manner, and to exercise good faith in order to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when being put on notice of problems being experienced with the Company's and/or its subsidiaries' business practices and operations, should have exercised good faith in taking timely and appropriate action to correct the corporate misconduct, and to prevent its recurrence.

117

238.    Defendants willfully ignored the obvious and pervasive problems being experienced with Resource Capital's internal controls, practices, and procedures, and failed to undertake a good faith effort to correct these problems or prevent their recurrence, which ultimately led to the Company taking a $41.1 million impairment charge years after the impairment actually occurred, and ultimately subjected the Company to the expenses and exposure of the now judicially-sustained Securities Action.

239.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Resource Capital disseminated accurate, truthful and complete information to its shareholders and the investing public.

240.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Resource Capital shareholders and the investing public materially misleading and inaccurate information through, *inter alia*, Resource Capital's SEC filings and other publicly-disseminated statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

241.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Resource Capital and its subsidiaries, for which they are legally responsible.  In particular, Defendants for years abused their positions of authority by causing or allowing Resource Capital to omit any necessary disclosures reflecting the known financial risks associated with the Mezzanine Loan, or the fact that the Company would need to record an allowance for loan losses on the Mezzanine Loan, which had been impaired since 2012.

242.    Defendants had a duty to Resource Capital, and its shareholders, to

118

prudently supervise, manage and control the operations, business, and internal financial accounting and disclosure controls of Resource Capital and its subsidiaries.

243. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Resource Capital and its subsidiaries in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Resource Capital's affairs, and in the use and preservation of Resource Capital's assets.

244. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Resource Capital and/or its subsidiaries to engage in the above-described illicit scheme complained of herein, which they knew had an unreasonable risk of causing damage to Resource Capital, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged Resource Capital.

245. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

246. As a result of the misconduct alleged herein, Defendants are liable to the Company for the damages.

247. Plaintiff, on behalf of Resource Capital, has no adequate remedy at law.

## COUNT II
## AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

248. Plaintiff incorporates by reference and realleges each and every allegation of the Complaint set forth above, as though fully set forth herein.

249.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Resource Capital in the form of, *inter alia¸* salaries, bonuses, stock options, and/or other forms of executive compensation.

250.    Plaintiff, as a shareholder and representative of Resource Capital, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches during the Relevant Period.

## COUNT III
## AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

251.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

252.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9. Specifically, the Proxies violated §14(a) and Rule 14a-9 because they solicited Resource Capital shareholder votes for, *inter alia*, director reelection and/or executive compensation, while simultaneously misrepresenting and/or failing to disclose the known financial risks associated with the Mezzanine Loan, or the fact that the Company would need to record an allowance for loan losses on the Mezzanine Loan.  At the time of the issuance of the Proxies, the loan was already impaired.

253.    The 2014 Proxy was particularly false and misleading when issued because it falsely stated that the Board employs a pay-for-performance metric.  The 2014 Proxy was likewise false and misleading when issued because while it claimed that the executive compensation paid to Defendants was based on a pay-for-performance philosophy, the actual financial results that the compensation was based upon was illusory.   In the exercise of reasonable care, Defendants should have known that the statements contained in the 2014 Proxy were materially false and misleading.

254.    The misrepresentations and omissions in the Proxies were material.  The 2014 Proxy was an essential link in the accomplishment of the continuation of Defendants' scheme by which they claim to adhere to a pay-for-performance policy in making executive compensation decisions whereby the interests of management and stockholders are aligned.

255.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading, and/or that the Proxies omitted material information.  The Company was significantly damaged as a result of the Defendants' material misrepresentations and omissions contained in the Proxies, as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all  Defendants, and in favor of the Company, for the amount of damages sustained by the Company as a result of the  Defendants' breaches of fiduciary duties;

B.      Directing Resource Capital to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect the Company and its shareholders from a reoccurrence of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to timely place before shareholders for a vote, a proposal to strengthen the Board's supervision of operations, and to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Resource Capital restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the  Defendants during the Relevant Period;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 23, 2017

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By:_s/Curtis V. Trinko_____
Curtis V. Trinko, Esq.
16 West 46th St, 7th Flr.
New York, New York 10036
Tel: (212) 490-9550
Fax: (212) 986-0158
ctrinko@trinko.com

122

**PROFY PROMISLOFF &
CIARLANTO, P.C.**
Jeffrey J. Ciarlanto
Joseph M. Profy
David M. Promisloff
100 N 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642

**LAW OFFICE OF ALFRED G.
YATES, JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

Counsel for Plaintiff

## RESOURCE CAPITAL CORP. VERIFICATION

I, Mark E. McKinney, hereby verify that I am familiar with the allegations in the Complaint, that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 2/17/2017

Mark E. McKinney