**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x

IN RE RESOURCE CAPITAL CORP.
SHAREHOLDER DERIVATIVE LITIGATION
DEMAND REFUSED ACTIONS.

: Civil Action No.: 17 Civ. 1381 (LLS)
:
:
: **VERIFIED CONSOLIDATED**
: **SHAREHOLDER DERIVATIVE**
: **COMPLAINT**
:
: DEMAND FOR JURY TRIAL
:

———————————————————— x

**TABLE OF CONTENTS**

                                                                                                          **Page**

I.      NATURE AND SUMMARY OF THE ACTION ............................................................. 2

II.     JURISDICTION AND VENUE ................................................................................... 8

III.    THE PARTIES ............................................................................................................ 9

        A.      Plaintiffs ......................................................................................................... 9

        B.      Nominal Defendant ......................................................................................... 9

        C.      Individual Defendants ................................................................................... 10

        D.      Relevant Non-Parties .................................................................................... 13

        E.      Party Definitions ........................................................................................... 14

IV.     FACTUAL ALLEGATIONS .................................................................................... 14

        A.      Overview of the Company ............................................................................ 14

        B.      Background to the Mezzanine Loan .............................................................. 16

        C.      The Puerto Rican Economic Recession ......................................................... 17

        D.      The Individual Defendants Made or Caused the Company to Make
                Numerous False and Misleading Statements Throughout the Relevant
                Period ............................................................................................................ 24

        E.      The Reasons the Relevant Period Statements Issued By the Individual
                Defendants Were False and Misleading ......................................................... 95

        F.      The Truth Begins to Emerge .......................................................................... 96

        G.      The Related Securities Class Action is Sustained .......................................... 102

V.      DUTIES OF THE INDIVIDUAL DEFENDANTS .................................................... 103

        A.      Fiduciary Duties ........................................................................................... 103

        B.      Audit Committee Duties ............................................................................... 104

        C.      Duties Pursuant to the Company's Code of Conduct and Ethics ...................... 106

D.      Control, Access, and Authority.................................................................. 107

E.      Reasonable and Prudent Supervision.................................................. 107

VI.     BREACHES OF DUTIES .................................................................................... 108

VII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ............ 109

VIII.   DAMAGES TO RESOURCE CAPITAL.......................................................... 110

IX.     DERIVATIVE AND DEMAND ALLEGATIONS ....................................................... 111

A.      Demand Allegations of Plaintiff McKinney ........................................ 112

B.      Demand Allegations of Plaintiffs Sherek and Spiegel........................ 122

C.      Demand Allegations of Plaintiff Sebenoler ........................................ 130

COUNT I      Against Defendants Kessler, Beach, E. Cohen, Jonathan Cohen, Fore,
             Hart, Ickowicz, Levin, Neff, and Wiggins for Violations of  Section 14(a)
             of The Securities Exchange Act of 1934 ........................................... 132

COUNT II     Against the Individual Defendants for Breach of Fiduciary Duties .................. 134

COUNT III    Against the Individual Defendants for Unjust Enrichment............................... 135

X.      PRAYER FOR RELIEF ............................................................................. 135

XI.     JURY DEMAND ..................................................................................... 137

Plaintiffs Mark E. McKinney ("McKinney"), Dave Sherek ("Sherek"), Robert H. Spiegel ("Spiegel"), and Rick Sebenoler ("Sebenoler") (collectively, "Plaintiffs"), by and through their respective undersigned counsel, bring this shareholder derivative action on behalf of Nominal Defendant Resource Capital Corp. ("Resource Capital" or the "Company"), against certain current and former officers and directors of the Company for issuing false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, and unjust enrichment.

The allegations in this verified consolidated shareholder derivative complaint (the "Complaint") are made upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of Plaintiffs' counsel. That investigation includes, among other things: (a) review and analysis of public filings made with the United States Securities and Exchange Commission (the "SEC") by Resource Capital and other related parties; (b) review and analysis of press releases and other publications disseminated by the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Resource Capital's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related pending securities fraud class action, *Levin v. Resource Capital Corp., et al.*, Case No. 1:15-cv-07081-LLS (S.D.N.Y.) (the "Securities Class Action"), and the related pending shareholder derivative actions, *Sherek v. Kessler, et al.*, Case No. 1:17-cv-01965-LLS (S.D.N.Y.) and *Sebenoler v. Beach et al.*, Case No. 1:17-cv-02998-LLS (S.D.N.Y.), which have been consolidated with this action; and (e) review of other publicly available information concerning Resource Capital and the Individual Defendants (defined below).

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Resource Capital is a diversified real estate finance company organized as a real estate investment trust ("REIT").  The Company invests in commercial and residential real estate-related assets and commercial finance assets, including debt and equity investments, with a focus on holding and managing commercial mortgage loans and related investments.

2.    Resource Capital's investments include mezzanine loans, which the Company's 2015 Form 10-K filed with the SEC (the "2015 10-K") describes as loans "that are senior to the borrower's equity in, and subordinate to a first mortgage loan on, a property."  Mezzanine loans are "secured by pledges of ownership interests, in whole or in part, in entities that directly own the real property."

3.    The Company's investments include a $41.1 million ownership interest in a mezzanine loan (the "Mezzanine Loan") purchased in 2007, and backed by a portfolio of luxury hotels, including three hotels in Puerto Rico.  Despite worsening economic and credit conditions in Puerto Rico stemming from a crippling recession that caused the country's debt to be downgraded to junk status, and despite the fact that the Mezzanine Loan was restructured in September 2012 to stop paying interest, the Individual Defendants (defined herein) failed to disclose the risks of the Mezzanine Loan and caused the Company to issue false and misleading statements describing the Mezzanine Loan as "current" or "performing."

4.    Since at least October 2012 and continuing through the present (the "Relevant Period"), the Individual Defendants made and/or caused the Company to make false and misleading statements concerning the Company's business model, financial prospects, and operational and compliance policies, including failing to disclose, *inter alia*: (i) risks related to the Mezzanine Loan, including the Company's increasing exposure to Puerto Rico's ongoing

economic decline; (ii) the true quality and performance of the Company's loans; (iii) deficiencies in Resource Capital's internal controls; and (iv) that as a result of the foregoing, Resource Capital's public statements were materially false and misleading at all relevant times.

5.     The truth concerning the misconduct in the Company's business practices was concealed until at least August 4, 2015, when the Individual Defendants caused Resource Capital to issue a press release announcing the Company's financial results for the three and six-month periods ended June 30, 2015, which disclosed that "RSO recognized an impairment of $41.1 million on a legacy mezzanine loan representing $38.1 million in loan principal and $3.0 million in accrued interest reversals, or $(0.29) and $(0.02) per common share, respectively." Regarding the details of the $41.1 million impairment charge, the August 4, 2015 press release stated, in pertinent part:

> ***Impairment***
>
> During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. ***The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved***.[1]

6.     As a result of the Individual Defendants' conduct, Resource Capital's common stock traded at artificially inflated levels during the Relevant Period.  In response to the announcement, which revealed the Company's exposure to risks related to the Mezzanine Loan,

---

[1]  Unless otherwise noted, all emphasis has been added by Plaintiffs.

the Company's stock price plummeted to close at $3.05 per share on August 5, 2015, a decline of approximately 12%.

7.      As a result of the events described herein, Resource Capital has become the subject of the Securities Class Action, which was filed on September 9, 2015.  The "Class Period" has been defined in the Securities Class Action as October 31, 2012 through August 5, 2015, and several of the individuals named as defendants in that action—namely, Jonathan Z. Cohen, David J. Bryant, Eldron C. Blackwell, and David E. Bloom—are also named herein as Individual Defendants.

8.      On February 12, 2016, the lead plaintiff in the Securities Class Action (the "Securities Plaintiff") filed the Amended Complaint for Violation of Federal Securities Laws (the "Securities Complaint").  On October 5, 2016, U.S. District Judge Louis L. Stanton ("Judge Stanton") denied the defendants' motion to dismiss the Securities Class Action in its entirety, notwithstanding the heightened pleading standards applicable to the Securities Class Action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

9.      In sustaining the Securities Class Action, Judge Stanton concluded that the Securities Plaintiff had sufficiently alleged a violation of § 10(b) of the Exchange Act, specifically finding the Securities Complaint adequately alleged that: Resource Capital's describing "the Mezzanine Loan as 'performing' or 'current,' without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty, was . . . 'to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . .'"  As a result, the Securities Plaintiff "plead[] a prima facie violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b)."

- 4 -

10.     In accordance with Maryland law,[2] on October 31, 2015, plaintiff McKinney made a written demand on Resource Capital's Board of Directors (the "Board") to investigate and, if warranted, take necessary legal action against those responsible for the damages the Company has suffered in connection with the events underlying the Securities Class Action (the "McKinney Demand"). On November 4, 2016, plaintiff Sherek and plaintiff Spiegel made a written demand on the Board to investigate and, if warranted, take necessary legal action against those responsible for those damages to the Company, including an investigation of the McKinney Demand (the "Sherek/Spiegel Demand"). On January 31, 2017, plaintiff Sebenoler also made a written demand on the Board to investigate and, if warranted, take legal action against those responsible for those damages to the Company (the "Sebenoler Demand").

11.     As discussed in detail below, the Board's response to each of the Plaintiffs' demands (or lack thereof) was wrongful and unreasonable under Maryland law. Indeed, even though the Board was presented with the opportunity on three separate occasions to engage in an independent investigation of the serious allegations of wrongdoing and meritorious claims alleged in each of Plaintiffs' demands, the Board failed each time and in every regard.

12.     For instance, in the case of the McKinney Demand, the Board took over 15 months to issue a substantive response, despite the fact that federal securities fraud claims had already been sustained in the Securities Class Action, and despite the deadlines set by the Board itself. More egregiously, when the Board finally did belatedly respond to the McKinney Demand (after McKinney was forced to file a shareholder derivative complaint), it failed to even address (much less confirm that any investigation actually took place) whether the Company's statements were false and misleading when made, which was the centerpiece of the McKinney Demand. This is

---

[2]  Resource Capital is a Maryland corporation.

particularly troublesome because, as discussed in detail below, the Board never even refused the McKinney Demand until over four months after the Securities Class Action was sustained and Judge Stanton affirmatively found that the Securities Plaintiff had adequately alleged that the Company (under the Individual Defendants' direction and on their watch) was engaged in an illicit scheme to defraud Resource Capital shareholders through the issuance of false and misleading statements.

13.      Rather, in support of the refusal of the McKinney Demand, and notwithstanding the sustained Securities Class Action based on the same false and misleading statements set forth therein, the Board inexplicably concluded that the McKinney Demand was "without factual or legal merit."

14.      In addition to the Board's belated refusal of the McKinney Demand, which failed to address the crux of the McKinney Demand, and which inexplicably concluded that the McKinney Demand was "without factual or legal merit" (notwithstanding the sustained Securities Class Action), the Board's purported investigation of the McKinney Demand was flawed for numerous other reasons.  For instance, it is clear that the Board never conducted any interviews of individuals who could or would corroborate the allegations contained in the McKinney Demand, despite the fact that in follow-up correspondences with the Board, McKinney's counsel specifically identified individuals that should have been interviewed (or individuals with comparable knowledge).

15.      Further, the refusal of the McKinney Demand was purportedly based on a report presented to the Board.  Notwithstanding that this secret report was the primary source upon which the refusal of the McKinney Demand was based, it was neither attached to the letter refusing the McKinney Demand nor produced to McKinney or McKinney's counsel when they later requested

a copy of it.   Accordingly, the Board has improperly attempted to insulate its purported "investigation" from any scrutiny, which is wholly improper.

16.    Unfortunately, the Board not only failed to rectify this improper conduct when it later received similar pre-suit shareholder demands from the other Plaintiffs, it actually doubled-down and failed to undertake any investigation whatsoever of those demands.

17.    For instance, plaintiffs Sherek and Spiegel issued the Sherek/Spiegel Demand, which called for the Board to investigate, *inter alia*, the accuracy of the Company's public disclosures that led to the sustained Securities Class Action.  In response to the Sherek/Spiegel Demand, rather than conducting any investigation whatsoever regarding the merits therein, the Board simply attached the woefully deficient response letter it sent to McKinney's counsel, which refused the McKinney Demand and which entirely failed to address the Sherek/Spiegel Demand.

18.    The Board subsequently repeated this exact and improper behavior in response to the Sebenoler Demand.

19.    In light of the Board's unreasonable and wrongful refusals of Plaintiffs' demands to investigate and remediate harms caused to the Company, Plaintiffs each filed shareholder derivative actions in the U.S. District Court for the Southern District of New York, alleging violations of Section 14(a) of the Exchange Act, breach of fiduciary duties, and unjust enrichment. Plaintiff McKinney filed his complaint on February 23, 2017, plaintiff Sherek and plaintiff Spiegel filed their complaint on March 17, 2017, and plaintiff Sebenoler filed his complaint on April 25, 2017.  On May 16, 2017, this Court consolidated these derivative actions under the caption: *In Re Resource Capital Corp. Shareholder Derivative Litigation Demand Refused Actions*, 17 Civ. 1381 (LLS).

20.     Here, the Board has failed on every level in response to each of the Plaintiffs' respective pre-suit demands.  Whether the Board failed to meet its own self-imposed deadlines, failed to investigate or even address the accuracy of the Company's public disclosures, failed to engage in a meaningful and transparent process, reached inexplicable conclusions, or failed to undertake any investigation whatsoever of the actual demands made (as in the case of plaintiffs Sherek, Spiegel, and Sebenoler), it is clear that its response to these demands was improper and directly at odds with the Board's fiduciary duties.  Accordingly, this derivative action should proceed.

## II.    JURISDICTION AND VENUE

21.     The Court has jurisdiction over all claims pursuant to: (i) 28 U.S.C. § 1331, in that the Complaint states a federal question; and (ii) 28 U.S.C. § 1332(a)(2), in that Plaintiffs and Defendants are citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interests or costs.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in New York, or is an individual who has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by the New York courts permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.

24.     In connection with the acts and conduct alleged herein, the Individual Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

### III.    THE PARTIES

#### A.    **Plaintiffs**

25.     Plaintiff McKinney has continuously held Resource Capital stock since 2010, and is a citizen of Arizona.

26.     Plaintiff Sherek has continuously held Resource Capital stock since October 12, 2012, and is a citizen of Minnesota.

27.     Plaintiff Spiegel has continuously held Resource Capital stock since August 17, 2010, and is a citizen of Arizona.

28.     Plaintiff Sebenoler has continuously held Resource Capital stock since 2008, and is a citizen of Texas.

#### B.    **Nominal Defendant**

29.     Nominal Defendant Resource Capital is a diversified REIT incorporated under Maryland law, with principal executive offices located in New York City.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "RSO."  The Company has more than 31 million shares outstanding.  The Company is externally managed by Resource Manager Resource Capital Management ("Resource Manager") which, prior to September 2016, was a wholly-owned subsidiary of Resource America, Inc. ("Resource America").  In September 2016, Resource America was acquired by C-III Capital Partners ("C-

III"), and C-III also assumed control of the management agreement between Resource Manager and Resource Capital (the "Management Agreement").

### C.      Individual Defendants

30.      Defendant Steven J. Kessler ("Kessler") has been a director of Resource Capital since November 2009.   Kessler was the Chairman of the Board from November 2009 to November 2016.   Before that, Kessler was the Company's Senior Vice President from September 2005 to November 2009, as well as its Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and Treasurer from March 2005 to September 2005.   Kessler received $604,161 in total compensation from Resource Capital in 2012, $368,649 in total compensation from Resource Capital in 2013, $346,399 in total compensation from Resource Capital in 2014, and $347,923 in total compensation from Resource Capital in 2015.   Kessler is a citizen of Pennsylvania.

31.      Defendant David J. Bryant ("Bryant") has been the Company's CFO, Senior Vice President, and Treasurer since June 2006.   Bryant is a defendant in the Securities Class Action. Bryant received $924,990 in total compensation from Resource Capital in 2012, $624,990 in total compensation from Resource Capital in 2013, $639,996 in total compensation from Resource Capital in 2014, and $674,998 in total compensation from Resource Capital in 2015.   Bryant is a citizen of Pennsylvania.

32.      Defendant Eldron C. Blackwell has been the Company's CAO and Vice President since March 2014.  Blackwell is a defendant in the Securities Class Action.  Blackwell is a citizen of Pennsylvania.

33.      Defendant David E. Bloom has been the Company's Senior Vice President of Real Estate Investments since 2005.   Bloom is a defendant in the Securities Class Action.   Bloom

received $799,997 in total compensation from Resource Capital in 2012, $299,997 in total compensation from Resource Capital in 2013, $149,996 in total compensation from Resource Capital in 2014, and $174,999 in total compensation from Resource Capital in 2015.  Bloom is a citizen of New Jersey.

34.     Defendant Walter T. Beach ("Beach") has been a director of Resource Capital since March 2005.  Beach was also a member of the Company's Audit Committee and Investment Committee from at least April 2012 to April 2016.  Beach received $124,995 in total compensation from Resource Capital in 2012, $219,999 in total compensation from Resource Capital in 2013, $219,995 in total compensation from Resource Capital in 2014, and $220,001 in total compensation from Resource Capital in 2015.  Beach is a citizen of New York.

35.     Defendant Edward E. Cohen ("E. Cohen") was a director of Resource Capital from March 2005 until September 2016, and was Chairman of the Board from March 2005 to November 2009.  E. Cohen has also held positions with other affiliates of Resource America and is one of Resource America's two largest beneficial stockowners, collectively owning approximately 30% of the shares together with his son, defendant Jonathan Z. Cohen.  E. Cohen received $5,105,174 in total compensation from Resource Capital in 2012, and $3,018,491 in total compensation from Resource Capital in 2013.  E. Cohen is a citizen of Florida.

36.     Defendant Jonathan Z. Cohen ("Jonathan Cohen") was Resource Capital's President, Chief Executive Officer ("CEO"), and a director from March 2005 until September 2016.  Jonathan Cohen was also the Chair of the Company's Investment Committee from at least April 2012 to April 2016.  Jonathan Cohen has also held positions with other affiliates of Resource America and he is one of Resource America's two largest beneficial stockowners, collectively owning approximately 30% of the shares together with his father, defendant E. Cohen.

- 11 -

Jonathan Cohen is a defendant in the Securities Class Action. Jonathan Cohen received $2,750,000 in total compensation from Resource Capital in 2012, $1,249,998 in total compensation from Resource Capital in 2013, $1,999,997 in total compensation from Resource Capital in 2014, and $199,993 in total compensation from Resource Capital in 2015. Jonathan Cohen is a citizen of New York.

37.    Defendant Richard L. Fore ("Fore") has been a director of Resource Capital since March 2013. Fore was also a member of the Company's Investment Committee from at least April 2014 to April 2016. Fore received $144,301 in total compensation from Resource Capital in 2013, $199,995 in total compensation from Resource Capital in 2014, and $200,013 in total compensation from Resource Capital in 2015. Fore is a citizen of Nevada.

38.    Defendant William B. Hart ("Hart") has been a director of Resource Capital since March 2005. Hart was also a member of the Company's Audit Committee from at least April 2012 to April 2016. Hart received $74,995 in total compensation from Resource Capital in 2012, $109,993 in total compensation from Resource Capital in 2013, $109,996 in total compensation from Resource Capital in 2014, and $110,006 in total compensation from Resource Capital in 2015. Hart is a citizen of Virginia.

39.    Defendant Gary Ickowicz ("Ickowicz") has been a director of Resource Capital since February 2007. Ickowicz was also a member of the Company's Investment Committee from at least April 2012 to April 2016. Ickowicz received $125,000 in total compensation from Resource Capital in 2012, $199,992 in total compensation from Resource Capital in 2013, $199,996 in total compensation from Resource Capital in 2014, and $199,998 in total compensation from Resource Capital in 2015. Ickowicz is a citizen of New Jersey.

40.    Defendant Murray S. Levin ("Levin") has been a director of Resource Capital since March 2005.  Levin received $74,995 in total compensation from Resource Capital in 2012, $104,993 in total compensation from Resource Capital in 2013, $104,996 in total compensation from Resource Capital in 2014, and $105,006 in total compensation from Resource Capital in 2015.  Levin is a citizen of Pennsylvania.

41.    Defendant P. Sherrill Neff ("Neff") has been a director of Resource Capital since March 2005, and was the Chair of the Company's Audit Committee from at least April 2012 to April 2016.   Neff  received $74,995 in total  compensation from  Resource Capital in 2012, $119,999 in total compensation from Resource Capital in 2013, $119,996 in total compensation from Resource Capital in 2014, and $120,001 in total compensation from Resource Capital in 2015.  Neff is a citizen of Pennsylvania.

42.    Defendant Stephanie H. Wiggins ("Wiggins") has been a director of Resource Capital since June 2013, and was a member of the Company's Audit Committee from at least April 2015 to April 2016.  Wiggins received $72,008 in total compensation from Resource Capital in 2013, $104,999 in total compensation from Resource Capital in 2014, and $110,004 in total compensation from Resource Capital in 2015.  Wiggins is a citizen of Virginia.

**D.    Relevant Non-Parties**

43.    Jeffrey P. Cohen ("Jeffrey Cohen") is not a defendant in this action.  He was appointed to serve on the Company's Board in September 2016.

44.    Andrew L. Farkas ("Farkas") is not a defendant in this action.  He was appointed to serve as Chairman of the Board in September 2016.

### E.    Party Definitions

45.    McKinney, Sherek, Spiegel, and Sebenoler are sometimes referred to collectively herein as "Plaintiffs."

46.    Defendants Kessler, Bryant, Blackwell, Bloom, Beach, E. Cohen, Jonathan Cohen, Fore, Hart, Ickowicz, Levin, Neff, and Wiggins are sometimes referred to collectively herein as the "Individual Defendants."

47.    Defendants Kessler, Beach, Fore, Hart, Ickowicz, Levin, Neff, and Wiggins are sometimes referred to collectively herein as the "Director Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    Overview of the Company

48.    Resource Capital is a diversified real estate finance company organized as an REIT. The Company invests in commercial and residential real estate-related assets and commercial finance assets, including debt and equity investments, with a focus on holding and managing commercial mortgage loans and related investments.  Resource Capital was founded in 2005 and is incorporated in Maryland, with executive offices located in New York, NY.

49.    As a REIT, Resource Capital is required by law to pay at least 90% of its taxable earnings to shareholders annually as dividends.

50.    The Company is externally managed by Resource Manager.  Prior to September 2016, Resource Manager was a wholly-owned subsidiary of Resource America.  In September 2016, Resource America was acquired by C-III, and C-III also assumed control of the Management Agreement.

51.    As stated in the Company's 2015 10-K:

*Our management agreement was not negotiated at arm's-length and, as a result, may not be as favorable to us as if it had been negotiated with a third-party.*

- 14 -

At the time the management agreement was negotiated, our officers and two of our directors, Edward E. Cohen and Jonathan Z. Cohen, were also officers or directors of the Manager or Resource America.  As a consequence, our management agreement was not the result of arm's-length negotiations and its terms, including fees payable, may not be as favorable to us as if it had been negotiated with an unaffiliated third-party.

52.     Defendants E. Cohen and Jonathan Cohen, father and son, are Resource America's largest stockholders, collectively beneficially owning approximately 30% of Resource America's shares.  Although E. Cohen and Jonathan Cohen retired from the Board in September 2016, they continue to exercise control over the Company through their very large stockholdings.  In addition, E. Cohen and Jonathan Cohen exert significant influence on the Company's operating policies and investment strategies through Resource America and Resource Manager.

53.     Pursuant to the Management Agreement, the Company must pay Resource Manager "a monthly base management fee equal to 1/12 of [the Company's] equity, as defined in the management agreement, times 1.50%, regardless of the performance of our portfolio."  As disclosed in the Company's 2015 10-K: "[t]he Manager's entitlement to substantial non-performance based compensation might reduce its incentive to devote its time and effort to seeking profitable opportunities for our portfolio.  This in turn could hurt our ability to make distributions to our stockholders."

54.     Further, the Management Agreement is structured to make termination burdensome and costly.  As stated in the Company's 2015 10-K:

> *Termination of the management agreement by us without cause is difficult and could be costly.*
>
> Termination of our management agreement without cause is difficult and could be costly.  We may terminate the management agreement without cause only annually upon the affirmative vote of at least two-thirds of our independent directors or by a vote of the holders of at least a majority of our outstanding common stock, based upon unsatisfactory performance by the Manager that is materially detrimental to us or a determination that the management fee payable to the Manager is not fair.

- 15 -

Moreover, with respect to a determination that the management fee is not fair, the Manager may prevent termination by accepting a mutually acceptable reduction of management fees. We must give not less than 180 days' prior notice of any termination. Upon any termination without cause, the Manager will be paid a termination fee equal to four times the sum of the average annual base management fee and the average annual incentive compensation earned by it during the two 12-month periods immediately preceding the date of termination, calculated as of the end of the most recently completed fiscal quarter before the date of termination.

### B.    Background to the Mezzanine Loan

55.    In 2007, the Company, under the Individual Defendants' direction and on their watch, acquired the Mezzanine Loan. The Mezzanine Loan was initially backed by a portfolio of 13 luxury hotels owned by The Blackstone Group ("Blackstone"), including three hotels in Puerto Rico. The portfolio also backed $742.5 million of debt securitized through the Wachovia Bank Commercial Mortgage Trust, 2007-WHALE8 (the "2007-WHALE8 Trust").

56.    When the Company took an ownership position in the Mezzanine Loan, Puerto Rico's economy was falling into a recession that correlated with the economic downturn in the United States between 2007 and 2009. However, although the United States began to recover economically after 2011, the economy in Puerto Rico continued to decline, and the residential real estate market in Puerto Rico was significantly impacted.

57.    As the assets backing the 2007-WHALE8 Trust began to lose value, rating agencies began to downgrade the ratings assigned to the securities issued by the 2007-WHALE8 Trust. By December 9, 2010, Moody's Investors Service ("Moody's") issued a press release stating that it had downgraded 11 classes of the 2007-WHALE8 Trust securities, noting that there were now only 12 hotels in the portfolio backing the Mezzanine Loan. As stated in the press release:

> The largest loan in the pool is secured by fee interests in LXR Hospitality Pool Loan ($948 million, or 64% of the pooled balance plus $124 million of rake bonds within the trust). ***The hotel portfolio includes 12 properties located in Puerto Rico, FL, CA, AZ, Jamaica and NY. The Park Shore Waikiki asset located in***

- 16 -

*Hawaii was released.  The sponsor is The Blackstone Group*.  There is additional debt in the form of non-trust junior component and mezzanine debt outside the trust.

58.    On July 26, 2012, Moody's issued a press release stating that it had downgraded six classes of the 2007-WHALE8 Trust securities.  Further, even though the loan backed by the portfolio backing the Mezzanine Loan had matured in May 2012, Blackstone had been unable to pay the lender, and the special servicer had granted forbearance to Blackstone until August 2012.  As stated in the press release:

> The largest loan in the pool is secured by fee interests in LXR Hospitality Pool Loan ($948 million, or 76% of the pooled balance plus $124 million of rake bonds within the trust).  The hotel portfolio includes 12 properties located in Puerto Rico, FL, CA, AZ, Jamaica and NY.  The Park Shore Waikiki asset located in Hawaii was released.  The sponsor is The Blackstone Group.  There is additional debt in the form of non-trust junior component and mezzanine debt outside the trust.  The loan matured in May 2012, and the special servicer (Bank of America Merrill Lynch) has granted forbearance through August 2012 to continue discussions with the borrower.  Cash management has been in place since March 2010 due to low performance.

59.    By September 2012, Blackstone was unable to meet its payment obligations and entered into a forbearance extension agreement, which provided for the sale or refinance of the assets by May 9, 2014, and completion and full repayment of the mortgage debt by September 9, 2014.

60.    As discussed in detail below, despite the decline in Puerto Rico's economy and the troubled performance of the portfolio backing the Mezzanine Loan, the Individual Defendants failed to disclose these risks to the Company's shareholders, and instead released false and misleading statements about the Company's business operations and investment performance.

**C.    The Puerto Rican Economic Recession**

61.    The Puerto Rican economy has been stuck in a recession since 2006.  According to an analysis of the Puerto Rican economy by former World Bank Chief Economists Anne Krueger, Ranjit Teja, and Andrew Wolfe (the "Krueger Report"), from 2004 through 2014, investment in

- 17 -

the Puerto Rican economy, as a portion of gross national product, fell by more than ten percentage points.  The following chart illustrates the declining investment in the Puerto Rican economy overall, and specifically, in construction:



62.      The Krueger Report further explains that the Puerto Rican economy historically has tracked the economy of the United States mainland.  Accordingly, Puerto Rico was significantly harmed during the downturn in the United States economy between 2007 and 2009.  As the following chart illustrates, however, while the United States mainland's economy began to recover following fiscal year 2011, Puerto Rico's economy resumed its descent:



- 18 -

63.     The residential real estate market in Puerto Rico has also been seriously damaged. As detailed in the Krueger Report, house prices have fallen sharply, with the downturn preceding the similar phenomenon on the United States mainland.  Indeed, the median sales price for existing homes fell 38% between fiscal years 2004 and 2014.

64.     In conjunction with Puerto Rico's economic decline and failing residential real estate market, Puerto Rico's banking sector has come under serious stress.  According to the Krueger Report, between 2005 and 2015, commercial bank assets fell by 30% "as banks reduced their balance sheets in response to the hit to their capital from lower asset prices.  The distress in the banking sector would have been worse were it not for the backstop provided by [the Federal Deposit Insurance Corporation], which had to intervene [in] several banks, and for initiatives such as [the Troubled Asset Relief Program]."

65.     Puerto Rico's economic woes are further illustrated by the extreme levels of public debt.  The Krueger Report points to the crisis-level debt incurred by Puerto Rico, observing that "[p]ublic sector debt has risen every year since 2000, through good years and bad ones, reaching 100 percent of [gross national product] by end-[fiscal year] 2014. . . .  The fact that debt was rising even in years before the economy started to contract says something about the weakness in public finances."  Indeed, the Krueger Report highlighted the failure of the Puerto Rican government to stabilize the Commonwealth's balance sheet when asking rhetorically, "how could debt continue climbing in the face of one emergency measure after another to 'balance the budget'—from the sales tax in FY2006 to staff cuts in FY2009 to pension reform in FY2013?"  Further evidence of the continual decline of Puerto Rico's fiscal health is the decline in tax revenues, which "slid markedly relative to nominal GNP, from over 15% of GNP prior to 2006 to around 12% despite new measures implemented in the intervening period."

66. In April 2013, the president of the Government Development Bank for Puerto Rico, which is tasked with "safeguard[ing] the fiscal stability of Puerto Rico and promot[ing] its competitiveness to transform [the Commonwealth's] economy into one of the most developed economies in the world," described the bank's position as "fragile" before resigning three months later.

67. In the Krueger Report's analysis, piecemeal fiscal reforms in Puerto Rico have left "a decade of stagnation and the cutoff of market access, which experience tells us has severe negative effects on credit, investment, and consumption."

68. By the spring of 2013, Puerto Rico's fiscal crisis was well-known and obvious, eliciting negative reactions from the investing community. On August 26, 2013, the investing periodical *Barron's* ran a cover story entitled "Troubling Winds," which discussed Puerto Rico's failing economy and crisis-level debt. The article noted that at the time of publication, Puerto Rico carried "$53 billion of tax-supported debt outstanding from more than a dozen issuers, according to Moody's Investors Service, and nearly $70 billion of total debt, according to the commonwealth." The article went on to note that "[e]ven using the lower figure, Puerto Rico's debt load would rank third among the states, behind only California and New York." Puerto Rico's debt burden, however, was severely disproportionate to normative measures of the Commonwealth's financial health, such as gross domestic product, personal income, and population. Indeed, Puerto Rico carried a debt burden of $14,324 per capita, 10 times the average of the 50 states, and more than five times that of California, the state with the highest debt burden. Accordingly, as of August 2013, Puerto Rico's general-obligation bonds received the lowest investment grade ratings available from both Moody's and Standard & Poor's, and both

maintained "negative outlooks on Puerto Rico's credit rating, meaning there is a possibility that its debt could get downgraded to junk in the coming year."

69.     The *Barron's* article also noted that "[a] closely watched index of economic activity compiled by the Puerto Rico Government Development Bank, shows a year-over-year decline of 4.5% in June [2013].  This indicator, which reflects gasoline consumption, payroll employment, electricity generation, and cement sales, has a high correlation with GDP."

70.     An article published by *Kiplinger* on September 17, 2013, entitled "Beware Puerto Rican Bonds Hiding in Your Portfolio," also noted that Puerto Rico's gross domestic product declined by 5% in July 2013, as compared to July 2012.  This was the fastest rate of decline for the Puerto Rican economy in 41 months, according to the Government Development Bank for Puerto Rico.

71.     Further, according to the *Kiplinger* article, between May 1, 2013 and September 17, 2013, the "Standard & Poor's Puerto Rico Municipal Bond index . . . plunged 19% . . . ."  Indeed, given the overwhelming debt owed by Puerto Rico, the article's author opined that "[m]anagers who loaded up on these bonds should be fired—as should their supervisors."  Goldberg noted that nine of the 10 funds most heavily laden with Puerto Rican bonds were managed by Oppenheimer, and that eight of the nine Oppenheimer funds lost between 11% and 15% over the three months leading up to the article's publication, which was "almost enough to wipe out the previous three years of positive returns."

72.     Investors in Puerto Rico's bonds noticed the Commonwealth's financial crisis, which was reflected in the performance of Puerto Rican municipal bonds.  A *Bloomberg* article, published on September 13, 2013, entitled "OppenheimerFunds Loses Most as Puerto Rico Tumbles: Muni Credit," highlighted the losses incurred by mutual funds with significant

- 21 -

investments in Puerto Rican bonds.  This *Bloomberg* article noted that "OppenheimerFunds Inc. is the biggest loser as mutual funds investing in municipal debt get pummeled by the worst year for Puerto Rican bonds since at least 2000."  Specifically, an Oppenheimer municipal debt unit with 26% of its $6.5 billion in assets invested in Puerto Rican debt, lost almost 12% from January 2013 through September 2013.

73.     The decline in Puerto Rico's economy, and the resulting fallout for United States investors, prompted Mr. Galvin (the Secretary of the Commonwealth of Massachusetts) to investigate several mutual fund families with high levels of investment in Puerto Rican debt, including OppenheimerFunds.  As reported by *The Wall Street Journal* on October 9, 2013, in an article entitled "Massachusetts Probes Sales of Puerto Rico Bonds," Mr. Galvin initiated the investigation because "he was concerned local investors may be unaware of all the risks they are taking on."  In Mr. Galvin's words, "everyone knows there is a problem with Puerto Rican bonds."

74.     Puerto Rico's economic decline and its concomitant debt crisis, ultimately resulted in all three major credit rating agencies downgrading the Commonwealth's debt to junk status in the first two weeks of February 2014.  As noted in a *MarketWatch* report, dated February 12, 2014, entitled "Puerto Rico bond turmoil sparks warning from muni fund," from February 2013 to February 2014, the "Standard & Poor's Puerto Rico muni index dropped 21.3%, rare losses for the municipal bond market, which is often sought for its perceived safety."  As a result of the downgrades, the OppenheimerFunds unit with heavy investment in Puerto Rican bonds, referred to above, amended its disclosures.  One such disclosure was amended to state: "[i]f the economic situation in Puerto Rico persists or worsens, the volatility, liquidity, credit quality, and performance of the Fund could be adversely affected."

75.     The Standard & Poor's Municipal Bond Puerto Rico Index failed to recover fully following the downgrades.  As of June 30, 2014, the index closed at 163.61, up from 157.55 on February 7, 2014, but still down 17.8% from February 4, 2013.  Similarly, as of September 30, 2014, the index closed at 171.52, slightly higher than June, but still down 13.8% from February 4, 2013.  By December 30, 2014, the index would drop to 170.44, down 14.3% compared to February 4, 2013.  By March 31, 2015, the index dropped further to 168.25, down 15.4% compared to February 4, 2013.

76.     On January 4, 2016, Puerto Rico defaulted on $174 million of debt payments. According to an article posted on *The New York Times* business blog *DealBook* on January 4, 2016, entitled "Puerto Rico Defaults on Debt Payments," Puerto Rico defaulted on the payments in order to pay the Commonwealth's "general obligation bondholders, who are entitled to be paid first, according to the Puerto Rican constitution."  While using the cash to pay the general obligation bonds, the Puerto Rican government put its other bonds into default.  Although the other bonds could be paid out of reserves, "drawing on a reserve without replenishing it is also considered a form of default."  Furthermore, bonds issued by the Puerto Rico Infrastructure Financing Authority and the Public Finance Corporation do not have reserves.  As a result, Standard & Poor's downgraded "the infrastructure authority's rating from CC to D."  According to Standard & Poor's, "[a]n obligation rated 'D' is in default or in breach of an imputed promise.. . . The 'D' rating also will be used upon the filing of a bankruptcy petition or the taking of similar action and where default on an obligation is a virtual certainty, for example due to automatic stay provisions."

77.     As detailed in a *Reuters* article, dated January 8, 2016, entitled "Bond insurers sue Puerto Rico over debt default, clawbacks," insurers of the Puerto Rico's bonds sued the

- 23 -

Commonwealth following the default, alleging that the Puerto Rican government's decision to divert payment to the general obligation bondholders was unconstitutional.

**D.  The Individual Defendants Made or Caused the Company to Make Numerous False and Misleading Statements Throughout the Relevant Period**

78.     During the Relevant Period, the Individual Defendants made and/or caused the Company to make a series of false and misleading statements concerning the Company's business model, financial prospects, and operational and compliance policies, including a failure to disclose, *inter alia*: (i) risks related to the Mezzanine Loan, including the Company's increasing exposure to Puerto Rico's ongoing economic decline; (ii) the true quality and performance of the Company's loans; (iii) deficiencies in Resource Capital's internal controls; and (iv) that as a result of the foregoing, Resource Capital's public statements were materially false and misleading at all relevant times.

79.     On October 31, 2012, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the third quarter 2012 ("Q3 2012"), during which the Individual Defendants reassured investors, analysts, and media representatives that the Company's assets were performing well.  During the call, defendant Jonathan Cohen stated:

> ***Our portfolio of loans continued to perform well***.  During 2012, we have grown our real estate loan portfolio by over $150 million net.  We expect this trend to continue as we continue to find good opportunities to lend money against good real estate.  We have greatly strived to grow our origination channel in real estate and we believe that the investments we have made in our team and systems will start to pay off.
>
> While our portfolio stayed constant for the quarter due to repayments from a legacy $28 million loan, legacy meaning made before the crisis, and another $6.5 million loan made in 2011, we underwrote and funded a series of, in my opinion, very attractive loans.  We are picking up pace and expect this portfolio to grow tremendously in the next few quarters, net of payoffs.  Dave Bloom will elaborate on this in the real estate portfolio momentarily.

- 24 -

80.    Additionally, defendant Bloom stated the following during the call:

Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes. The majority of the properties securing our loans are continuing to realize improved cash flow on a quarter-over-quarter basis. ***And the entire portfolio remains performing with no defaults***.   As assets are recapitalized or sold and paid off, the few legacy positions that require extra asset management attention grows smaller each quarter.  And we remain extremely focused on the ultimate resolution of the limited number of situations.

81.    The above statements, made by defendants Bloom and Jonathan Cohen, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By October 31, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. In light of the true status of the Mezzanine Loan, defendant Jonathan Cohen's description that the Company's loan portfolios were "performing well" was materially misleading.  Further, defendant Bloom's statements concerning the Company's "legacy positions," which included the Mezzanine Loan, and representations that the Company's "entire portfolio remains performing with no defaults," were also materially misleading.

82.    On November 9, 2012, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 10-Q").

83.    The Q3 2012 10-Q—which incorporated the 2011 10-K, specifically including the "Risk Factors" disclosed in the 2011 10-K—failed to disclose the Company's increasing exposure

to Puerto Rico's ongoing economic decline related to the Mezzanine Loan.    Indeed, the Q3 2012 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio.  While the Individual Defendants admitted in the 2011 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis.  Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis.  By incorporating the 2011 10-K, the Q3 2012 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. . . . Where we have any kind of concentration risk in our investments, an adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

84.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As disclosed by the Individual Defendants on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the Q3 2012 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By November 9, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell

the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

85.    Additionally, in the Q3 2012 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by causing the Company to state that "[a]ll of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2012:** | | | | | | |
| Whole loans | $ 415,782 | $ 7,000 | $ 98,874 | $ — | $ 34,000 | $ 555,656 |
| B notes | 16,357 | — | — | — | — | 16,357 |
| Mezzanine loans | 23,322 | — | 44,500 | — | — | 67,822 |
| | $ 455,461 | $ 7,000 | $ 143,374 | $ — | $ 34,000 | $ 639,835 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

***All of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011.***

86.     The above statements, made or caused to be made by the Individual Defendants, were materially misleading because they mischaracterized the credit quality of the Mezzanine Loan, and omitted material information concerning the weakness of the Mezzanine Loan, and the risks it created for the Company.  The $44.500 million in mezzanine loans represented by the Company—under the Individual Defendants' direction and on their watch—as "Rating 3" as of September 30, 2012 (which consisted of the Mezzanine Loan), was essentially unchanged from the $44.509 million represented by the Company—under the Individual Defendants' direction and on their watch—as "Rating 3" as of June 30, 2012, $44.517 million as of March 31, 2012, and $44.527 million as of December 31, 2011, notwithstanding that Blackstone had entered into a forbearance agreement and the Company had stopped receiving cash income from the loan in September 2012.  Indeed, the Individual Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.  These statements were also false and misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of September 30, 2012," despite the fact that by November 9, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

87.     The Q3 2012 10-Q also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis.  17 C.F.R.

§ 229.303(a)(3)(i).   Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.   The Individual Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

88.   Finally, the Q3 2012 10-Q was misleading with respect to the Company's then-existing internal controls.   The Q3 2012 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") (identical to those described below in ¶99, *infra*) by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

89.   These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

90.   On March 5, 2013, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the fourth quarter and fiscal year 2012, during which the Individual Defendants continued to state that the Company's assets were performing well.   During the call, defendant Jonathan Cohen stated:

> Our credit quality is stable and improving and other than the legacy loans we have sold in our syndicated bank loan facility, we feel like the credit environment for us is excellent.   We took a modest provision on real estate loans in fourth quarter of $400,000.   ***However, all 43 of our outstanding real estate loans are performing and we see a trend of improving property performance underlying these loans***

> ***beginning in 2011 through the year-end 2012 and continuing into 2013***.  That is, our real estate loss is shrinking.
>
> \*        \*        \*
>
> Our liquidity remains excellent.  We had approximately $180 million of cash including $94 million of unrestricted cash as of December 31, even after making considerable investment during the quarter.  Stay tuned for more investments.  ***Our portfolio of real estate loans continued to perform well.***  During 2012, we have grown our real estate loan portfolio by over $175 million.  We expect this trend to continue as Dave Bloom and his real estate team continue to find out good opportunities from that money against good real estate.  We have generally strived to grow our origination channel and we believe that the investments we have made in our team and system, will start to pay off or have started to pay off and will continue to start to pay off.

91.    The above statements, made by defendant Jonathan Cohen, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By March 5, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

92.    On March 18, 2013, the Individual Defendants caused Resource Capital to file its Annual Report for 2012 on Form 10-K with the SEC, which announced the Company's financial and operating results for the quarter and year ended December 31, 2012 (the "2012 10-K").

93.    The 2012 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real

- 30 -

estate loan portfolio. While the Individual Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, in the 2012 10-K, the Individual Defendants portrayed the geographic distribution of the portfolio as limited to the mainland United States, and did not include any disclosures regarding the Company's increasing exposure to Puerto Rico's ongoing economic decline related to the Mezzanine Loan. Indeed, the 2012 10-K provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

94.    The 2012 10-K contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico:



**Geographic Area by State**

95.     The above statements, made or caused to be made by the Individual Defendants, were thus materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  Not only did Resource Capital's 2012 10-K completely withhold the fact that it was even invested in Puerto Rico, but as disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the 2012 10-K, Puerto Rico was in the midst of a historic economic downturn.  By March 18, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

96.     Additionally, in the 2012 10-K, the Individual Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of our commercial real estate loans were performing as of December 31, 2012 and 2011," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating.  We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

*All of our commercial real estate loans were performing as of December 31, 2012 and 2011.*

97.     The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.   Remarkably, the $44.490 million in mezzanine loans

- 33 -

represented by the Company—under the Individual Defendants' direction and on their watch—as "Rating 3" as of December 31, 2012 was essentially unchanged from the $44.500 million represented by the Company as "Rating 3" as of September 30, 2012.  The Individual Defendants caused Resource Capital to maintain its prior rating on the mezzanine loans despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012, as interest merely accrued.  Indeed, the Individual Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the 2012 10-K was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of December 31, 2012[.]"  The Individual Defendants represented this, despite the fact that by March 18, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

98.     The 2012 10-K also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis.    17 C.F.R. § 229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.   The Individual Defendants should have disclosed the Company's

exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

99.    Finally, the 2012 10-K was misleading with respect to the Company's then-existing internal controls.  Resource Capital's 2012 10-K contained signed certifications pursuant to SOX by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In addition to defendants Bryant and Jonathan Cohen, the 2012 10-K was also signed by defendants Kessler, Beach, E. Cohen, Hart, Ickowicz, Levin, and Neff.  The SOX Certifications in the 2012 10-K set forth as follows:

1.    I have reviewed this report on Form 10-K for the year ended December 31, 2012 of Resource Capital, Corp.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under

our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

100.   These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

101.   On April 18, 2013, the Individual Defendants caused Resource Capital to file a proxy statement pursuant to Section 14(a) of the Exchange Act (the "2013 Proxy").   The

2013 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election. However, the 2013 Proxy misrepresented and/or failed to disclose: (i) risks related to the Mezzanine Loan, including the Company's increasing exposure to Puerto Rico's ongoing economic decline; (ii) the true quality and performance of the Company's loans; (iii) deficiencies in Resource Capital's internal controls; and (iv) that as a result of the foregoing, Resource Capital's public statements were materially false and misleading at all relevant times.

102.    The 2013 Proxy also stated that based on the Company's "performance," the Company awarded its named executive officers more than $5.5 million in stock awards in 2012. The 2013 Proxy omitted material information concerning the Company's true performance, and did not disclose the Company's inadequate internal controls that led to the Board approving compensation awards based on inflated levels of performance.

103.    On May 8, 2013, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the first quarter 2013 ("Q1 2013"), during which the Individual Defendants continued to state that the Company's assets were "perform[ing] well." During the call, defendant Bloom stated:

> We note improving metrics across all asset classes with the majority of the properties securing our loans realizing improved cash flow year-over-year and continuing to trend in an upward direction. In addition, we are pleased to see the majority of the asset specific business plans across the portfolio are well on track and progressing towards the realization of borrowers' plans for value creation and ***the entire portfolio remains performing with no defaults***.

104.    Defendant Jonathan Cohen also stated the following during the call:

> Our portfolio of real estate loans continue to perform well. During the last 12 months we have grown our real estate loan portfolio by over $223 million on a gross origination basis. We expect this trend to continue as our real estate debt team continues to find good opportunities to lend money against good real estate.

We have greatly strived to grow our origination channel and we believe the investments we have made in our team and systems will start to pay off.

105. The above statements, made by defendants Bloom and Jonathan Cohen, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By May 8, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

106. On May 10, 2013, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 10-Q").

107. The Q1 2013 10-Q—which incorporated the 2012 10-K, specifically including the "Risk Factors" disclosed in the 2012 10-K—failed to disclose the Company's increasing exposure to Puerto Rico's ongoing economic decline related to the Mezzanine Loan.  Indeed, the Q1 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio.  While the Individual Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis.  Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States,

thereby omitting to disclose any exposure to the Puerto Rican economic crisis. By incorporating the 2012 10-K, the Q1 2013 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

108. The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As of the date of the Q1 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn. By May 10, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

109. Additionally, in the Q1 2013 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by

stating that "[a]ll of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31, 2013** | | | | | | |
| Whole loans | $ 497,052 | $ — | $ 53,362 | $ — | $ — | $ 550,414 |
| B notes | 16,293 | — | — | — | — | 16,293 |
| Mezzanine loans | 44,704 | — | 38,072 | — | — | 82,776 |
| | $ 558,049 | $ — | $ 91,434 | $ — | $ — | $ 649,483 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ — | 34,000 $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ — | 34,000 $ 667,051 |

*All of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012.*

110. The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Remarkably, the $38.072 million in mezzanine loans represented by the Individual Defendants as "Rating 3" as of March 31, 2013, maintained the same rating on the Puerto Rico mezzanine loan position. The Individual Defendants caused Resource Capital to maintain its prior rating on the Mezzanine Loan, despite the forbearance agreement

entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012, as interest merely accrued.  Indeed, the Individual Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.  In addition, the Q1 2013 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of March 31, 2013 and December 31, 2012."  The Individual Defendants represented this despite the fact that by May 10, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

111.    The Q1 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis.   17 C.F.R. § 229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  The Individual Defendants should have disclosed Resource Capital's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

112.    Finally, the Q1 2013 10-Q was misleading with respect to the Company's then-existing internal controls.  The Q1 2013 10-Q contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen,

certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

113.    These SOX Certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

114.    On August 7, 2013, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the second quarter 2013 ("Q2 2013"), during which the Individual Defendants continued to reassure investors that the Company's assets were performing well, including mezzanine loans.  During the call, defendant Bloom stated:

> Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes. The majority of the properties securing our loans are continuing to realize improved cash flow and we are seeing borrowers' plans for value creation on or ahead of budget. ***Once again I am pleased to report that the entire portfolio is performing with no defaults.***

115.    During the call, defendant Bryant also stated:

> Overall real estate credit has been excellent and to reiterate Jonathan's point, I characterize our bank loan portfolio credit as improving. Five bank loans totaling $12.6 million are delinquent out of a total portfolio of $1.1 billion and remarkably, all of our 49 real estate loans are current and performing.

116.    The above statements, made by defendants Bloom and Bryant, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By August 7, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's

expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

117. On August 9, 2013, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 10-Q").

118. The Q2 2013 10-Q—which incorporated the 2012 10-K, specifically including the "Risk Factors" disclosed in the 2012 10-K—failed to disclose the Company's increasing exposure to Puerto Rico's ongoing economic decline related to the Mezzanine Loan. Indeed, the Q2 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio. While the Individual Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2012 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. By incorporating the 2012 10-K, the Q2 2013 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan

portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

119.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the Q2 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By August 9, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

120.    Additionally, in the Q2 2013 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were performing as of June 30, 2013 and December 31, 2012," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

- 44 -

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2013** | | | | | | |
| Whole loans | $ 553,333 | $ — | $ 55,374 | $ — | $ — | $ 608,707 |
| B notes | 16,265 | — | — | — | — | 16,265 |
| Mezzanine loans | 28,938 | — | 38,072 | — | — | 67,010 |
| | $ 598,536 | $ — | $ 93,446 | $ — | $ — | $ 691,982 |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ — | 34,000 $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ — | 34,000 $ 667,051 |

*All of the Company's commercial real estate loans were performing as of June 30, 2013 and December 31, 2012.*

121.   The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Remarkably, the $38.072 million in mezzanine loans represented by the Company—under the Individual Defendants' direction and on their watch—as "Rating 3" as of June 30, 2013 maintained the same rating on the Puerto Rico Mezzanine Loan position.  The Individual Defendants caused Resource Capital to maintain its prior rating on the Mezzanine Loan, despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012, as interest merely accrued.  Indeed, the Individual Defendants caused the Company to specifically note payment

- 45 -

history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.  In addition, the Q2 2013 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of June 30, 2013 and December 31, 2012."  The Individual Defendants caused the Company to represent this despite the fact that by August 9, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

122.    Further, in the Q2 2013 10-Q, the Individual Defendants also made or caused to be made false and misleading statements about the Company's mezzanine loan portfolio by indicating that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of June 30, 2013:

**Troubled-Debt Restructurings**

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Three Months Ended June 30, 2013:** | | | | |
| Whole loans | — | $ | — | $ — |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Loans receivable - related party | — | | — | — |
| Total loans | — | $ | — | $ — |
| | | | | |
| **Three Months Ended June 30, 2012:** | | | | |
| Whole loans | — | $ | — | $ — |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Loans receivable | — | | — | — |
| Loans receivable - related party | — | | — | — |
| Total loans | — | $ | — | $ — |
| | | | | |
| **Six Months Ended June 30, 2013:** | | | | |
| Whole loans | 2 | $ | 56,328 | $ 56,328 |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Loans receivable - related party | 1 | | 6,592 | 6,592 |
| Total loans | 3 | $ | 62,920 | $ 62,920 |
| | | | | |
| **Six Months Ended June 30, 2012:** | | | | |
| Whole loans | 3 | $ | 92,912 | $ 76,597 |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Loans receivable | — | | — | — |
| Loans receivable - related party | 1 | | 7,797 | 7,797 |
| Total loans | 4 | $ | 100,709 | $ 84,394 |

*As of June 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.*

123.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments.  As disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments was actually $41.1 million.  Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled-debt restructurings, the Individual Defendants caused the Q2 2013 10-Q to actually give the impression that the quality of Resource Capital's mezzanine

loan portfolio improved compared to the previous quarter (Q1 2013) and fiscal year 2012, both of which disclosed a single troubled-debt restructuring ("TDR") of $38.072 million. This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by August 9, 2013. Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

124.    The Q2 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. § 229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. The Individual Defendants should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

125.    Finally, the Q2 2013 10-Q was misleading with respect to the Company's then-existing internal controls. The Q2 2013 10-Q contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the filing was accurate and that it disclosed any material changes to the Company's internal control over financial reporting.

126.    These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information

including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

127.    On November 6, 2013, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the third quarter 2013 ("Q3 2013"), during which the Individual Defendants continued to provide reassurance that the Company's assets were performing well, including mezzanine loans.  During the call, defendant Bryant stated:

> Overall, real estate credit has been excellent and I'd characterize the bank loan portfolio credit as very benign. Three bank loans totaling $3.6 million are delinquent out of a portfolio of approximately $940 million and ***remarkably, all of our real estate loans are current and performing.***

128.    During the call, defendant Bloom also stated:

> We are improving metrics across all asset classes with the majority of the property securing our loans realizing improved cash flow on a year-over-year basis and continuing to trend in upward direction.  In addition, we are pleased to see that the majority of the asset specific plans across the portfolio are well on track and progressing towards realization ultimately of the borrowers' plans for value creation and ***the entire portfolio remains performing with no defaults***. ***We are very particular about markets in which we lend, sponsor quality and asset-specific business plans and the resilience of the assets I just described is a daily reminder that validates our keen focus on credit first approach to our business***.

129.    The above statements, made by defendants Bloom and Bryant, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By November 6, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Ultimately,

Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

130.    On November 12, 2013, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 10-Q").

131.    The Q3 2013 10-Q—which incorporated the 2012 10-K, specifically including the "Risk Factors" disclosed in the 2012 10-K—failed to disclose the Company's increasing exposure to Puerto Rico's ongoing economic decline related to the Mezzanine Loan.    Indeed, the Q3 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio.    While the Individual Defendants admitted in the 2012 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis.    Furthermore, the 2012 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis.    By incorporating the 2012 10-K, the Q3 2013 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties.    We also may have material concentrations in the property types and industry sectors that are in our loan portfolio.    Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios.    An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

132.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the Q3 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

133.    Additionally, in the Q3 2013 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship,

payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2013** | | | | | | |
| Whole loans | $ 591,105 | $ 44,943 | $ 32,067 | $ — | $ — | $ 668,115 |
| B notes | 16,238 | — | — | — | — | 16,238 |
| Mezzanine loans | 57,574 | — | — | — | — | 57,574 |
| | $ 664,917 | $ 44,943 | $ 32,067 | $ — | $ — | $ 741,927 |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

*All of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012.*

134.    The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Notably, the Q3 2013 10-Q represented and categorized mezzanine loans involving Puerto Rican assets under its best credit risk category (Rating 1).  The Individual Defendants represented this despite the fact that by November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

135.    Further, in the Q3 2013 10-Q, the Individual Defendants also made or caused to be made false and misleading statements about the Company's mezzanine loan portfolio by indicating

that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of September 30, 2013:

### Troubled-Debt Restructurings

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended September 30, 2013:** | | | |
| Whole loans | 2 | $ 48,374 | $ 52,716 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $ 48,374 | $ 52,716 |
| | | | |
| **Three Months Ended September 30, 2012:** | | | |
| Whole loans | 2 | $ 42,550 | $ 42,550 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 3 | $ 80,622 | $ 80,622 |
| **Nine Months Ended September 30, 2013:** | | | |
| Whole loans | 4 | $ 104,702 | $ 109,044 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 5 | $ 111,294 | $ 115,636 |
| | | | |
| **Nine Months Ended September 30, 2012:** | | | |
| Whole loans | 5 | $ 168,708 | $ 151,422 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 7 | $ 214,577 | $ 197,291 |

*As of September 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.*

136.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's actual conduct with respect

to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments.  As the Individual Defendants disclosed on August 5, 2015, the loan loss allowance for the Company's Puerto Rican investments was actually $41.1 million.  Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled-debt restructurings, the Q3 2013 10-Q actually gave the impression that quality of Resource Capital's mezzanine loan portfolio improved compared to Q1 2013 and fiscal year 2012, both of which disclosed a single TDR of $38.072 million.  This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by November 12, 2013.  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

137.    The Q3 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. § 229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  The Individual Defendants should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

138.    Finally, the Q3 2013 10-Q was misleading with respect to the Company's then-existing internal controls.  The Q3 2013 10-Q contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen,

certifying that the financial information contained in the filing was accurate and that it disclosed any material changes to the Company's internal control over financial reporting.

139.    These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

140.    On February 26, 2014, weeks after all three of the major credit rating agencies had downgraded Puerto Rico's debt to junk status, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the fourth quarter and fiscal year 2013, during which the Individual Defendants continued to reassure investors that the Company's assets were performing well, including its mezzanine loans.  During the call, defendant Bryant stated that "all 57 of our real estate loans are current and performing," while defendant Bloom added:

> We're again pleased to report that *the entire RSO commercial mortgage portfolio is performing with no defaults*.  We're very particular about markets in which we lend, while additional markets continued to recover the depth and breadth of a given market, sponsor experience and asset specific business plans all play heavily in our underwriting process.  In addition although we're lending on lightly transitional properties, *we continue to target properties with stabilized projections that stand up to rigorous stressed underwriting and verification* with day one cash flow coverage and meaningful sponsor equity.

141.    The above statements, made by defendants Bloom and Bryant, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By February 26, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its

servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

142. On March 3, 2014, the Individual Defendants caused Resource Capital to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K").

143. The 2013 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio. While the Individual Defendants admitted in the 2013 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, in the 2013 10-K, the Individual Defendants portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby failing to disclose any exposure to the Puerto Rican economic crisis. Indeed, the 2013 10-K provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

144.   The 2013 10-K contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico:



**Geographic Area by State**



145.   Indeed, the 2013 10-K's Management Discussion and Analysis section—issued under the Individual Defendants' direction and on their watch—contained the following statement, which similarly misrepresented Resource Capital's real estate-related assets as being solely located in the United States, and that all necessary provisions for loan loss and impairments had been made by the Company:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers.  Over a period of several years, we entered into loan modifications with respect to 17 of our outstanding commercial real estate loans.  During the past three years, we have added to our provision for loan losses to reflect the effect of these conditions on our borrowers and have recorded both temporary and other than temporary impairments in the market valuation of CMBS and ABS in our investment portfolio.  However, during 2012 and into

- 57 -

December 31, 2013, the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly for 2013. We expensed provisions of $3.0 million for the year ended December 31, 2013 as compared to provisions of $16.8 million for the year ended December 31, 2012. Our asset impairments have increased slightly, we recognized asset impairments of $863,000 for the year ended December 31, 2013 as compared to $180,000 for the year ended December 31, 2012. We also saw a marked improvement in other comprehensive income with respect to our available for sale securities portfolio and interest rate derivatives, which declined to a loss of $14.0 million at December 31, 2013 from a loss of $27.1 million at December 31, 2012. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2013, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

146.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. Not only did the Individual Defendants cause Resource Capital's 2013 10-K to completely withhold the fact that the Company was even invested in Puerto Rico, but as disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the 2013 10-K, Puerto Rico was in the midst of a historic economic downturn. By March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

147.    Additionally, in the 2013 10-K, the Individual Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by

stating that "[a]ll of our commercial real estate loans were performing as of December 31, 2013 and 2012," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
|  | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
|  | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

*All of our commercial real estate loans were performing as of December 31, 2013 and 2012.*

148.   The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Incredibly, in the 2013 10-K, the Individual Defendants represented and categorized mezzanine loans involving Puerto Rican assets under its best credit risk category (Rating 1).  The Individual Defendants represented this despite the fact that by

March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

149.    Further, in the 2013 10-K, the Individual Defendants also made or caused to be made false and misleading statements about the Company's mezzanine loan portfolio by indicating that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of December 31, 2013:

**Troubled-Debt Restructurings**

The following tables show troubled-debt restructurings in our loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Year Ended December 31, 2013:** | | | | |
| Whole loans | 5 | $ | 143,484 | $ 147,826 |
| B notes | — | | — | — |
| **Mezzanine loans** | — | | — | — |
| Bank loans | — | | — | — |
| Residential mortgage loans | — | | — | — |
| Loans receivable - related party | 1 | | 6,592 | 6,592 |
| Total loans | 6 | $ | 150,076 | $ 154,418 |
| | | | | |
| **Year Ended December 31, 2012:** | | | | |
| Whole loans | 6 | $ | 143,261 | $ 126,946 |
| B notes | — | | — | — |
| Mezzanine loans | 1 | | 38,072 | 38,072 |
| Bank loans | — | | — | — |
| Loans receivable - related party | 1 | | 7,797 | 7,797 |
| Total loans | 8 | $ | 189,130 | $ 172,815 |

*As of December 31, 2013 and 2012, there were no troubled-debt restructurings that subsequently defaulted.*

150. The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As the Individual Defendants caused the Company to disclose on August 5, 2015, the loan loss allowance for its Puerto Rican investments was actually $41.1 million. Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled-debt restructurings, the 2013 10-K actually gave the impression that the quality of Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million. This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by March 3, 2014. Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

151. The 2013 10-K also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. § 229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. The Individual Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

152. Finally, the 2013 10-K was misleading with respect to the Company's then-existing internal controls. Resource Capital's 2013 10-K contained signed certifications pursuant to SOX

(identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In addition to defendants Bryant and Jonathan Cohen, the 2013 10-K was also signed by defendants Kessler, Beach, E. Cohen, Hart, Ickowicz, Levin, Neff, and Wiggins.

153.    These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

154.    On March 13, 2014, defendant Bloom (the Company's Senior Vice President for Commercial Real Estate) filed a Form 4 with the SEC disclosing the sale of Resource Capital stock.  The Form 4 disclosed that on March 11, 2014, Bloom sold 29,000 shares of Resource Capital stock at prices ranging from $5.78 per share to $5.80 per share.  The Form 4 further disclosed that on March 12, 2014, defendant Bloom sold an additional 8,165 shares of Resource Capital stock at prices ranging from $5.76 per share to $5.79 per share.  These sales took place at prices that were nearly double the $2.97 per share price to which Resource Capital stock fell following the truth publicly emerging.  Accordingly, by selling when he did, defendant Bloom effectively inflated his proceeds by more than 48%.

155.    Defendant Bloom's stock sales were irregular and atypical in terms of timing and size and, therefore, indicative of scienter.[3]  First, these sales followed, by mere weeks, the three

---

[3] Plaintiffs are not required to plead scienter as to any of their claims in this action.  *See infra* ¶240 at n.4.

major credit rating agencies' downgrade of Puerto Rican debt, and only one week after the filing of the materially misleading 2013 10-K.  Second, prior to defendant Bloom's sale on March 11, 2014, he had not sold a single share of Resource Capital stock in almost three years.  Third, in the aggregate, the transactions represented a sale of 20% of defendant Bloom's vested shares, or more than 11% of his total holdings in the Company.  As the Company's Senior Vice President for Real Estate Investments, and a key spokesperson for the Company on matters relating to the value of its commercial real estate loan portfolio, defendant Bloom was in a position to understand the effects of the Puerto Rican economic crisis on Resource Capital's mezzanine loans backed by certain Puerto Rican hotels, perhaps better than anyone else at the Company.  Indeed, as Senior Vice President for Real Estate Investments, defendant Bloom was responsible for the Company's quarterly evaluations for loan loss impairments, and most often affirmed his commitment to "credit quality."  Defendant Bloom's access to information pertaining to the Mezzanine Loan at issue, along with his material insider sale of stock, is highly suspicious.

156.    On April 16, 2014, the Individual Defendants caused Resource Capital to file a proxy statement pursuant to Section 14(a) of the Exchange Act (the "2014 Proxy").  The 2014 Proxy described director responsibilities, the duties of each committee, and Board risk management, and also provided information about the director nominees up for election.  However, the 2014 Proxy misrepresented and/or failed to disclose: (i) risks related to the Mezzanine Loan, including the Company's increasing exposure to Puerto Rico's ongoing economic decline; (ii) the true quality and performance of the Company's loans; (iii) deficiencies in Resource Capital's internal controls; and (iv) that as a result of the foregoing, Resource Capital's public statements were materially false and misleading at all relevant times.

157.    The 2014 Proxy also stated that based on the Company's "performance," the Company awarded its named executive officers more than $2 million in stock awards in 2013.  The 2014 Proxy omitted material information concerning the Company's true performance, and did not disclose the Company's inadequate internal controls that led to the Board approving compensation awards based on inflated levels of performance.

158.    On May 1, 2014, Moody's issued a press release stating that it had affirmed the current ratings on the 2007-WHALE8 Trust securities.  The ratings on the LXR-1 and LXR-2 classes remained at Caa1 and Caa3, respectively.  According to Moody's, "[o]bligations rated Caa are judged to be speculative of poor standing and are subject to very high credit risk."  Further, there were only eight hotels backing the Mezzanine Loan by that time, and Blackstone continued to be unable to make the repayment obligations.  As stated in the press release:

> The largest loan in the pool is secured by fee interests in LXR Hospitality Pool Loan ($599 million, or 68% of the pooled balance plus $124 million of non-pooled, or rake bonds within the trust).  *The remaining hotels include eight properties located in Arizona, Florida, Puerto Rico, and Jamaica*.  The Park Shore Waikiki, HI, Golden Door Spa in San Marcos, CA, Miami Beach Resort & Spa, FL, Wyndham Garden LaGuardia, NY, and The London West Hollywood, CA have been released to date.  The sponsor is The Blackstone Group.  There is additional debt in the form of non-trust junior component and mezzanine debt outside the trust.

> The previous special servicer (Bank of America, N.A.) completed a Forbearance Extension and Property Disposition Cooperation Agreement in September 2012.  *The plan provides for principal pay down from sale or refinance in the total amount of $447.45 million by May 9, 2014, and full repayment of the mortgage debt on September 9, 2014.  The borrower has requested an additional time and modification to the existing forbearance agreement at this time*.  The current special servicer (Key Bank, National Association) is in discussions with the borrower.

159.    On May 7, 2014, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the first quarter 2014 ("Q1 2014"), during which the Individual Defendants continued to state that the Company's assets were

performing well. During the call, defendant Bloom reiterated that the Company's entire real estate portfolio was performing, stating:

> Credit across the portfolio continues to trend in very positive direction, with improving metrics across all assets classes. The majority of the properties securing our loans are continuing to realize improved cash flow and receiving borrower's plans for value creation well on or ahead of track. ***Once again, I'm pleased to report that the entire commercial real estate loan portfolio is performing with no defaults***.

160.    During the call, defendant Jonathan Cohen also stated:

> Our credit quality continues to be very solid, our real estate watch-list is shrinking and we reverse $4.6 million of the specific allowance in the first quarter as a result of the pending sale by the borrower on the property of a legacy the whole loan that will pay down the existing balance and further reduce our legacy loan portfolio.

161.    The above statements, made by defendants Bloom and Jonathan Cohen, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By May 7, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Additionally, as of May 1, 2014, Fitch Ratings downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

162.    On May 9, 2014, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").

163.    The Q1 2014 10-Q—which incorporated the 2013 10-K, specifically including the "Risk Factors" disclosed in the 2013 10-K—failed to disclose the Company's increasing exposure to Puerto Rico's ongoing economic decline related to the Mezzanine Loan.  Indeed, the Q1 2014 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio.  While the Individual Defendants admitted in the 2013 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis.  Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis.  By incorporating the 2013 10-K, the Q1 2014 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties.  We also may have material concentrations in the property types and industry sectors that are in our loan portfolio.  Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios.  An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

164.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As of the date of the Q1 2014 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By May 9, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance

- 66 -

agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

165. Additionally, in the Q1 2014 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31 2014** | | | | | | |
| Whole loans | $  768,243 | $  32,500 | $  33,110 | $  — | $  — | $  833,853 |
| B notes | 16,168 | — | — | — | — | 16,168 |
| Mezzanine loans | 51,832 | 12,467 | — | — | — | 64,299 |
| | $  836,243 | $  44,967 | $  33,110 | $  — | $  — | $  914,320 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $  680,718 | $  32,500 | $  32,571 | $  — | $  — | $  745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $  748,785 | $  44,955 | $  32,571 | $  — | $  — | $  826,311 |

*All of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013.*

166.    The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Incredibly, the Q1 2014 10-Q represented and categorized mezzanine loans involving Puerto Rican assets under its best credit risk category (Rating 1).  The Individual Defendants represented this despite the fact that by May 9, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

167.    Further, in the Q1 2014 10-Q, the Individual Defendants also made or caused to be made false and misleading statements about the Company's mezzanine loan portfolio by indicating

that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of March 31, 2014:

### Troubled-Debt Restructurings

The Company had no troubled-debt restructurings during the three months ended March 31, 2014.

The following table shows troubled-debt restructurings in the Company's loan portfolio (in thousands) during the three months *ended March 31, 2013*:

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| Whole loans | 6 | $ 153,958 | $ 136,672 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 8 | $ 199,827 | $ 182,541 |

*As of March 31, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.*

168.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments.  As the Individual Defendants disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments alone was actually $41.1 million.  Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled-debt restructurings, the Q1 2014 10-Q actually gave the impression that the quality of Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million.  In addition, in the Q1 2014 10-Q, the Individual Defendants misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company did not

- 69 -

receive any interest income (other than on an accrual basis) since September 2012. The Individual Defendants represented this despite the fact that by May 9, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

169. The Q1 2014 10-Q also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. The Individual Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

170. Finally, the Q1 2014 10-Q was misleading with respect to the Company's then-existing internal controls. The Q1 2014 10-Q contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

171. These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's

internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

172.    On August 6, 2014, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for second quarter 2014 ("Q2 2014"), during which the Individual Defendants continued to state that the Company's assets were performing well.  During the call, defendant Bloom reiterated that the Company's entire real estate portfolio was performing, stating:

> We also note improving credit metrics across all asset classes represented in our commercial real estate portfolio.  The majority of the properties securing our loans are continuing to realize improved cash flow with borrowers' plans for value creation well on track.  ***I am once again pleased to report that the entire commercial real estate loan portfolio is performing with no defaults***.

173.    During the call, defendant Bryant also stated:

> Only one bank loan for $1.6 million is delinquent out of a portfolio of $765 million and again all of our real estate loans totaling $1,000,043,000 are current.  Our leverage stands at 1.7 times at June 30.  When we treat our TruPS issuances, which have a remaining term of approximately 22 years, as equity our leverage is 1.6 times.

174.    The above statements, made by defendants Bloom and Bryant, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By August 6, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below

issuance expectations." Ultimately, Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

175. On August 8, 2014, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").

176. The Q2 2014 10-Q—which incorporated the 2013 10-K, specifically including the "Risk Factors" disclosed in the 2013 10-K—failed to disclose the Company's increasing exposure to Puerto Rico's ongoing economic decline related to the Mezzanine Loan. Indeed, the Q2 2014 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio. While the Individual Defendants admitted in the 2013 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. By incorporating the 2013 10-K, the Q2 2014 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

- 72 -

177.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the Q2 2014 10-Q, Puerto Rico was already experiencing a historic economic downturn.  By August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."   Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.  Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch—failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

178.    Additionally, in the Q2 2014 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were current as of June 30, 2014 and December 31, 2013," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades are made

continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2014** | | | | | | |
| Whole loans | $ 900,246 | $ 32,500 | $ 22,000 | $ — | $ — | $ 954,746 |
| B notes | 16,138 | — | — | — | — | 16,138 |
| Mezzanine loans | 45,460 | 21,800 | — | — | — | 67,260 |
| | $ 961,844 | $ 54,300 | $ 22,000 | $ — | $ — | $ 1,038,144 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

*All of the Company's commercial real estate loans were current as of June 30, 2014 and December 31, 2013.*

179.    The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Incredibly, in the Q2 2014 10-Q, the Individual Defendants represented and categorized mezzanine loans involving Puerto Rican assets under its best credit risk category (Rating 1).  The Individual Defendants characterized the portfolio in this way despite the fact that by August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below

- 74 -

issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

180. Further, in the Q2 2014 10-Q, the Individual Defendants also made or caused to be made false and misleading statements about the Company's mezzanine loan portfolio by indicating that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of June 30, 2014:

**Troubled-Debt Restructurings**

The Company had no troubled-debt restructurings during the three months ended June 30, 2014 and 2013 or during the six months ended June 30, 2014.

The following table shows troubled-debt restructurings in the Company's loan portfolio during the six months ended June 30, 2013 (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Six Months Ended June 30, 2013** | | | | |
| Whole loans | 2 | $ | 56,328 | $ 56,328 |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Residential mortgage loans | — | | — | — |
| Loans receivable - related party | 1 | | 6,592 | 6,592 |
| Total loans | 3 | $ | 62,920 | $ 62,920 |

*As of June 30, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.*

181. The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As the Individual Defendants disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments alone was actually $41.1 million. In addition, the Q2 2014 10-Q misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even

though the Company had not received any interest income (other than on an accrual basis) since September 2012.  The Individual Defendants represented this despite the fact that by August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

182.    The Q2 2014 10-Q also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. § 229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  The Individual Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

183.    Finally, the Q2 2014 10-Q was misleading with respect to the Company's then-existing internal controls.  The Q2 2014 10-Q contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

184. These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

185. On November 4, 2014, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for third quarter 2014 ("Q3 2014"), during which the Individual Defendants continued to state that the Company's assets were performing well. During the call, defendant Bloom reiterated that the Company's entire real estate portfolio was performing, stating: "*I am once again pleased to report that the entire commercial real estate portfolio is performing with no defaults*." Further, defendant Bryant added: "[T]wo bank loans for $2.3 million are delinquent out of a portfolio of $712 million, just 32 basis points, and all of our 65 real estate loans totaling $1.1 billion are current."

186. The above statements, made by defendants Bloom and Bryant, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By November 4, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

- 77 -

187.    On November 10, 2014, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

188.    The Q3 2014 10-Q—which incorporated the 2013 10-K, specifically including the "Risk Factors" disclosed in the 2013 10-K—failed to disclose the Company's increasing exposure to Puerto Rico's ongoing economic decline related to the Mezzanine Loan.    Indeed, the Q3 2014 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio.    While the Individual Defendants admitted in the 2013 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis.    Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis.    By incorporating the 2013 10-K, the Q3 2014 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties.    We also may have material concentrations in the property types and industry sectors that are in our loan portfolio.    Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios.    An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

189.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the

Puerto Rican economic crisis. As disclosed on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the Q3 2014 10-Q, Puerto Rico was already experiencing a historic economic downturn. By November 10, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio. Accordingly, the Individual Defendants' risk disclosure failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

190.    Additionally, in the Q3 2014 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were current as of September 30, 2014 and December 31, 2013," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers factors such as the strength of underlying sponsorship,

payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2014** | | | | | | |
| Whole loans | $ 990,471 | $ 32,500 | $ — | $ — | $ — | $ 1,022,971 |
| B notes | 16,107 | — | — | — | — | 16,107 |
| Mezzanine loans | 45,447 | 21,858 | — | — | — | 67,305 |
| | $ 1,052,025 | $ 54,358 | $ — | $ — | $ — | $ 1,106,383 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

***All of the Company's commercial real estate loans were current as of September 30, 2014 and December 31, 2013.***

191.    The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Incredibly, the Q3 2014 10-Q represented and categorized mezzanine loans involving Puerto Rican assets under its best credit risk category (Rating 1), despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012, two years prior, as interest merely accrued.  Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.  In addition, the Q3 2014 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were current as of September 30, 2014 and December 31, 2013," despite the fact that the Company stopped receiving cash income from the loan in September 2012.  The Individual Defendants characterized the portfolio in this way despite the fact that by November 10, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations,"

Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

192.    The Q3 2014 10-Q also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. § 229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  The Individual Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

193.    Finally, the Q3 2014 10-Q was misleading with respect to the Company's then-existing internal controls.  The Q3 2014 10-Q contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

194.    These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

195.    On February 26, 2015, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the fourth quarter and fiscal year 2014, during which the Individual Defendants continued to state that the Company's assets were performing well.  During the call, defendant Bloom reiterated that the Company's entire real estate portfolio was performing, stating:

> We will continue to utilize our $600 million term financing facilities to support the growth of our new loan originations, and we plan to access the CLO market to optimally match fund our assets on a regular basis.  We know improving credit metrics across all asset classes represented in our commercial real estate loan portfolio, the majority of the properties securing our loans continuing to realize improved cash flow with borrowers' plans for value creation well on track.  ***I am once again pleased to report the entire commercial real estate loan portfolio is performing with no defaults***.

196.    During the call, defendant Bryant also stated:

> Two bank loans for $1.4 million are delinquent out of a portfolio of $323million, 41 basis points and all 78 of our real estate loans are current.  Of note, for Q4 we were able to sell off two remaining real estate properties for gains of $3.2 million, bringing 2014 gains to $6.1 million.

197.    The above statements, made by defendants Bloom and Bryant, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By February 26, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

198.    On March 2, 2015, the Individual Defendants caused Resource Capital to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").

199.    The 2014 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio. While the Individual Defendants admitted in the 2014 10-K that certain geographic concentrations could affect the performance of the Company's investments, they failed to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, in the 2014 10-K, the Individual Defendants portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby failing to disclose any exposure to the Puerto Rican economic crisis. Indeed, the 2014 10-K provided the following risk disclosure:

Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.

We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

200.    The 2014 10-K contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico:

- 83 -



201.    Indeed, the 2014 10-K's Management Discussion and Analysis section—issued under the Individual Defendants' direction and on their watch—contained the following statement, which similarly misrepresented Resource Capital's real estate-related assets as being solely located in the United States, and that all necessary provisions for loan loss and impairments had been made by the Company:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. Over a period of several years, we entered into loan modifications with respect to 14 of our remaining outstanding commercial real estate loans. During the past 21 months, we have adjusted our provision for loan losses to reflect the effect of these conditions on our borrowers as well as, where necessary, market-related temporary adjustments to the market valuations of both CMBS and ABS in our investment portfolio. However, during 2013 and continuing through December 31, 2014, the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly in 2014. For the year ended December 31, 2014, we have a net recovery in the provision for loan losses of $1.8 million, primarily due to the successful refinancing of a commercial real estate loan position on which we had previously established a significant reserve for credit loss. Also, other comprehensive income saw an increase of $20.1 million at December 31, 2014. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2014, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

202.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis.  As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007.  As of the date of the 2014 10-K, Puerto Rico was already experiencing a historic economic downturn.  By March 2, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.  Further, Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.  Accordingly, the Individual Defendants' risk disclosure failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

203.    Additionally, in the 2014 10-K, the Individual Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of our commercial real estate loans were performing as of December 31, 2014 and 2013," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new

information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We value loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |
| | | | | | | |
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

***All of our commercial real estate loans were performing as of December 31, 2014 and 2013.***

204.    The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Incredibly, the 2014 10-K represented and categorized the Company's mezzanine loans involving Puerto Rican assets under its best credit risk category (Rating 1).  The Individual Defendants represented this despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012, as interest merely accrued.  Indeed, the Individual Defendants caused the Company to specifically note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.  In addition, the 2014 10-K was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of December 31, 2014 and 2013."  The Individual Defendants characterized

the loan portfolio in this way, despite the fact that by March 2, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

205.    The 2014 10-K also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. § 229.303(a)(3)(i).   Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.   The Individual Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

206.    Finally, the 2014 10-K was misleading with respect to the Company's then-existing internal controls.  Resource Capital's 2014 10-K contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen, certifying that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In addition to defendants Bryant and Jonathan Cohen, the 2014 10-K was signed by defendants Kessler, Beach, E. Cohen, Hart, Ickowicz, Levin, Neff, and Wiggins.

207.    These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

208.    On April 23, 2015, the Individual Defendants caused Resource Capital to file a proxy statement pursuant to Section 14(a) of the Exchange Act (the "2015 Proxy").    The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election.  However, the 2015 Proxy misrepresented and/or failed to disclose: (i) risks related to the Mezzanine Loan, including the Company's increasing exposure to Puerto Rico's ongoing economic decline; (ii) the true quality and performance of the Company's loans; (iii) deficiencies in Resource Capital's internal controls; and (iv) that as a result of the foregoing, Resource Capital's public statements were materially false and misleading at all relevant times.

209.    The 2015 Proxy also stated that based on the Company's "performance," the Company awarded its named executive officers more than $2.5 million in stock awards in 2014. The 2015 Proxy omitted material information concerning the Company's true performance and did not disclose the Company's inadequate internal controls that led to the Board approving compensation awards based on inflated levels of performance.

210.    On May 6, 2015, the Individual Defendants caused Resource Capital to hold a conference call regarding the Company's financial results for the first quarter 2015 ("Q1 2015"), during which the Individual Defendants continued to state that the Company's assets were performing well.  During the call, defendant Bloom stated:

I am *once again pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.*  The broader real estate recovery has taken hold and we remain optimistic about fundamentals, but are cautiously on the lookout for markets that we feel are outpacing normal sustainable growth.  The positive performance of our portfolio is a daily reminder that validates the credit first approach to lending and selectivity we apply to markets, asset classes and sponsors in our origination process.

211.    During the call, defendant Bloom also stated:

We ended the period with $4 million in commercial real estate allowances and $3.2 million in commercial financial allowances.  With the lone exception of the one specific middle market position that became impaired, our credit has been very good.  One bank loan where a mere $251,000 is delinquent out of a portfolio of $298 million.  All of our middle market loans are current, and as Dave Bloom mentioned, *all 79 of our real estate loans totaling $1.5 billion are current.*

212.    The above statements, made by defendant Bloom, were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan.  By May 6, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

213.    On May 11, 2015, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").

214.    The Q1 2015 10-Q—which incorporated the 2014 10-K, specifically including the "Risk Factors" disclosed in the 2014 10-K—failed to disclose the Company's increasing exposure

to Puerto Rico's ongoing economic decline related to the Mezzanine Loan. Indeed, the Q1 2015 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to the Puerto Rican economy within its commercial real estate loan portfolio. While the Individual Defendants admitted in the 2014 10-K that certain geographic concentrations could affect the performance of the Company's investments, they omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. By incorporating the 2014 10-K, the Q1 2015 10-Q provided the following risk disclosure:

> Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

215. The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the Q1 2015 10-Q, Puerto Rico was already experiencing a historic economic downturn. By May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a

- 90 -

forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold. Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio. Accordingly, Resource Capital's risk disclosure—issued under the Individual Defendants' direction and on their watch— failed to accurately disclose the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

216. Additionally, in the Q1 2015 10-Q, the Individual Defendants materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were current as of March 31, 2015 and December 31, 2014," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31, 2015** | | | | | | |
| Whole loans | $ 1,329,882 | $ 32,500 | $ — | $ — | $ — | $ 1,362,382 |
| B notes | 16,031 | — | — | — | — | 16,031 |
| Mezzanine loans | 45,417 | 22,054 | — | — | — | 67,471 |
| | $ 1,391,330 | $ 54,554 | $ — | $ — | $ — | $ 1,445,884 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |

*All of the Company's commercial real estate loans were current as of March 31, 2015 and December 31, 2014.*

217.    The above statements, made or caused to be made by the Individual Defendants, were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets.  Incredibly, the Q1 2015 10-Q represented and categorized mezzanine loans involving Puerto Rican assets under its best credit risk category (Rating 1).  The Individual Defendants misrepresented this fact despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012, as interest merely accrued.  Indeed, the Individual Defendants specifically caused the Company to note payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio.  In addition, the Q1 2015 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were current as of March 31, 2015 and December 31, 2014."  The Individual Defendants characterized the portfolio in this way despite the fact that by May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below

issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold.

218.    Further, in the Q1 2015 10-Q, the Individual Defendants also made or caused to be made false and misleading statements about the Company's mezzanine loan portfolio by indicating that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of March 31, 2015:

**Troubled-Debt Restructurings**

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended March 31, 2015:** | | | |
| Whole loans | 2 | $      67,459 | $      67,459 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Middle market loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $      67,459 | $      67,459 |

*The Company had no troubled-debt restructurings during the three months ended March 31, 2014.* As of March 31, 2015 and 2014, there were no commercial real estate loan troubled-debt restructurings that subsequently defaulted.

219.    The above statements, made or caused to be made by the Individual Defendants, were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, the existence of a troubled-debt restructuring in the Company's mezzanine loan portfolio, and the actual amounts that the Company would be able to recover from its real estate loan investments. As disclosed on August 5, 2015, the loan loss allowance for Resource Capital's Puerto Rican investments alone was actually $41.1 million.  Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled-debt restructurings, the Q1 2015 10-Q actually gave the impression that the quality of Resource Capital's mezzanine loan portfolio

- 93 -

improved compared to the previous quarter, which disclosed a single TDR of $38.072 million.  In addition, in the Q1 2015 10-Q, the Individual Defendants misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company did not receive any interest income (other than on an accrual basis) since September 2012.  The Individual Defendants represented this despite the fact that by May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold.  Ultimately, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to the non-performing assets comprising the underlying portfolio.

220.    The Q1 2015 10-Q also failed to comply with Item 303 of Regulation S-K, by failing to disclose the Company's exposure to the Puerto Rican economic crisis.  17 C.F.R. § 229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  The Individual Defendants should have disclosed the Company's exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

221.    Finally, the Q1 2015 10-Q was misleading with respect to the Company's then-existing internal controls.  The Q1 2015 10-Q contained signed certifications pursuant to SOX (identical to those described above in ¶99, *supra*) by defendants Bryant and Jonathan Cohen,

certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

222.    These SOX certifications, made or caused to be made by the Individual Defendants, were materially false and misleading as to: (i) the quality and effectiveness of the Company's internal controls; and (ii) the completeness of the disclosures, which omitted material information including the Company's exposure to the economic crisis in Puerto Rico, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loans.

### E.    The Reasons the Relevant Period Statements Issued By the Individual Defendants Were False and Misleading

223.    The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)    the Company's increasing exposure to Puerto Rico's ongoing economic decline created significant financial risks;

(b)    the portfolio backing the Mezzanine Loan had decreased significantly in value, and payments had stopped pursuant to the forbearance agreement between Blackstone and the special servicer;

(c)    despite the repeated assurances by the Individual Defendants that all of the Company's real estate loans were performing, the Mezzanine Loan was not performing;

(d)    the Company lacked adequate internal controls; and

(e)    as a result of the foregoing, the Company's touted financial and business prospects were materially false and misleading at all relevant times.

224.    As a result of the false and misleading statements and omissions, made or caused to be made by the Individual Defendants, Resource Capital shares traded at artificially inflated

- 95 -

prices during the Relevant Period.  Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, investors sold Resource Capital stock, causing the Company's stock price to fall 12.36% on August 5, 2015, to close at $3.05 per share, erasing millions of dollars in market capitalization.

### F.    The Truth Begins to Emerge

225.    After several years of failing to disclose Resource Capital's exposure to the Puerto Rican economy, and the true credit risk profile of its mezzanine loan portfolio—all occurring under the Individual Defendants' direction and on their watch—the Individual Defendants finally revealed the truth about Resource Capital's hidden investments in August 2015.

226.    On August 4, 2015, after the markets closed, the Individual Defendants caused Resource Capital to issue a press release announcing its results for the quarter ended June 30, 2015. Investors and analysts were shocked when the Company disclosed a GAAP net loss of $31 million for the quarter, attributing the loss to the Company's recording of an allowance for $41.1 million for the Mezzanine Loan.  As reported in the press release:

> *Impairment*
>
> During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007.  The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million.  The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels.  The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved.

227.    On August 5, 2015, the Individual Defendants caused Resource Capital to hold a conference call to discuss the Company's shocking financial results for the second quarter 2015 ("Q2 2015").  The Individual Defendants conceded that the Company had been exposed to the risk

- 96 -

of Puerto Rico's failing economy since 2007 and that the Mezzanine Loan had not been performing since at least 2012.  Indeed, during the call, defendant Jonathan Cohen stated:

> [W]e cannot ignore the significant pressure on our stock price which has certainly been a source of frustration for our shareholders and for us personally.
>
> On top of that *a legacy mezzanine loan that we purchased in 2007, one of the last two mezzanine positions in our portfolio deteriorated suddenly due to its exposure to Puerto Rico and we were forced to impair that asset*.  We stopped investing in this type of loan in 2007 and the remaining mezzanine loan in our portfolio is a very good credit, a $7 million position secured by property in New York City and we expected to pay off within the next 18 months.  This impairment causes our book value to decrease to $4.56 leaving us trading at approximately 78% of GAAP book value.
>
> *       *       *
>
> Obviously a large and very disappointing element of our result this quarter was the loan loss reserve that we recognize on our position in a mezzanine loan whose borrower is an affiliate of one of the world's largest private equity firms.  The loan we impair was one where we had a small percentage of a subordinated mezzanine position in a complicated multi-tranche $2.8 billion transaction that financed luxury hotels.
>
> *Our investment was purchased in 2007 at a very well capitalized and committed borrower went through several restructurings over the years to provide runway for the borrower to complete its business plan and we expected to be paid off when that happens*.
>
> *But the last three assets are in Puerto Rico*.  The borrower's ability to favorably refinance its senior loans was impacted by economic and credit conditions in Puerto Rico and the new loan which closed in May meaningfully reduced the borrower's time to achieve its plan.  On such highly leveraged transaction even small changes in value can have a large impact on the subordinated tranches which unfortunately is where we were.
>
> *Accordingly we have fully reserved for it*.

228.    Also during the call, defendant Bloom added:

> Jonathan addressed the specific reserve that we took this quarter on a mezzanine loan that was part of a very large multi-tranche financing that included a $1.3 billion first mortgage and $625 million of mezzanine debt split into eight tranches, many with multiple participants and over $830 million of borrower act equity into the transaction.  *Its important note that this loan dates back to mid-2007 and was restructured and amended in 2012 and since that time, interest was on an accrual*

- 97 -

*basis, so it has not contributed to our income since September of 2012 in any meaningful way*.

*Pursuant to the terms of the extension the loan has not some due, nor is it in default, that said in the ordinary course of closing our quarters we review all of our loan positions and after a review of the subject transaction the determination was made to impair the position in the current quarter as we have serious doubts about the ultimate collectability of the loan upon maturity*. That said, markets can change suddenly and with almost a year until the loan matures, no one can be absolutely certain about the ultimate resolution of this impaired loan.

By way of brief history RSO's commercial real estate business plan has always been to directly originate, floating rate whole loans unlikely transitional properties across the country. Having commenced operations in mid-2005 during the time that we were building out our national origination team, we still recognized relative value in certain mezzanine loans and B note investments. Markets were extremely liquid and the majority of these subject positions paid off in relatively short order, that said we were always cognizant of the fact that multi-tranche debt transactions involved other lenders which results in a lack of unilateral control should a problem arise.

229.    During the question-and-answer portion of the call, defendants Bloom and Jonathan Cohen engaged in a discussion with Steve Delaney ("Delaney"), an analyst from JMP Securities, relating to the Puerto Rico mezzanine loan position, and recognized the previously undisclosed risk associated with a mezzanine loan secured by real estate located in the embattled Commonwealth of Puerto Rico, as follows:

**DeLaney:**
Good morning John. I know this is a tough call for you guys and I appreciate you stepping up addressing the stock situation right upfront for us. Thank you. I'd like to clarify for starters not that -- we'll come back to those large mez loans but at March you were carrying 67.5 million of mez loans with the 38 million impaired suggesting maybe 29 million to 30 million of other mez loans. Now I wanted to compare that you mentioned there was one remaining of $7 million in New York. Can you just clarify what is left in the mez bucket beyond this hotel loan?

**Defendant Bloom:**
Steve, this is Dave, let me reconcile that for you. So, you're right. It was $67 million less $38 million gets you to about $29 million, about $13 million paid off in Q2 on one position. And another $9 million or $9.5 million paid off in July, right after the quarter ended. So that's why we're now left with little over $7 million on that one position.

- 98 -

**DeLaney:**

Okay, great. That's helpful, appreciate you clarifying that and the characteristics of the remaining $7 million. And look, we recognize you guys have done an amazing job over the last two, three years just shedding mezz where you could and just getting back to the large problematic loan. I guess it sounds like to me that it was a combination of both the structure, the original loan structure and what became sort of an idiosyncratic situation with respect to what you ended up with is residual credit and that's really the only question I have is you started off with 13 loans and it sounds like you're ending up with three loans that are happen to be in Puerto Rico, you use the term the last loans. So help me understand as payoffs were made, collateral was released, did you benefit from any of the paydown and as these other 10 hotel properties were sold or did all that cash flow go to senior tranches, let's start there?

**Defendant Bloom:**

So just to be clear, the priority of payment is sequential. So the senior loan it was retired first and then tranches of mezzanine loan are retired in a specific order after that.

**DeLaney:**

Yes, that's what was going through my mind. So, you end up going from, it's almost like adverse selection. The most liquid properties, I guess, go out first and as a subordinate investor, you're kind of left with, you're really lending on the weaker loans in the pool, I guess, and you acknowledge that that was the weakness in that structure and one reason why you guys ceased doing that business. Okay, so and just to be clear there is three hotels left and they're all in Puerto Rico. Correct?

**Defendant Bloom:**

There are now two.

**DeLaney:**

Two, where?

**Defendant Bloom:**

They are all in Puerto Rico.

**DeLaney:**

Both in Puerto Rico. So let me suggest this and maybe other analysts will have questions after this, but just a thought this is very complicated. I think look, there is a $0.31 hit to book that's all fine, we know you're not in this business, I think investors will like to make their own decision about the possibility of any type of recovery, it can't hurt you any more now, right? But a thought I had is -- because it is so detailed and involved, I think people might want to know, how many room keys, what RevPAR, would you at least consider, and you don't have to answer this, but I'm going to suggest that you consider putting in information piece together on the two loans or whatever you can disclose publicly and maybe put that

out on an 8-K, and then sophisticated real estate investors can kind of draw their own conclusions as to whether there is any possibility of a recovery, what would have to develop, so just a suggestion there if I may.

**Defendant Jonathan Cohen:**
This is Jonathan.  Thank you, Steve, and we will take that under consideration.

**DeLaney:**
You are very welcome.  When you have these legacy situations, John, where you could end up in effect with a $40 million credit loss, is there any reach back on prior incentive fees that may have been paid, is there any adjustment to that for the benefit of shareholders, how would you and the Board address that if this becomes a real loss?

**Defendant Jonathan Cohen:**
Well first of all we haven't, unfortunately for us made very many incentive fees over the years.  So I don't think there is many to reach back to but obviously when it becomes real loss it goes into that calculation.

230.    On August 7, 2015, the Individual Defendants caused Resource Capital to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  The Q2 2015 10-Q finally disclosed: (i) the Company's exposure to Puerto Rico's ongoing economic decline through the Mezzanine Loan, which dated back to 2007; and (ii) the extent of the credit risk to the Company's mezzanine loan portfolio.  In contrast to the previous disclosures, which stated that all of the Company's commercial real estate loans were performing, the Company now stated that it "had no delinquent commercial real estate loans":

> During the quarter ended June 30, 2015, the Company recorded an allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007.  The outstanding loan balance of $38.1 million was fully reserved and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million.  The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels.  An impairment analysis showed that the fair value of the underlying collateral declined from that as of March 31, 2015.  Contributing to this decline was a modification of the senior mortgage that accelerated the time horizon for disposing of the three remaining properties collateralizing the loan.  Compounding this fact, the remaining three luxury brand hotel properties securing the loan are located in or near San Juan,

Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that realizable values had declined rapidly and that the troubled debt restructuring should be fully reserved as of June 30, 2015.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2015** | | | | | | |
| Whole loans | $1,467,901 | $ 32,500 | $ — | $ 2,202 | $ — | $1,502,603 |
| B notes | 15,997 | — | — | — | — | 15,997 |
| Mezzanine loans | 16,750 | — | — | 38,072 | — | 54,822 |
| | $1,500,648 | $ 32,500 | $ — | $ 40,274 | $ — | $1,573,422 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $1,231,092 | $ 32,500 | $ — | $ — | $ — | $1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $1,292,596 | $ 54,434 | $ — | $ — | $ — | $1,347,030 |

*The Company had no delinquent commercial real estate loans as of June 30, 2015 and December 31, 2014.*

231.    Notably, the Individual Defendants changed the language used in connection with this disclosure—the Q2 2015 10-Q stated that "[t]he Company had no delinquent commercial real estate loans," rather than affirmatively stating that all of the Company's loans were "current" or "performing," like all of Resource Capital's previous disclosures during the Relevant Period.

232.    Further, the Q2 2015 10-Q gave a significant portion of its mezzanine loans—$38.072 million—the worst risk rating of 4, in contrast to the previous reports which stated that the mezzanine loans had a risk rating of 1 or 2.

233.    In addition, the Company's allowance for loan loss increased to $46.319 million as of June 30, 2015, as compared with $7.385 million as of March 31, 2015, and $4.613 million as of December 31, 2014.

234.    On January 29, 2016, Resource America announced that it had hired an outside advisor to assist the Board in considering strategic alternatives.

235.    On February 12, 2016, the Amended Complaint for Violation of Federal Securities Laws was filed in the Securities Class Action.  The Securities Complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder against the Company and defendants Jonathan Cohen, Bryant, Blackwell, and Bloom on behalf of all persons who purchased Company stock between October 31, 2012 and August 5, 2015.

236.    On May 20, 2016, defendants Jonathan Cohen and E. Cohen notified the Board that they intended to resign as directors of Resource Capital, with the resignations effective September 8, 2016.  The Board appointed Jeffrey Cohen and Farkas as replacement directors on May 21, 2016.

237.    On May 23, 2016, Resource America announced it would be acquired by C-III.

238.    Defendant Jonathan Cohen also resigned as CEO and President effective September 8, 2016, and Robert C. Lieber was appointed as CEO and President.

### G.    The Related Securities Class Action is Sustained

239.    On October 5, 2016, Judge Stanton of the United States District Court for the Southern District of New York denied the defendants' motion to dismiss the Securities Class Action.  In his Order, Judge Stanton stated:

> To describe the Mezzanine Loan as "performing" or "current" without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5 ". . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . ." That pleads a prima facie violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

> Defendants raise issues, but each is rebuttable (in parentheses). They say the omission was not material in comparison to Resource's overall assets (it was material to the truth of the statements they made in the 1 OQs, and the stock fell 12% on the announcement of the need for 100% reserve against the debt). Defendants' argue that they lacked scienter (the relevant facts were well known to them, and the omission gave Resource Capital the advantage of maintaining the impression that all was well in the portfolio). They assert that the non-disclosure

accorded with generally Accepted Accounting Principles (the Financial Accounting Standards Board does not grant exemptions from making disclosures required to avoid misleading under the Exchange Act).

Much in the surrounding circumstances may lead to a defendants' verdict at trial, but one cannot at this point enter judgment dismissing the complaint against them as a matter of law.

240.    Significantly, Judge Stanton found that the actionable statements alleged in the Securities Action met the materially ***heightened*** pleading standards imposed upon the Securities Plaintiff by the PSLRA,[4] which are inapplicable in this shareholder derivative action.

**V.      DUTIES OF THE INDIVIDUAL DEFENDANTS**

**A.      <u>Fiduciary Duties</u>**

241.    By reason of their positions as officers, directors, and/or fiduciaries of Resource Capital, and because of their ability to control the business and corporate affairs of Resource Capital, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Resource Capital in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Resource

---

[4] The PSLRA imposes significantly heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter.  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002).  To meet these heightened standards, a complaint must specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.  *Id.* at 1085.  With respect to pleading scienter, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind.  15 U.S.C. § 78-u4(b)(2).  The inference of scienter must be more than merely reasonable—it must be cogent and compelling, meaning that a complaint will only survive if a reasonable person would deem the inference of scienter cogent, and at least as compelling as any opposing inference one could draw from the facts alleged.  *See Tellabs, Inc. v. Makor Issue & Rights, Ltd.*, 551 U.S. 308 (2007).  Notably, the PSLRA's heightened pleading standards ***do not apply*** to this shareholder derivative action.  *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010).

Capital and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

242.    Each director and officer of the Company owes to Resource Capital and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

243.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### B.    Audit Committee Duties

244.    In addition to these duties, the members of the Audit Committee owed specific duties to Resource Capital, under the Audit Committee's Charter, to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

245.    Specifically, according to Resource Capital's Audit Committee Charter, the Audit Committee's responsibilities include the principal functions of assisting the Board in its oversight duties and in this capacity:

1.    Is responsible for appointing the Company's independent auditors and exercising oversight thereof;

2.    Is delegated the authority to receive funds and engage advisors as needed;

3.    Shall monitor the integrity and ensure the transparency of the Company's financial reporting processes and systems of internal controls regarding finance, accounting and regulatory compliance;

4.    Shall ensure the independence and monitor the performance of the Company's independent auditors and internal auditing department;

5.      Shall provide an avenue of communication among the independent auditors, management, the internal auditing department and the Board of Directors; and

To effectively perform his or her role, each Committee member will obtain an understanding of the responsibilities of Audit Committee membership.

246.    Specifically, regarding financial statements and disclosures, the members of the Audit Committee owed specific duties to the Company under the Audit Committee Charter to:

1.      Review significant accounting and reporting issues and understand their impact on the financial statements.  These issues include:

    o      Complex or unusual transactions and highly judgmental areas

    o      Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles

    o      The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company

2.      Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

3.      Review with management and the external auditors the results of the audit, including any difficulties encountered.  This review will include any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

4.      Discuss the annual audited financial statements and quarterly financial statements with management and the external auditors prior to filing or distribution.  The review should include discussions with management and independent auditors of significant issues regarding accounting principles, practices, and judgments.

5.      Review disclosures made by CEO and CFO during the Forms 10-K and 10-Q certification process about significant deficiencies, if any, in the design or operation of internal controls or any fraud that involves management or other employees who have a significant role in the Company's internal controls.

6.      Review earnings press releases (particularly use of "pro-forma," or "adjusted" non-GAAP information), as well as financial information and earnings guidance, if any, provided to analysts and rating agencies. This review may be general (i.e., the types of information to be disclosed and the type of presentations to be made). The Audit Committee Chairman and the independent auditors should each indicate their approval to management prior to the issuance of earnings press releases. The Audit Committee Chairman and the external auditors will confer, as necessary, prior to providing such approval.

247.    Further, regarding internal controls, the members of the Audit Committee owed specific duties to the Company under the Audit Committee Charter to:

1.      Consider the effectiveness of the Company's internal control system, including information technology security and control and compliance with the reporting requirements of The Sarbanes-Oxley Act.

2.      Understand the scope of internal and external auditors' review of internal control over financial reporting, and obtain reports on significant findings and recommendations, together with management's responses.

3.      In consultation with management and independent accountants, verify that the CEO and CFO have certified that they disclosed to the independent auditors and to the Audit Committee all significant deficiencies, if any, in the design or operation of internal controls that could affect the Company's ability to record, process, summarize and report financial data, any material weaknesses in the internal controls, and fraud – whether or not material – that involved management or other employees who have a significant role in the Company's internal control.

4.      Analyze any internal control deficiencies, management or employee fraud identified by the CEO/CFO certification process or by the Disclosure Committee.

248.    Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**C.      Duties Pursuant to the Company's Code of Conduct and Ethics**

249.    Additionally, the Individual Defendants, as officers and/or directors of Resource Capital, were and are all bound by the Company's Code of Business Conduct and Ethics (the

- 106 -

"Code") which, according to the Code, "sets out basic principles to guide all employees of Resource Capital Corp. . . . All of our employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior." Each director and employee of Resource Capital is covered by the Code, as well as the Company's agents, representatives, and consultants.

250. Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same, or similar, duties on, among others, the Board as those set forth above.

### D.       Control, Access, and Authority

251. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Resource Capital, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Resource Capital.

252. Because of their advisory, executive, managerial, and directorial positions with Resource Capital, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Resource Capital.

253. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Resource Capital, and was at all times acting within the course and scope of such agency.

### E.       Reasonable and Prudent Supervision

254. To discharge their duties, the officers and directors of Resource Capital were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Resource Capital were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how Resource Capital conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that Resource Capital was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VI.     BREACHES OF DUTIES

255.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Resource Capital and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Resource Capital, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of Resource Capital, the absence of good faith on their part, and a reckless disregard for their duties to Resource Capital and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Resource Capital.

256. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

257. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws, which has now survived a motion to dismiss under the heightened pleading standards of the PSLRA. As a result, Resource Capital has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

258. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

259. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

260.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

261.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

262.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## VIII.   DAMAGES TO RESOURCE CAPITAL

263.     As a result of the Individual Defendants' wrongful conduct, Resource Capital disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Resource Capital's credibility.  Resource Capital has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

264.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Resource Capital's market capitalization has been substantially damaged, having lost millions of dollars in value as a result of the conduct described herein.

265.    Further, as a direct and proximate result of the Individual Defendants' conduct, Resource Capital has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending Resource Capital and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Resource Capital's artificially-inflated stock price; and

(c)    costs incurred from the loss of the Company's customers' confidence in Resource Capital's products.

266.    Moreover, these actions have irreparably damaged Resource Capital's corporate image and goodwill.  For at least the foreseeable future, Resource Capital will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Resource Capital's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX.    DERIVATIVE AND DEMAND ALLEGATIONS

267.    Plaintiffs McKinney, Sherek, Spiegel, and Sebenoler have continuously held Resource Capital stock throughout the Relevant Period and remain shareholders of the Company.

268.    As detailed below, each of the Plaintiffs' pre-suit demands have either been actually and/or functionally refused by the Board, forcing Plaintiffs to file shareholder derivative actions, and this Complaint, on behalf of the Company.

269.    Plaintiffs have not made any demand on shareholders of Resource Capital to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Resource Capital is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b)    making demand on such a number of shareholders would be impossible for Plaintiffs, who have no means of collecting the names, addresses, or phone numbers of Resource Capital shareholders; and

(c)    making demand on all shareholders would force Plaintiffs to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

270.    Given the Board's wrongful, bad-faith, and unreasonable refusal of Plaintiffs' lawful demands to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the harms caused to the Company, this shareholder derivative action should be permitted to proceed.

### A.    **Demand Allegations of Plaintiff McKinney**

271.    On October 31, 2015, McKinney issued the McKinney Demand on the Board to investigate, and if warranted, commence an action against certain current and/or former directors and executive officers of the Company for violations of Maryland law, New York law, and/or federal law.  A true and correct copy of the McKinney Demand is attached hereto as **Exhibit A**.

272.    Thereafter, McKinney's counsel received a letter, dated November 12, 2015, from Michael Yecies ("Yecies"), Resource Capital's Senior Vice President, Chief Legal Officer, and Secretary, which requested evidence of McKinney's ownership of Resource Capital stock.  A true and correct copy of the November 12, 2015 letter is attached hereto as **Exhibit B**.

273.    Even though Mr. Yecies' letter provided no legal authority—under Maryland law or otherwise—to condition a response and/or investigation of the matters raised in the McKinney Demand on the receipt of proof of McKinney's stock holdings, on November 16, 2015, McKinney provided Mr. Yecies with redacted proof of McKinney's ownership of Resource Capital stock.

274.    Thereafter, McKinney's counsel received a letter from Mr. Yecies, dated January 29, 2016, which stated that the Board had "appointed an independent Evaluation Committee that is in the process of evaluating the substance of [the McKinney Demand].  When the work of the independent Demand Evaluation Committee is completed, it will respond to your letter."  Mr. Yecies' letter then asked whether McKinney would agree to toll the filing of any potential suit against Management (as defined in the McKinney Demand) until the purported Demand Evaluation Committee (the "Demand Evaluation Committee" or "DEC") "responds" to the McKinney Demand, and the United States District Court for the Southern District of New York rules on the motion to dismiss in the Securities Class Action.

275.    McKinney's counsel responded to Mr. Yecies in a letter dated February 8, 2016. Therein, McKinney's counsel informed Mr. Yecies that under Maryland law, directors were duty-bound upon receipt of a shareholder demand to promptly investigate that demand, and that whether the members of Management (as defined in the McKinney Demand) breached their fiduciary duties was independent from whether they engaged in fraud, as alleged in the Securities Class Action.  Nonetheless, McKinney's counsel informed Mr. Yecies that McKinney would

- 113 -

agree to toll the filing of a potential suit if the Board was agreeable to very reasonable conditions. A true and correct copy of McKinney's February 8, 2016 letter is attached hereto as **Exhibit C**. McKinney's counsel never received a response from Mr. Yecies.  Instead, on February 12, 2016, McKinney's counsel received a letter from Michael D. LiPuma, Esq. ("LiPuma"), who stated that he wrote on behalf of a "Special Litigation Committee ("SLC")"[5] of the Board.  According to Mr. LiPuma, the SLC consisted of "Murray Levin, Richard Fore, and Gary Ickowitz [sic]."

276.    McKinney then heard nothing for the next six months, until August 10, 2016.  On that date, McKinney's counsel received a letter from Mr. LiPuma (the "August 10, 2016 Letter"), who stated that he represented the "Demand Evaluation Committee appointed by [the Company]."  The August 10, 2016 Letter stated that the "[c]ommittee is close to finishing its investigation," and also "offered" McKinney the opportunity to speak to the Demand Evaluation Committee in person, or to submit additional materials in writing.  A true and correct copy of the August 10, 2016 Letter is attached hereto as **Exhibit D**.

277.    On August 22, 2016, McKinney's counsel sent a letter to Mr. LiPuma (the "August 22, 2016 Letter") setting forth certain reasonable, equitable conditions under which McKinney, or McKinney's counsel, would be willing to accept Mr. LiPuma's offer to meet (as set forth in the August 10, 2016 Letter).  A true and correct copy of the August 22, 2016 Letter is attached hereto as **Exhibit E**.

278.    On September 13, 2016, Mr. LiPuma informed McKinney's counsel that McKinney's counsel's proposed conditions contained in the August 22, 2016 Letter were unacceptable.  Indeed, it was readily apparent that the Board and/or DEC were unwilling to

---

[5]  Upon information and belief, the so-called Special Litigation Committee is in fact the DEC, as these names are used interchangeably by Mr. LiPuma.

provide McKinney's counsel with any additional information whatsoever, while at the same time expecting McKinney to come forth with additional information for the Board and DEC. A true and correct copy of Mr. LiPuma's September 13, 2016 letter is attached hereto as **Exhibit F**.

279.    On October 7, 2016, nearly a year after the McKinney Demand was issued, and subsequent to the Securities Class Action being sustained by the Court, McKinney's counsel sent a letter to Mr. LiPuma requesting that the Board and/or DEC respond to the McKinney Demand within the next 30 days.

280.    On October 26, 2016, McKinney's counsel received a letter from Mr. LiPuma, which stated that "although the Demand Evaluation Committee estimates that its investigation and report will not be completed by the November 6 deadline you have suggested, the Committee is working diligently to finish its work and expects that you will have a response to [the McKinney Demand] within a reasonable time." Notably, this contention was nearly identical to that of Mr. LiPuma's August 10, 2016 Letter issued over two months prior thereto.

281.    Thus, McKinney's counsel was forced to send another letter to Mr. LiPuma, and did so on November 4, 2016. This letter informed Mr. LiPuma that he made nearly identical contentions in his letter of August 2016 and October 2016, that he provided no definition of the term "reasonable time," and that he gave no indication of when a response would be issued. As such, McKinney's counsel requested a specific date by which McKinney and McKinney's counsel could expect to receive a response to the McKinney Demand.

282.    McKinney's counsel then received a letter from Mr. LiPuma, dated November 14, 2016, wherein Mr. LiPuma stated the he could not give a fixed date by which the Committee expected to complete its investigation, but "I estimate, however, that it will be around *early January 2017, if not sooner*." A true and correct copy of the November 14, 2016

letter is attached hereto as **Exhibit G**.  This was the last correspondence McKinney's counsel received from Mr. LiPuma.

283.    Three months then passed since Mr. LiPuma's last letter to McKinney's counsel—during which time, there had been radio silence from Mr. LiPuma and/or anyone else associated with the "investigation"—and *over 15 months* had elapsed since the McKinney Demand was first issued.  Thus, it was well beyond the "early January 2017, if not sooner" timeframe that Mr. LiPuma set forth in his last letter, and it became readily apparent that the Individual Defendants failed in their duty to appropriately investigate and respond to the McKinney Demand in a timely manner (as defined by the timeframe they themselves provided).  Time and again, McKinney's counsel's requests for updates and specifics regarding the purported "investigation" were met with non-responsive answers and ambiguous statements.

284.    Accordingly, because it was clear that the Board had functionally refused his demand, McKinney filed his shareholder derivative action on February 23, 2017 (the "McKinney Action").

285.    Just days after McKinney filed his complaint, on or about March 3, 2017, McKinney's counsel received a letter (the "March 3, 2017 Letter") from Mr. Joshua Horn ("Horn") of the law firm Fox Rothschild LLP ("Fox Rothschild"), attached to which was a letter Mr. LiPuma had sent to Mr. Horn on February 28, 2017, which refused the McKinney Demand (the "February 28, 2017 Letter").  This communication memorialized the fact that the DEC and Board had indeed refused the McKinney Demand.  In particular, in the attached February 28, 2017 Letter, Mr. LiPuma noted that "*[o]n February 7, 2017, after the DEC presented its Report to the Board, the Board voted unanimously to accept the recommendation of the DEC not to pursue the claims alleged in the McKinney Demand*."  The March 3, 2017 Letter provided no

justification or explanation for the three-week delay in informing plaintiff McKinney of the decision to refuse his demand. A true and correct copy of the March 3, 2017 Letter, including the February 28, 2017 Letter enclosed therewith, is attached hereto as **Exhibit H**.

286.    Thus, although the Board had functionally refused the McKinney Demand through several months of silence and non-responsiveness, and failed to adhere to the timeline that it created, the Board had, in fact, also affirmatively decided to refuse the McKinney Demand before he filed his complaint. Notably, the Board never actually sent the February 28, 2017 Letter to Plaintiff until after the McKinney Action was filed, nor inform McKinney's counsel of the fact that the demand had actually been refused at a February 7, 2017 Board meeting. Clearly, the Board's failure to fulfill its obligations with respect to the McKinney Demand—which resulted in its functional and, now, actual refusal—is improper, demonstrates the Board's lack of due diligence and good faith, and is not entitled to the protections of the business judgment rule.

287.    Notwithstanding the fact that because the Board failed in its fiduciary obligations by functionally refusing his demand, which independently gives McKinney standing to pursue claims derivatively on behalf of Resource Capital, the Board's actual refusal of the demand (withheld from McKinney and his counsel until after he filed his complaint) was similarly the product of a woefully inadequate and conflicted process, which produced an inexplicable conclusion.

288.    In light of the obvious facial deficiencies in the February 28, 2017 Letter, McKinney's counsel was forced to send another letter to Mr. Horn, dated March 8, 2017 (the "March 8, 2017 Letter"), which sought additional information regarding the purported process undertaken in reaching the materially deficient conclusions of the February 28, 2017 Letter that

refused the McKinney Demand. A true and correct copy of the March 8, 2017 Letter is attached hereto as **Exhibit I**.

289. In the March 8, 2017 Letter, McKinney's counsel requested a copy of the report that was purportedly presented to the Board and which served as the basis for refusing the McKinney Demand. Additionally, McKinney's counsel requested that the Board "provide a list of the ten witnesses that the DEC and/or its counsel interviewed as part of the investigation." Specifically, the March 8, 2017 Letter requested that the Board "inform us as to whether the witnesses interviewed by the DEC included: Anne Krueger, Ranjit Teja, and/or Andrew Wolfe (or anyone else associated with the Krueger Report), whether the witnesses interviewed by the DEC included anyone associated with the Government Development Bank of Puerto Rico, or whether the DEC intends to interview any of these individuals."

290. On March 15, 2017, McKinney's counsel received a letter from Mr. Horn in response to the March 8, 2017 Letter (the "March 15, 2017 Letter"). A true and correct copy of the March 15, 2017 Letter is attached hereto as **Exhibit J**. Like the prior communications received by McKinney's counsel, the March 15, 2017 Letter ignored McKinney's requests and was devoid of any additional details regarding the process of the Board's and/or DEC's investigation.

291. As an initial matter, the March 15, 2017 Letter affirmatively refused to provide McKinney or McKinney's counsel with access to the so-called "report," which the decision to refuse the McKinney Demand was purportedly based upon.

292. Additionally, based on the representations in the March 15, 2017 Letter, it is apparent that none of the individuals identified by McKinney's counsel were ever interviewed. In fact, the March 15, 2017 Letter goes so far as to say the "inquiry whether the governor of

- 118 -

Puerto Rico, Anne Krueger, Ranjit Teja, and/or Andrew Wolfe were interviewed is totally misplaced and based upon a flawed and illogical premise that RCC and/or the DEC were somehow obligated to interview any or all of these individuals, none of whom are associated with RCC in any capacity."

293. The failure of the March 15, 2017 Letter to provide any additional information whatsoever (outside of what the Board failed to do) only serves to confirm the deficiencies with the February 28, 2017 Letter, which refused the McKinney Demand.

294. Specifically, the February 28, 2017 Letter was independently wrongful when issued because, *inter alia*, it: (a) failed to address the primary concern raised in the McKinney Demand—whether the Company's statements were false and misleading; (b) was based on a woefully deficient process that failed to include interviews of anyone that could possibly corroborate McKinney's contentions of wrongdoing; and (c) reached the inexplicable conclusion that the McKinney Demand was without "factual or legal merit," notwithstanding the sustained Securities Class Action.

295. As an initial matter, despite it being the centerpiece of the McKinney Demand, the February 28, 2017 Letter confirms that no investigation regarding the falsity of the Company's public disclosures was ever even commenced. Specifically, the February 28, 2017 Letter admits that the scope of the DEC's investigation was limited to only two issues: "the adequacy of [the Company's] internal controls in the areas of financial reporting and investment monitoring; and the timing of the decision to write off the Loan Position."

296. This is particularly troublesome because the February 28, 2017 Letter was issued after Judge Stanton sustained the Securities Class Action (based on false and misleading statements) and specifically held that to "describe the Mezzanine Loan as 'performing' or

- 119 -

'current' without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty" was false and misleading and served as an adequate basis to allege securities fraud.  Accordingly, it is clear that somehow, neither the Board nor the DEC ever even investigated the crux of the wrongdoing alleged in the McKinney Demand, which prior to the issuance of the February 28, 2017 Letter, served as the basis for sustained securities fraud claims.  The Board's and/or DEC's astounding failure to even commence an investigation into the falsity of the Company's public disclosures, particularly in light of the sustained Securities Class Action, renders their conduct and the issuance of the February 28, 2017 Letter wrongful on this basis alone.

297.    Along these lines, and perhaps most egregiously, despite the fact that the McKinney Demand was based upon the same allegations that gave rise to the Securities Class Action, and despite the fact that the Securities Class Action was sustained over four months prior to the refusal of the McKinney Demand, the February 28, 2017 Letter inexplicably "concluded that Mr. McKinney's claims lack any factual or legal merit . . . ."

298.    Additionally, as mentioned above, the February 28, 2017 Letter and March 15, 2017 Letter confirm that neither the Board nor the DEC interviewed Anne Krueger, Ranjit Teja, and/or Andrew Wolfe, (or anyone else associated with the Krueger Report) or anyone associated with the Government Development Bank of Puerto Rico, all of whom could corroborate McKinney's claims of wrongful conduct.  At a minimum, a reasonable investigation would include an interview with some or all of these individuals or other individuals with comparable knowledge.  The Board's and/or DEC's failure to even attempt to speak with any of these individuals raises questions about the diligence with which the Board pursued its investigation.

At a minimum, it demonstrates that the internal investigation was restricted in scope, perfunctory, and half-hearted.

299.     Further, the Board's and/or DEC's investigation was flawed because two of the members of the DEC—defendants Fore and Ickowicz—were also members of the Company's Investment Committee during the Class Period of October 31, 2012 to August 5, 2015 (as alleged in the Securities Class Action).  Fore was a member of the Company's Investment Committee from at least April 2014 to April 2016.  Ickowicz was a member of the Company's Investment Committee from at least April 2012 to April 2016.  The Company's Investment Committee is charged with reviewing and considering the Company's proposed investments, and held twenty meetings during fiscal 2015.  As such, as members of the Investment Committee, defendants Fore and Ickowicz must have known that the Company's public statements concerning its investments were false and misleading, and were therefore incapable of conducting a disinterested and/or independent investigation into the matters raised in the McKinney Demand.

300.     Clearly, the Board's failure to conduct a bona-fide and independent investigation into the allegations raised in the McKinney Demand regarding the Company's disclosure issues, along with its complete disregard of the actual merits of the claims set forth in the McKinney Demand and prejudgment of the merits of the claims set forth in the McKinney Demand, is improper and demonstrates the Board's lack of diligence and good faith.  The entire "process" was procedurally deficient and replete with conflicts of interest.  The Board's abdication of its duty to investigate the centerpiece of the McKinney Demand (the accuracy of the Company's public disclosures, which ultimately resulted in the sustained Securities Class Action) was not reasonable, was a decision made in bad faith, and is not entitled to the protections of the business judgment rule and likewise warrants that this action proceed.

**B.      Demand Allegations of Plaintiffs Sherek and Spiegel**

301.    Before filing a derivative action, plaintiffs Sherek and Spiegel first demanded that the Board take action to investigate the misconduct alleged herein and, if warranted, to commence litigation against the Individual Defendants.  Specifically, on November 4, 2016, in accordance with Maryland law, Sherek and Spiegel issued the Sherek/Spiegel Demand on the Board to investigate and address the misconduct and, if warranted, to commence litigation against the Individual Defendants.  A true and correct copy of the Sherek/Spiegel Demand is attached hereto as **Exhibit K**.

302.    In response to the Sherek/Spiegel Demand, counsel for Sherek and Spiegel received a letter, dated November 10, 2016 (the "November 10, 2016 Letter"), from Shelle Weisbaum ("Weisbaum"), who signed the November 10, 2016 Letter in her capacity as the Company's Chief Legal Officer, and requested additional information regarding Sherek's and Spiegel's holdings of Resource Capital stock.  A true and correct copy of the November 10, 2016 Letter is attached hereto as **Exhibit L**.

303.    On December 12, 2016, counsel for Sherek and Spiegel responded by letter (the "December 12, 2016 Letter") to Ms. Weisbaum and provided additional information regarding the dates that Sherek and Spiegel had purchased their shares of Resource Capital stock.  In addition, counsel for Sherek and Spiegel noted that the November 10, 2016 Letter provided no information regarding any actions that the Company intended to take regarding the Sherek/Spiegel Demand, and requested additional information regarding the person(s) who would be evaluating the same. A true and correct copy of the December 12, 2016 Letter is attached hereto as **Exhibit M**.

304.    In response to the December 12, 2016 Letter, counsel for Sherek and Spiegel received a letter, dated December 16, 2016 (the "December 16, 2016 Letter"), from

Ms. Weisbaum, stating only that the Company's Board "has appointed an independent Demand Evaluation Committee who is in the process of evaluating the substance of your November 4, 2016 letter.  When the work of the independent Demand Evaluation Committee is completed, it will issue a report which Resource Capital Corp. will share with you."  The December 16, 2016 Letter contained no additional information regarding the persons appointed to the Demand Evaluation Committee, the mandate of the Demand Evaluation Committee, or the estimated timing of the completion of the investigation.  A true and correct copy of the December 16, 2016 Letter is attached hereto as **Exhibit N**.

305.    On January 25, 2017, counsel for Sherek and Spiegel responded by letter (the "January 25, 2017 Letter") to Ms. Weisbaum and requested additional information regarding: (a) the persons appointed to the Demand Evaluation Committee and the dates they were appointed; (b) the process used to select members of the committee and to determine that each member is disinterested and independent; and (c) the scope of the mandate of the Demand Evaluation Committee.  In addition, counsel for Sherek and Spiegel requested that the Demand Evaluation Committee's investigation include the allegations and claims made in three shareholder derivative actions filed on behalf of the Company in this Court.  A true and correct copy of the January 25, 2017 Letter is attached hereto as **Exhibit O**.

306.    Counsel for Sherek and Spiegel then received a letter, dated March 10, 2017, from Mr. Horn (the "March 10, 2017 Letter").  The March 10, 2017 Letter states that Fox Rothschild represents the Company and that Mr. Horn was writing in response to the Sherek/Spiegel Demand. The March 10, 2017 Letter states that the Company appointed a Demand Evaluation Committee "to examine the claims of [Sherek and Spiegel] among others."  The March 10, 2017 Letter enclosed the Demand Evaluation Committee's February 28, 2017 Letter to Mr. Horn "regarding a

shareholder demand that is nearly identical to the one [Sherek and Spiegel] have made." A true and correct copy of the March 10, 2017 Letter, including the February 28, 2017 Letter enclosed therewith, is attached hereto as **Exhibit P**.

307. The February 28, 2017 Letter was written in response to a request from Mr. Horn to the Demand Evaluation Committee to provide a summary of the reasons why the Demand Evaluation Committee recommended to the Company's Board that the claims asserted in the McKinney Demand "lack factual or legal merit, and why it would not be in the best interest of RCC to pursue those claims." On February 7, 2017, according to the February 28, 2017 Letter, the Board voted unanimously to "accept the recommendation of the [Demand Evaluation Committee] not to pursue the claims alleged in the McKinney Demand."

308. The March 10, 2017 Letter claims that the February 28, 2017 Letter "addresses all of the material allegations contained in [the Sherek/Spiegel Demand] letter." Thus, the March 10, 2017 Letter and February 28, 2017 Letter, collectively, constitute a *de facto* refusal of the demand made by Sherek and Spiegel for the Board to investigate and take action to address the misconduct identified in the Sherek/Spiegel Demand and herein.

309. The Board's refusal of the Sherek/Spiegel Demand was both unreasonable and uninformed. The February 28, 2017 Letter, on which the Board based its refusal of the Sherek/Spiegel Demand, indicates that the Demand Evaluation Committee failed to investigate the improper statements discussed herein. Indeed, the February 28, 2017 Letter admits that the scope of the Demand Evaluation Committee's investigation was limited to only two issues raised in the McKinney Demand: "the adequacy of [the Company's] internal controls in the areas of financial reporting and investment monitoring; and the timing of the decision to write off the Loan Position." Thus, based on this limited scope, the Demand Evaluation Committee failed to investigate, as

Sherek and Spiegel demanded, whether the Company's officers and directors breached their fiduciary duties to the Company by issuing or causing to issue false and misleading statements on behalf of the Company.   Indeed, the Sherek/Spiegel Demand specifically required "a full investigation of the allegations" contained in the Securities Complaint.   Accordingly, the Demand Evaluation Committee and the Board did not act on the basis of all reasonably available information, and ignored the specific demand made by Sherek and Spiegel to investigate the false and misleading statements alleged herein, notwithstanding that the related Securities Class Action had already been sustained on the very basis that the Individual Defendants knowingly issued or caused the Company to issue numerous false and misleading statements.

310.   The February 28, 2017 Letter also lacks key information regarding the Demand Evaluation Committee's process, reasoning, and conclusions in conducting its investigation.   For example, the February 28, 2017 Letter is only a summary of the reasons behind the Demand Evaluation Committee's recommendations to the Board regarding the issues raised *in the McKinney Demand*—the February 28, 2017 Letter refers to the existence of a February 27, 2017 presentation of a "Report" to the Board by the Demand Evaluation Committee, but this "Report" has not been provided to Sherek or Spiegel.   The February 28, 2017 Letter also states that the Demand Evaluation Committee interviewed ten witnesses, but does not identify those witnesses.   Instead, the February 28, 2017 Letter generically describes the ten witnesses to include "not only directors and officers but also [the Company's] Director of Internal Audit, and the [C]ompany's external auditor, Grant Thornton LLP."   The Sherek/Spiegel Demand identified *14* directors and officers for the Company to investigate; considering the Demand Evaluation Committee only interviewed *ten* witnesses, the February 28, 2017 Letter on its face demonstrates the Demand Evaluation Committee failed to interview witnesses with information material to Plaintiffs'

demands. Finally, the February 28, 2017 Letter fails to weigh the potential recovery from any lawsuit in a way that would allow the Board to compare a lawsuit to the costs, and fails to consider the specific merits of bringing suit against any of the individual officers and directors identified in the Sherek/Spiegel Demand.

311. The limited nature of the Demand Evaluation Committee's investigation is unsurprising in light of the bias of the persons leading it: defendants Levin, Fore, and Ickowicz. All three were identified in the Sherek/Spiegel Demand as directors that appeared to have breached their fiduciary duties to the Company by issuing false and misleading statements on behalf of the Company, and/or completely failing to discharge their designated duties and responsibilities. Indeed, defendants Levin and Ickowicz signed the Company's 2012, 2013, and 2014 Form 10-K's which, as alleged herein, contained materially false or misleading information regarding the quality and effectiveness of the Company's internal controls and the completeness of the Company's disclosures.

312. In addition, defendants Fore and Ickowicz were both members of the Company's Investment Committee during the Class Period of October 31, 2012 to August 5, 2015 (as alleged in the Securities Class Action). Fore was a member of the Company's Investment Committee from at least April 2014 to April 2016. Ickowicz was a member of the Company's Investment Committee from at least April 2012 to April 2016. The Company's Investment Committee is charged with reviewing and considering the Company's proposed investments, and held twenty meetings during fiscal 2015. As such, as members of the Investment Committee, defendants Fore and Ickowicz must have known that the Company's public statements concerning its investments were false and misleading, and were therefore incapable of conducting a disinterested investigation into the Sherek/Spiegel Demand.

313.    Moreover, the March 10, 2017 Letter and February 28, 2017 Letter do not state whether the Demand Evaluation Committee engaged independent counsel to guide its deliberations and to advise it regarding the Sherek/Spiegel Demand.  Although the February 28, 2017 Letter is addressed to Mr. Horn of the law firm Fox Rothschild, the March 10, 2017 Letter from Mr. Horn to counsel for Sherek and Spiegel states that Fox Rothschild represents the Company itself.

314.    On April 20, 2017, counsel for Sherek and Spiegel received a letter from Mr. LiPuma (the "April 20, 2017 Letter"), which intimated that the Demand Evaluation Committee was "close to finishing its investigation," and also "offer[ed]" Sherek and Spiegel the opportunity to speak to the Committee in person, or to submit additional materials in writing.  A true and correct copy of the April 20, 2017 Letter is attached hereto as **Exhibit Q**.

315.    Counsel for plaintiffs Sherek and Spiegel responded by letter on May 2, 2017 (the "May 2, 2017 Letter"), beginning by noting obvious "surprise[]" in receiving the April 20, 2017 Letter, given that the March 10, 2017 Letter previously sent to Sherek and Spiegel had already ostensibly refused their demand, and they had received no follow-up communication since that time.  To that end, the May 2, 2017 Letter attached the March 10, 2017 Letter and the February 28, 2017 Letter.  Moreover, the April 20, 2017 Letter had been sent more than a month after plaintiffs Sherek and Spiegel had already filed their shareholder derivative action, and more than five months after their demand was initially made on the Board.  Nevertheless, counsel for plaintiffs Sherek and Spiegel expressed their willingness to meet with the Demand Evaluation Committee under certain reasonable, equitable conditions.  A true and correct copy of the May 2, 2017 Letter is attached hereto as **Exhibit R**.

316.    Finally, on May 10, 2017, Mr. LiPuma informed counsel for plaintiffs Sherek and Spiegel by letter (the "May 10, 2017 Letter") that their proposed conditions contained in the May 2, 2017 Letter were unacceptable.  A true and correct copy of the May 10, 2017 Letter is attached hereto as **Exhibit S**.  Indeed, it was readily apparent that the Board and/or the Demand Evaluation Committee were unwilling to provide counsel for Sherek and Spiegel with any additional information whatsoever, while at the same time expecting Sherek and Spiegel to come forth with additional information for the Board and Committee.  This conduct was unsurprising however, given that the Board and/or the Demand Evaluation Committee had previously solicited information from plaintiff McKinney in August 2016, but likewise refused to provide McKinney with any information or documentation (or access thereto) whatsoever.

317.    Because their Demand was functionally refused, Plaintiffs Sherek and Spiegel were forced to file their complaint on March 17, 2017.

318.    Then on June 29, 2017, counsel for plaintiffs Sherek and Spiegel received a letter from Mr. Horn (the "Horn June 29, 2017 Letter"), attached to which was a letter Mr. LiPuma had sent to Mr. Horn on June 29, 2017, which refused the Sherek/Spiegel Demand (the "LiPuma June 29, 2017 Letter").  A true and correct copy of the Horn June 29, 2017 Letter, including the LiPuma June 29, 2017 Letter enclosed therewith, is attached hereto as **Exhibit T**.

319.    Unsurprisingly, the LiPuma June 29, 2017 Letter explained that the "***DEC presented its Report to the Board, the Board voted unanimously to accept the recommendation of the DEC not to pursue the claims alleged in the Sherek-Spiegel Demand,***" thus confirming the *de facto* refusal of the of the Sherek/Spiegel Demand received by counsel for Sherek and Spiegel on March 10, 2017.  Notably, according to the LiPuma June 29, 2017 Letter, this vote occurred on June 1, 2017.  Yet, inexplicably, counsel for Sherek and Spiegel was not informed

- 128 -

of this vote until *four weeks after it occurred* and not until the *day before the filing of this complaint*.

320.    As an initial matter, the timing of the Horn June 29, 2017 Letter and the LiPuma June 29, 2017 Letter evidences that they are nothing more than a failed attempt at curing the deficiencies in the refusal of the McKinney Demand identified by Sherek and Spiegel in the complaint they filed on March 17, 2017, following their receipt of the March 10, 2017 Letter, which constituted a *de facto* refusal.  Indeed, the LiPuma June 29, 2017 Letter suffers from many of the same deficiencies outlined in ¶¶309-313 above, and like the refusal directed at the McKinney Demand, is unreasonable and uniformed.

321.    For example, it is clear that the Demand Evaluation Committee failed to investigate the falsity of the Company's public disclosures in connection with the McKinney Demand, despite it being the centerpiece of the McKinney Demand.  This impacted the Demand Evaluation Committee's overall investigation and undermined its conclusion.  But one example of this is the Demand Evaluation Committee's conclusion that claims brought pursuant to Section 14(a) of the Exchange Act would be time-barred.  In so concluding, the LiPuma June 29, 2017 Letter erroneously states that "no such claims were suggested in the McKinney Demand, which is why the issue was not analyzed in the McKinney Report."  As is detailed above in ¶¶294-295, *supra*, the McKenny Demand specifically sought the investigation of whether the Company's statements were false and misleading.

322.    Another example of the flaws contained in the LiPuma June 29, 2017 Letter is that rather than acknowledging the magnitude of the order sustaining the Securities Class Action, the LiPuma June 29, 2017 Letter grossly understates it.  Specifically, the LiPuma June 29, 2017 Letter states that in denying the motion to dismiss, "Judge Stanton discussed only one substantive

issue: that it was allegedly misleading to describe the Loan Position as performing or current without stating that 'it was a non-interest-paying troubled debt of a borrower in financial difficulty,'" concluding, without support or any citation to evidence, interviews with witnesses, or legal authority, that "[t]he [Demand Evaluation Committee] respectfully disagrees with the assertion that the Company's disclosures regarding the Loan Position were misleading." The LiPuma June 29, 2017 Letter also states that "[i]t is unclear whether Judge Stanton credited any other theories asserted in the [Securities Class Action] complaint."

323.    It is clear that, despite Judge Stanton denying defendants' motion to dismiss ***in its entirety***, the Demand Evaluation Committee elected to minimize its impact in conducting its investigation. Considering the Sherek/Spiegel Demand was based upon the same allegations that gave rise to the Securities Class Action, and despite the fact that the Securities Class Action was sustained over four months prior to the refusal of the McKinney Demand (and almost nine months prior to the LiPuma June 29, 2017 Letter) the LiPuma June 29, 2017 Letter inexplicably "concluded that the Sherek-Spiegel claims lack any factual or legal merit . . . ."

324.    These flaws and others, including, *inter alia*, those identified at ¶¶294-300, 309-313 herein in connection with the refusal of the McKinney Demand, demonstrate the Board's failure to fulfill its obligations with respect to the Sherek/Spiegel Demand—which resulted in its refusal. The refusal of the Sherek/Spiegel Demand is therefore improper, and it demonstrates the Board's lack of due diligence and good faith, and the decision to refuse the Sherek/Spiegel Demand is not entitled to the protections of the business judgment rule.

## C.    Demand Allegations of Plaintiff Sebenoler

325.    On January 31, 2017, plaintiff Sebenoler issued the Sebenoler Demand to Andrew L. Farkas ("Farkas"), the newly-appointed Chairman of the Board, demanding that the

Board investigate and take legal action against those responsible for the damages the Company has suffered, and is certain to suffer, as alleged herein.  A true and correct copy of the Sebenoler Demand is attached hereto as **Exhibit U**.

326.   Less than two months later, Sebenoler's counsel received a letter from Mr. Horn, dated March 22, 2017 (the "March 22, 2017 Letter"), acknowledging receipt of the Sebenoler Demand, and enclosing a response from the Company refusing a demand made by another shareholder in a related derivative action.  A true and correct copy of the March 22, 2017 Letter is attached hereto as **Exhibit V**.

327.   The Company's refusal of the Sebenoler Demand is notable in that Mr. Horn admitted in the March 22, 2017 Letter that the Board did not consider—and has not considered— the Sebenoler Demand, opting instead to enclose a report generated by the DEC, which was appointed to examine the claims of *other shareholders*, whose demands the Board claimed are "nearly identical" to those made by Sebenoler.  Further proving that Sebenoler's demand was not actually or seriously considered, Horn noted that "to the extent" the Sebenoler Demand "has made allegations, distinct from those addressed in the enclosed, the Demand Evaluation Committee will continue its review of this matter and I will follow-up with you accordingly."  Regardless, the March 22, 2017 Letter advised that "the Board voted unanimously to accept the recommendation of the DEC not to pursue the claims alleged."  Thus, the Board explicitly refused the Sebenoler Demand.

328.   Because the Sebenoler Demand was functionally refused, plaintiff Sebenoler was forced to file his complaint on April 25, 2017.

329.   Then, on June 30, 2017 plaintiff Sebenoler's counsel received a letter dated June 29, 2017 from Mr. Horn which included a similarly dated letter from Mr. LiPuma refusing

- 131 -

the Sebenoler Demand. This correspondence is *identical* in all material respects to the Horn June 29, 2017 Letter and LiPuma June 29, 2017 received by counsel for Sherek and Spiegel. A true and correct copy of the correspondence received by plaintiff Sebenoler is attached hereto as **Exhibit W**.

330. The refusal of the Sebenoler Demand is deficient for the same reasons outlined in ¶¶319-324, above.

331. Clearly, the Board's failure to fulfill its obligations with respect to the Sebenoler Demand—which resulted in its refusal—is improper, demonstrates the Board's lack of due diligence and good faith, and is not entitled to the protections of the business judgment rule.

## COUNT I
### Against Defendants Kessler, Beach, E. Cohen, Jonathan Cohen, Fore, Hart, Ickowicz, Levin, Neff, and Wiggins for Violations of Section 14(a) of The Securities Exchange Act of 1934

332. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

333. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

334. The Company's 2014 and 2015 Proxy Statements (collectively, the "Proxies") violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose: (i) risks related to the Mezzanine Loan, including the Company's increasing exposure to Puerto Rico's ongoing economic decline; (ii) the true quality and performance of the Company's loans, including that the Company would have to record an allowance for loan losses; (iii) deficiencies in Resource

Capital's internal controls; and (iv) that as a result of the foregoing, Resource Capital's public statements were materially false and misleading at all relevant times. At the time of the issuance of the Proxies, the Mezzanine Loan was already impaired.

335. The 2014 Proxy was particularly false and misleading when issued because it falsely stated that the Board employs a pay-for-performance metric. The 2014 Proxy was likewise false and misleading when issued because while it claimed that the executive compensation paid to Defendants was based on a pay-for-performance philosophy, the actual financial results that the compensation was based upon was illusory. In the exercise of reasonable care, Defendants should have known that the statements contained in the 2014 Proxy were materially false and misleading.

336. The misrepresentations and omissions in the Proxies were material. The Proxies were essential links in the accomplishment of the continuation of Defendants' scheme by which they claim to adhere to a pay-for-performance policy in making executive compensation decisions whereby the interests of management and stockholders are aligned.

337. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in these Proxies were materially false and misleading. The misrepresentations and omissions were material to Resource Capital shareholders in voting on the matters set forth for shareholder determination in the Proxies, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditor.

338. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

## COUNT II
### Against the Individual Defendants for Breach of Fiduciary Duties

339.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

340.    The Individual Defendants owed, and owe, Resource Capital fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed, and owe, Resource Capital the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

341.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

342.    The Individual Defendants each knowingly, recklessly, or negligently: (i) made false or misleading statements that misrepresented or failed to disclose material information concerning the Company; (ii) approved the issuance of such false and/or misleading statements; (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company; (iv) failed to act independently and with due care in rejecting Plaintiffs' demands; and/or (v) failed to address the misconduct.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

343.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Resource Capital has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

344.    Plaintiffs, on behalf of Resource Capital, have no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Unjust Enrichment

345.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

346.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Resource Capital.

347.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Resource Capital.

348.     Plaintiffs, as shareholders and representatives of Resource Capital, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

349.     Plaintiffs, on behalf of Resource Capital, have no adequate remedy at law.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Against all Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal law, breaches of fiduciary duties, and unjust enrichment;

B.     Directing Resource Capital to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Resource Capital and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be

- 135 -

necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a provision to permit shareholders of Resource Capital to nominate at least three candidates for election to the Board to replace existing directors;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Resource Capital's directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.      Awarding to Resource Capital restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XI.   JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: June 30, 2017

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

*s/Curtis V. Trinko*
CURTIS V. TRINKO

16 WEST 46TH ST, 7TH FLR.
New York, NY 10036
Tel: (212) 490-9550
Fax: (212) 986-0158
ctrinko@trinko.com

**PROFY PROMISLOFF & CIARLANTO, P.C.**
JEFFREY J. CIARLANTO
JOSEPH M. PROFY
DAVID M. PROMISLOFF
100 N 22ND Street, Unit 105
Philadelphia, PA 19103
Tel: (215) 259-5156
Fax: (215) 600-2642

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, PA 15234-1507
Tel: (412) 391-5164
Fax: (412) 471-1033

*Counsel for Plaintiff Mark E. McKinney*

**JOHNSON & WEAVER, LLP**
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Tel: (212) 802-1486
Fax: (212) 602-1592
ScottH@johnsonandweaver.com

**JOHNSON & WEAVER, LLP**
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Tel: (619) 230-0063
Fax: (619) 255-1856
FrankJ@johnsonandweaver.com

**JOHNSON & WEAVER, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Tel: (770) 200-3104
Fax: (770) 200-3101
MichaelF@johnsonandweaver.com

*Attorneys for Plaintiffs*
*Dave Sherek and Robert H. Spiegel*

**BERNSTEIN LIEBHARD LLP**
JOSEPH R. SEIDMAN, JR.
10 East 40th Street
New York, NY 10016
Tel: (212) 779-1414
Fax: (212) 779-3218

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA 19312
Tel: (610) 225-2677
Fax: (610) 408-8062

*Counsel for Plaintiff Rick Sebenoler*

## RESOURCE CAPITAL CORP. VERIFICATION

I, Mark E. McKinney, hereby verify that I am familiar with the allegations in the Consolidated Shareholder Derivative Complaint, that I have authorized the filing of the Consolidated Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 6/27/2017

Mark E. McKinney

## <u>RESOURCE CAPITAL CORP. VERIFICATION</u>

I, RICK SEBENOLER, hereby verify that I am familiar with the allegations in the

Consolidated Shareholder Derivative Complaint, that I have authorized the filing of the

Complaint, and that the foregoing is true and correct to the best of my knowledge,

information, and belief.


Date:_____            _____
                                        RICK SEBENOLER

## **VERIFICATION**

I, Dave Sherek, verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint and Jury Demand, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  June 26, 2017

DocuSigned by:

*Dave Sherek*

8A78CB66422049C...

(Signature of Dave Sherek)

## **VERIFICATION**

I, Robert H. Spiegel, verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint and Jury Demand, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: June 26, 2017

DocuSigned by:

*Robert H. Spiegel*

8D1C346AADE149B...

(Signature of Robert H. Spiegel)