UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE RESOURCE CAPITAL CORP.            :        17 Civ. 1381 (LLS)
SHAREHOLDER DERIVATIVE LITIGATION       :
DEMAND REFUSED ACTIONS                  :        OPINION & ORDER
                                        :
----------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/23/18

LOUIS L. STANTON, District Judge:

The individual defendants and nominal defendant Resource Capital Corp. (collectively the "defendants") move to dismiss the verified consolidated shareholder derivative complaint (Dkt. No. 32) (the "complaint") on the ground that the plaintiffs lack standing to assert claims derivatively[1] on behalf of Resource Capital.

For the following reasons, the motion is granted.

## BACKGROUND

### The Parties

Ten of the individual defendants (Mr. Kessler, Mr. Beach, Mr. Edward E. Cohen, Mr. Jonathan Cohen, Mr. Fore, Mr. Hart, Mr. Ickowicz, Mr. Levin, Mr. Neff, and Ms. Wiggins) are current and former board members of the company.  Mr. Jonathan Cohen is

---

[1] The parties have agreed to defer briefing on other defenses to the complaint until this derivative standing issue is resolved.  (Dkt. No. 34).

-1-

also the former CEO.  The remaining three individual defendants (Mr. Bryant, Mr. Blackwell, and Mr. Bloom) are officers.

Resource Capital is a Maryland real estate investment trust that invests in commercial and residential real estate assets.

## The Loan

Resource Capital's investment portfolio includes loans secured by commercial real estate which are "senior to the borrower's equity in, and subordinate to a mortgage loan on, a property," and are described as "mezzanine loans."  Compl. (Dkt. No. 32) ¶ 3.

The complaint arises out of a $38.1 million investment in a mezzanine loan that Resource Capital purchased in 2007.  Id. The loan was originally made to affiliates of The Blackstone Group ("Blackstone"), and was secured by a portfolio of thirteen luxury hotels, including three hotels in Puerto Rico.  Id. After economic conditions in Puerto Rico worsened, in September 2012 the loan was restructured to extend its maturity date and defer payment of interest on it.  Id. ¶ 59.  Resource Capital's first public filing on November 9, 2012, after the restructuring identified the loan as a "Troubled Debt Restructuring" ("TDR") and disclosed that interest payments on one of its tranches were being deferred.  Quarterly Report (Form 10-Q) at 20 n.7, 27, 65 n.7, 71 (Nov. 9, 2012).  These consisted of the statement "Fixed rate mezzanine loans include a mezzanine loan that was modified

-2-

into two tranches which both currently pay interest at 0.50%. In addition, the subordinate tranche accrues interest at LIBOR plus 18.50% which is deferred until maturity," Id. at 20 n.7, 65, n.7, and a table of Troubled Debt Restructurings, showing a $38,072,000 balance of mezzanine loan restructurings in the loan portfolio. Id. at 27, 71. That Quarterly Report also explained that Resource Capital "considers a loan to be impaired if . . . the loan is deemed to be a troubled-debt restructuring ("TDR") where a concession has been given to a borrower in financial difficulty." Quarterly Report (Form 10-Q) at 11 (Nov. 9, 2012). These disclosures were repeated where appropriate in Resource Capital's Annual Reports filed for each of the years 2012, 2013, 2014, and 2015.

Nevertheless, for several years thereafter, Resource Capital's SEC filings described the loan as "current" or "performing." Compl. ¶ 3.

After the restructuring in 2012, all of the hotels securing the loan were sold to retire the mezzanine loans at favorable prices, except the three hotels in Puerto Rico which were still held in May 2015. Compl. ¶¶ 5, 227. At that time, Blackstone attempted to obtain a three-year bridge loan that would give it enough time to sell the remaining Puerto Rico hotels at favorable prices. It could only obtain a one-year bridge loan, and its risk was flagged by its high interest rate. Compl.

-3-

¶ 227. Blackstone sold one of the remaining hotels in July 2015 for a price well below its appraised value, and that made it "very difficult for [sale of] the other two remaining properties to generate sufficient proceeds to repay the remaining debt." Quarterly Report (Form 10-Q) at 90 (Aug. 7, 2015). Meanwhile, economic conditions in Puerto Rico continued to deteriorate, making a sale of the remaining hotels at higher valuations even less likely. Compl. ¶¶ 61-77.

In June 2015, Puerto Rico's governor publicly announced that Puerto Rico would be unable to pay its debts. At that point, the company determined that it was unlikely to recover on the loan.

In 2015's second quarter, Resource Capital recorded a $41.1 million impairment of the loan. Compl. ¶ 230. Its independent auditor reviewed and approved the description of the impairment and its timing. On August 4, 2015, Resource Capital publicly announced the impairment, with other news including its quarterly earnings. Compl. ¶ 226. Its press release included a section entitled "Impairment," which stated:

> During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were

-4-

luxury brand hotels. The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved.

Compl. ¶ 5; see also Quarterly Report (Form 10-Q) at 3-7, 90 (Aug. 7, 2015).

The company's share price dropped from $3.48 to $3.05 the next day, but within two weeks rebounded to $3.41. See RSO Historical Share Prices (via Yahoo! Finance) (Aug. 4, 2015- Aug. 21, 2015).

**The Shareholder Demands**

During the period from October 31, 2015 to the end of January 2016, Resource Capital's board of directors received from three sources demands that it investigate and pursue claims in connection with the mezzanine loan investment. In the first of these, Mr. McKinney on October 31, 2015, demanded that the board investigate and take any warranted legal action against its directors and officers for breaches of fiduciary duty in connection with the loan. He sought an investigation of the individuals responsible for allegedly misrepresenting the risk of the company's loan portfolio and the company's processes for assessing the quality of its loans.

On November 4, 2016, Mr. Sherek and Mr. Spiegel issued their demand. On January 31, 2017, Mr. Sebenoler issued his

demand. Both of these demanded that the board investigate the same allegations as those in the McKinney demand, and also whether to sue the company's directors and officers for:

- causing or permitting the company to incorrectly describe its loan portfolio as "current and "performing";
- causing or permitting the company to apply inflated risk ratings to its commercial loan portfolio; and
- causing the company to fail to list the loan as a TDR for certain periods.

After receiving the McKinney demand, the board formed a demand evaluation committee (the "DEC") to investigate the allegations and make recommendations to the full board. It appointed three outside directors to the DEC: Messrs. Fore, Ickowicz, and Levin. It hired Mr. Michael LiPuma as its independent counsel.

After it reviewed the report of the DEC's investigation, the board concluded that the McKinney demand was meritless. Compl. ¶ 285. On March 3, 2017, it notified Mr. McKinney that it refused his demand. Id. Instead of repeating the same investigation for the allegations in the Sherek/Spiegel and Sebenoler demands, the board forwarded those shareholders its response to the McKinney demand. Id. ¶ 306. The board stated that it would continue to review the allegations that went

-6-

beyond those in the McKinney demand, and followed up with letters refusing those allegations in June 2017. Id. ¶ 318.

Messrs. McKinney, Sherek/Spiegel, and Sebenoler commenced three separate shareholder derivative actions on behalf of Resource Capital. On May 16, 2017, I entered an order consolidating those "demand-refused" actions into this case. (Dkt. No. 29).

### The Investigation

Over the course of a fifteen-month investigation, the DEC held more than thirty meetings, reviewed more than 5,000 pages of documents, and interviewed ten witnesses, including the company's directors and officers, as well as its internal and external auditors.

On February 7, 2017, the DEC reported its recommendation to the board. For several reasons, including that it found that the allegations in the McKinney demand were meritless, the DEC recommended that the board refuse the McKinney demand.

The DEC found no evidence that the company's directors and officers misrepresented the risk of the company's loan portfolio. Between the 2012 restructuring and the first quarter of 2015, the loan "was continuing to perform according to its modified and restructured terms," and Blackstone's ongoing asset sales were at prices high enough that Resource Capital's position was adequately secured by the remaining collateral.

-7-

Compl. Ex. H at 8.  It was not until the second quarter of 2015 that the combination of several events caused doubt that Blackstone would be able to repay the loan.

The DEC also concluded that there was no evidence that the company's internal processes for evaluating its investment risks were inadequate.  The DEC found that the company implemented an extensive system of internal controls over financial reporting, which was designed to comply with the Sarbanes-Oxley Act, updated according to a respected and widely used industry standard, and reviewed by internal and external auditors, and by the board's audit committee.  It also found that Resource Capital employed adequate controls over investment monitoring, including a Credit Watchlist and Portfolio Report.

Further, the DEC evaluated other factors that cautioned against pursuing the demanded litigation.  The directors could invoke their exculpation from liability under the company's articles of incorporation, and the protection of the business judgment rule.  Litigation against the directors and officers could impose "massive legal fees," for the company's own counsel and indemnification of the directors' and officers' counsel fees.  Further, suing its directors and officers for breach of fiduciary duty would require the company to admit and adopt charges of wrongdoing which it was opposing in a pending class securities litigation.

-8-

The full board voted on February 7, 2017, to refuse the McKinney demand and informed Mr. McKinney accordingly. Mr. McKinney filed a shareholder derivative action, alleging that the company's board failed to investigate Mr. McKinney's allegations.

The DEC continued to investigate the additional allegations in the Sherek/Spiegel and Sebenoler demands. Upon reviewing additional documents and conducting six more interviews, the DEC concluded that pursuing the additional claims was not in the company's best interest, and so reported to the full board on June 1, 2017. Beyond the same reasons as supported refusal of the McKinney demand, the DEC concluded that the disclosures Resource Capital had made were not misleading and were made without scienter, and some of the suggested claims were time-barred. The board voted unanimously to refuse the Sherek/Spiegel and Sebenoler demands, and the company so informed Messrs. Sherek, Spiegel, and Sebenoler on June 29, 2017.

Those plaintiffs then filed the complaints now consolidated with the Mr. McKinney's complaint and at issue here.

## STANDARD

"The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business

-9-

judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 97 (1991) (citation and internal quotation marks omitted). Directors of a corporation "are presumed to act properly and in the best interest of the corporation," and their decisions are entitled to the protection of the business judgment rule. Id. "The corporate board's decision to deny the litigation demand receives the same business judgment rule presumption as any other board decision." Oliveira v. Sugarman, 152 A.3d 728, 737 (Md. 2017) (citation omitted). Thus, "the court considering a demand refused action limits its review to whether the board acted independently, in good faith, and within 'the realm of sound business judgment.'" Boland v. Boland, 31 A.3d 529, 549 (Md. 2011) (citation omitted). "To overcome the 'dangerous terrain' of the business judgment rule presumption, the plaintiff must assert facts that suggest the corporate directors did not act in accordance with the rule." Oliveira, 152 A.3d at 736 (citations omitted).

Courts consider several factors in determining whether a DEC's investigation following demand was reasonable:

> (i) whether the committee engaged independent counsel to assist in the investigation; (ii) whether the committee produced a report, its length, and whether it documented the committee's procedures, reasoning, and conclusions; (iii) whether the committee properly

-10-

identified the claims at issue; (iv) whether the committee reviewed the testimony of or interviewed directors, officers, and employees; (v) whether the committee (or counsel hired to assist it) reviewed documents regarding the questionable transaction; and (vi) the number of times the committee met. Scalisi, 501 F. Supp. 2d at 363 (citing Bender, 172 Md. App at 672-73).

Boland, 5 A.3d at 130.

**DISCUSSION**

**"Performing" and the Business Judgment Rule**

The plaintiffs make much of the frequent characterization, in the company's public statements, of the mezzanine loan as "performing"--as did the October 5, 2016 opinion in the class securities litigation, Levin v. Resource Capital Corp.[2] That opinion stated:

> With regard to the $41,100,000 Mezzanine Loan, the statements that it was "performing" or "current" are accurate only in the special sense that its performance complied with its "troubled-debt" restructuring in September 2012 under which it stopped paying interest on its loan, as a concession "given to a borrower in financial difficulty." (Resource's Form 10K December 31, 2012, p. 97) Under that concession, the borrower in financial difficulty was "current" and "performed" by not paying interest: a counter-intuitive use of those characterizations.
>
> To describe the Mezzanine Loan as "performing" or "current" without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5 " . . . to omit to state a material fact necessary in order to make the statements made, in the

---

[2] Levin v. Res. Capital Corp. et al., 15 Civ. 7081 (LLS) (S.D.N.Y. Oct. 5, 2016) (Dkt. No. 36), 2016 WL 5867451.

light of the circumstances under which they were made, not misleading . . . ." That pleads a prima facie violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

Id. at *1.

That opinion, upholding the sufficiency of the pleadings, did not mention and gave no consideration to the scope of Maryland's business judgment rule. The rule is a matter of defense. The parties agree that Maryland law and its business judgment rule, which is extremely broad, apply to these cases. Now that must be addressed: the business judgment rule is germane to the issues concerning whether the board's decision, that pursuing litigation ostensibly brought for the company's benefit would not be in its best interest, should be overthrown.

Under the business judgment rule, courts apply a "presumption of reasonableness as to the substance of a board's decision" to refuse a shareholder's demand. Oliveira, 152 A.3d at 73. Courts defer to a board's decision about whether to accept demand as long as "any rational business person could have reached that result, proceeding independently and in good faith with the best interests of the corporation in mind." Bender v. Schwartz, 917 A.2d 142, 152, 172 Md. App. 648, 655 (Md. 2007). The Court of Appeals of Maryland has explained:

> [T]he focus of the [court's review of the SLC recommendation] is not on the merits of the plaintiffs' claims, but on whether maintenance of the suit would be in the company's best interest. This

-12-

> inquiry is one step removed from the actual merits and allows a special litigation committee to recommend dismissal, consistent with its business judgment, <u>even if a derivative suit may ultimately be successful</u>. (Emphasis added.)  <u>Booth Family Trust</u>, 640 F.3d at 139.

<u>Boland</u>, 31 A.3d at 570 (alteration and emphasis in original) (citation omitted).

In these cases, the board's unanimous opinion that the litigation would do the company more harm than good is supported by trenchant business considerations.  While the epithet "performing" was deceptive except to insiders, it was confined to one loan in a large and diverse portfolio, and any wound inflicted by that loan's default would be (and was) temporary and manageable.  The information necessary to disclose the loan's impairment had periodically been made publicly available, to a degree which undercuts attribution of <u>scienter</u> to the abuse of the word "performing."  The articles of Resource Capital's incorporation indemnify its officers and directors from liability, except where they have received an improper benefit or engaged in dishonesty, which were unlikely to be established. The proposed litigation might require the company to tolerate or endorse propositions which it did not believe and was contesting in its defense against the securities class action, and whether it was more likely to benefit the lawyers than the company was a

decision which fell comfortably within the business judgment rule.

## The DEC's Independence

The plaintiffs concede that, by making their demands, they waived the claim that the board could not independently act on those demands, Bender, 917 A.2d at 152; instead, they argue that the DEC, which had investigatory authority, is not independent. Additionally, the plaintiffs claim that the three DEC members were biased because they were each identified in the Sherek/Spiegel demand "as directors that appeared to have breached their fiduciary duties to the Company." Compl. ¶ 311.s

Two of the DEC members served on Resource Capital's investment committee: Mr. Fore from April 2014 to April 2016, and Mr. Ickowicz from April 2012 to April 2016. The investment committee, which held twenty meetings during fiscal year 2015, is responsible for reviewing and considering the company's proposed investments. "As such," the plaintiffs contend, "defendants Fore and Ickowicz must have known that the Company's public statements concerning its investments were false and misleading, and were therefore incapable of conducting a disinterested and/or independent investigation into the matters raised in the McKinney Demand." Compl. ¶ 299.

Actually, only the independence of the full board is relevant, because "the decision to reject demand was made by the

-14-

full Board." Stoner v. Walsh, 772 F. Supp. 790, 801 (S.D.N.Y. 1991). Even if the DEC's independence were in issue, the complaint does not show disqualifying conflicts of interest affecting any DEC member. Under Maryland law, directors are not considered biased in evaluating demand "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision." Werbowsky v. Collomb, 766 A.2d 123, 143 (Md. 2001). "Simply being members of the board or the compensation committee and participating in the decision-making do not suffice." Weinberg ex re. BioMed Realty Trust, Inc. v. Gold, 838 F. Supp. 2d 355, 260 (D. Md. 2012). There is no showing that Mr. Fore's or Mr. Ickowicz's service on the investment committee would have brought to their attention any particular adverse information about the mezzanine loan beyond that which was being publicly disclosed: that the loan was in difficulty, such that its payment of interest had ceased and would be "deferred." Neither of them joined that committee until 2012, five years after the company had acquired the loan.

Nor does the allegation that the DEC members were claimed to breach their fiduciary duties preclude them from considering the demand. See Sekuk Global Enters. Profit Sharing Plan v. Kevinedes, No. 24-C-03-007496, 2004 WL 1982508, at *7 (Md. Cir. Ct. 2004) (holding that directors were disinterested despite allegations that they breached their fiduciary duties).

-15-

### Interviews of Witnesses

Of the six factors that courts consider in determining whether a board's decision to refuse demand was reasonable under Maryland law, the plaintiffs' opposition brief only argues one: they say the DEC should have interviewed witnesses outside the company.

In response to the McKinney demand, the DEC interviewed ten witnesses, including the company's officers, directors, Director of Internal Audit, and external auditor. In response to the Sherek/Spiegel and Sebenoler demands, the DEC conducted six additional interviews of those witnesses.

As a general matter, "there is no rule of general application that a board must interview every possible witness who may shed some light on the conduct forming the basis of the litigation." Halpert Enters., Inc. v Harrison, No. 07-1144 Civ., 2008 WL 4585466, at *2 (2d Cir. Oct. 15, 2008). Although the plaintiffs characterize all ten witnesses as "Company insiders," Opp'n (Dkt. No. 39) at 16, one of the witnesses was a representative of Resource Capital's external auditor, Grant Thornton LLP. There is no basis for assuming that Mr. McKinney's proposed witnesses, the authors of the Krueger Report or representatives of the Puerto Rican Government Development Bank, would possess any knowledge of what Resource Capital's directors or officers knew or should have known.

Their descriptions of the deplorable and deteriorating economic situation in Puerto Rico would not assist plaintiffs, for a claim of directorial breach of fiduciary duty may not be supported "merely by identifying signs of general difficulty in the market in which the company participates and asserting that the defendants should be held liable for exercising their business judgment in a manner that appears to have been inconsistent with those indications." In re Am. Int'l Grp., Inc. Derivative Litig., 700 F. Supp. 2d 419, 435 (S.D.N.Y. 2010). Instead, "a plaintiff must plead particularized facts showing that the directors 'knew they were not discharging fiduciary obligations' or 'demonstrated a conscious disregard for their responsibilities.'" Id. (citation omitted). That involves only a matter of business judgment, as is evident from the company's stated reasons for concluding that the loan was collectible through the second quarter of 2015:

> Through the first quarter of 2015, the Loan Position continued to perform according to its modified terms, and RCC was tracking the asset sales, which were proceeding in a manner and at a price that demonstrated the Loan Position would be paid off, notwithstanding the existence of the Puerto Rican debt crisis. It was only when the "perfect storm" of negative events occurred, after the first quarter of 2015, that RCC determined the Loan Position was uncollectible and that it should be written off.

Id. at 9-10.

-17-

## Retention of Independent Counsel

The plaintiffs question whether the DEC engaged independent counsel to advise it regarding the Sherek/Spiegel Demand, because correspondence from the Fox Rothschild law firm "states that Fox Rothschild represents the Company itself." Compl. ¶ 313. Yet the demand refusal letter containing a summary of the DEC's findings states that "the DEC and its independent counsel, Michael LiPuma, Esquire, engaged in a thorough review of the independence of each DEC member with respect to the claims and parties at issue." Compl. Ex. T at 3. Mr. LiPuma also wrote a letter to Messrs. Sherek's and Spiegel's counsel that stated, "I represent the Demand Evaluation Committee appointed by RCC." Compl. Ex. Q.

## CONCLUSION

The motion to dismiss the verified consolidated shareholders derivative complaint (Dkt. No. 35) is granted. The Clerk is directed to enter judgment dismissing that complaint and those in each of the three consolidated actions: 17 Civ. 1381 (Dkt. No. 1), 17 Civ. 1965 (Dkt. No. 1), and 17 Civ. 2998 (Dkt. No. 1).

So ordered.

Dated: New York, New York
February 23, 2018

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.