UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE RESOURCE CAPITAL CORP. SHAREHOLDER DERIVATIVE LITIGATION DEMAND FUTILE ACTIONS | : : : : : : | Civil Action No.: 17 Civ. 253 (LLS) |
| IN RE RESOURCE CAPITAL CORP. SHAREHOLDER DERIVATIVE LITIGATION DEMAND REFUSED ACTIONS | : : : : : : : | Civil Action No.: 17 Civ. 1381 (LLS) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF DERIVATIVE SETTLEMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   OVERVIEW OF THE LITIGATION ...................................................................4

      A.    Plaintiffs' Factual Allegations...................................................................4

      B.    Procedural History .....................................................................................6

            1.    The Demand Refused Actions ..........................................................6

            2.    The Demand Futile Actions ..............................................................8

      C.    Settlement Negotiations............................................................................10

III.  GOVERNING LEGAL STANDARDS.................................................................11

IV.   THE SETTLEMENT MEETS THE STANDARD FOR PRELIMINARILY
      APPROVAL ........................................................................................................13

      A.    The Settlement Confers Substantial Benefits Upon Resource Capital and
            Falls Within the Range of Possible Approval...........................................13

      B.    The Settlement Merits a Presumption of Fairness Because It Is the Product
            of Arms'-Length Negotiations by Experienced and Well-Informed Counsel........17

      C.    The Independent, Non-Defendant Directors' Exercise of Business
            Judgment Warrants Deference ...................................................................18

V.    THE PROPOSED FORM AND MEANS OF NOTICE AND SCHEDULE OF
      EVENTS MEET DUE PROCESS STANDARDS..............................................19

VI.   CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

**Pages(s)**

**CASES**

*Arace v. Thompson*, No. 08 CIV. 7905 (DC),
2011 U.S. Dist. LEXIS 93105 (S.D.N.Y. Aug. 17, 2011) ................................................ 20

*Brooks v. Am. Exp. Indus., Inc.*,
No. 71 Civ. 5128, 1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977) ................... 19

*City of Providence v. Aéropostale, Inc.*,
No. 11 Civ. 7132 (CM) (GWG), 2014 U.S. Dist. LEXIS 64517 (S.D.N.Y.
May 9, 2014) ..................................................................................................................... 17

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ............................................................................... 13

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) ................................................................................................ 18

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ............................................................................................... 12

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ........................................................................................................... 18

*In re Apollo Grp., Inc. Sec. Litig.*,
No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4,
2008) ................................................................................................................................... 17

*In re Apollo Grp., Inc. Sec. Litig.*,
No. 08-6971, 2010 U.S. App. LEXIS 14478 (9th Cir. June 23, 2010) ............................. 17

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000) ................................................................................. 18

*In re Currency Conversion Fee Antitrust Litig.*,
No. MDL No. 1409, 2006 U.S. Dist. LEXIS 81440 (S.D.N.Y. Nov. 8, 2006) ................ 12

*In re Drexel Burnham Lambert Grp. Inc.*,
995 F.2d 1138 (2d Cir. 1993) ............................................................................................ 19

*In re Elan Sec. Litig.*,
385 F. Supp. 2d 363 (S.D.N.Y. 2005) ............................................................................... 18

*In re Lloyd's Am. Trust Fund Litig.*,
No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ........................................................................................................................ 17

*In re Metro. Life Derivative Litig.*,
935 F. Supp. 286 (S.D.N.Y. 1996)............................................................................ 16, 20

*In re NASDAQ Market-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ...................................................................................... 12

*In re NVIDIA Corp. Derivative Litig*,
Master File No. C-06-06110-SBA, 2009 U.S. Dist. LEXIS 24973 (N.D. Cal. March 18, 2009)............................................................................................................. 13

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997) .................................................................................... 18

*In re Pfizer Inc., S'holder Derivative Litig.*,
780 F. Supp. 2d 336 (S.D.N.Y. 2011)...................................................................... 13, 16

*In re Prudential Sec. Inc. P'ships Litig.*, 1
63 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................................... 11

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008)............................................................................. 17

*Ingram v. Coca-Cola Co.*,
200 F.R.D. 685(N.D. Ga. 2001)...................................................................................... 18

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983) .......................................................................................... 13

*Marsden v. Select Med. Corp.*,
No. 04 Civ. 4020 (JCJ), 2005 U.S. Dist. LEXIS 714 (E.D. Pa. Jan. 18, 2005) ................ 20

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970)........................................................................................................ 13

*Republic Nat'l Life Ins. Co. v. Beasley*,
73 F.R.D. 658 (S.D.N.Y. 1977) ...................................................................................... 11

*Schimmel v. Goldman*,
57 F.R.D. 481 (S.D.N.Y. 1977) ...................................................................................... 11

*Unite Nat'l Ret. Fund v. Watts*,
No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) ........................................................................................................................ 13

*Unitrin, Inc. v. Am. Gen. Corp.*,
     651 A.2d 1361 (Del. 1995) ................................................................................. 19

*Werbowsky v. Collomb*,
     766 A.2d 123 (Md. 2001) ..................................................................................... 9

*West Virginia v. Chas. Pfizer & Co.*,
     314 F. Supp. 710, 741 (S.D.N.Y. 1970)............................................................. 12

*Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981) ............................................... 19

## OTHER AUTHORITIES

*Manual for Complex Litigation, Third*, § 30.41............................................................. 11

## I.      INTRODUCTION

Plaintiffs respectfully submit this Memorandum in support of preliminary approval of the settlement ("Settlement")[1] of shareholder derivative claims brought on behalf of nominal defendant Resource Capital Corp. ("Resource Capital" or the "Company") against certain of its current and former directors and officers,[2] and corporate defendants Resource America, Inc. ("Resource America") and Resource Capital Manager, Inc. (the "Manager").[3]  The Settlement resolves claims pending in the derivative actions captioned *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Refused Actions*, Case No. 17 Civ. 1381 (LLS) (the "Demand Refused Actions") and *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Futile Actions*, Case No. 17 Civ. 253 (LLS) (the "Demand Futile Actions") (collectively, the "Actions").  It is the product of extensive arms'-length negotiations between the Settling Parties[4], which were overseen by court-appointed mediators as part of the Court's Civil Appeals Mediation Program ("CAMP").

---

[1] The Settlement's terms are set forth in the Stipulation and Agreement of Settlement ("Stipulation") executed by the parties on January 27, 2019, filed concurrently herewith as Exhibit 1 to the Declaration of Shane P. Sanders (the "Sanders Decl.").

[2] The Individual Defendants are Walter T. Beach, Eldron C. Blackwell, David E. Bloom, David J. Bryant, Edward E. Cohen, Jonathan Z. Cohen, Richard L. Fore, William B. Hart, Gary Ickowicz, Steven J. Kessler, Murray S. Levin, P. Sherrill Neff, and Stephanie H. Wiggins.

[3] Resource Capital is now known as Exantas Capital Corp., but is referred to herein as Resource Capital or the Company, in order to be consistent with prior pleadings.  Resource Capital Manager is now known as Exantas Capital Manager, Inc., which, as noted, we refer to as the "Manager." Resource America and the Manager are collectively referred to as the "Corporate Defendants." "Defendants" refers to the Individual Defendants, the Corporate Defendants and the Company, collectively.

[4] Unless otherwise defined herein, all capitalized terms have the same meaning ascribed to them in the Stipulation.

The Settlement confers substantial benefits upon Resource Capital and its shareholders by obligating the Board of Directors (the "Board") to adopt corporate governance reforms that substantially enhance the rigor and independence of Board oversight and decision-making with respect to the evaluation and approval of proposed investments and the ongoing evaluation and supervision of credit risk (the "Reforms").

Among other measures, the Settlement provides for: (a) the adoption of enhanced director independence standards, including a formal policy requiring the positions of Board Chairman and CEO to be filled by different individuals at all times; (b) the adoption of an Investment Committee Charter detailing the responsibilities of the Board's Investment Committee for approving each of the Company's proposed investments in loans and preferred equity initially valued in excess of $35 million but less than or equal to $50 million; (c) amendments to the Audit Committee Charter enhancing, among other things, its oversight of conditions that may affect credit risk, including changes in economic and business conditions, the volume and severity of past due loans, and changes in underwriting standards, concentrations in the portfolio, and the regulatory environment; and supervision of the Company's related internal controls relating to credit risk management and disclosure, including review and approval of the Company's procedures for monitoring loans and the Company's practices relating to recognition of impairments, loan losses, write downs and allowances, and provisions for loan losses; (d) mandatory training for all members of the Board regarding best corporate governance practices; (e) substantially enhanced disclosure requirements regarding the amounts of base management fees and incentive compensation paid to the Manager under Resource Capital's Management Agreement with the Manager; and (f) the requirement that any proposed amendment to the Management Agreement that would materially increase the

amount of incentive compensation paid to the Manager be approved by a majority of common stockholders.

The Reforms specifically address the alleged weaknesses in the Company's processes and procedures concerning its investment portfolio, disclosure practices, and executive and Board-level oversight that Plaintiffs contend permitted the alleged wrongdoing to take place and to damage Resource Capital.  Operating together, the Reforms will materially reduce the probability of recurrence of similar or related alleged wrongdoing and damages in the future, produce better investment and risk management decisions overall, facilitate timely and accurate disclosure of credit risk, loan impairment, and loan losses, provide far greater transparency regarding the actual costs of the Manager's services, and allow stockholders to veto any decision to materially increase incentive compensation paid to the Manager.  The Settlement guarantees that Resource Capital and its stockholders will reap the long-term benefits of strong corporate governance and enhanced Board oversight of credit risk and related disclosures, and greater transparency and stockholder control over management fees, which in turn will help enhance investor confidence and improve returns over time as these changes take effect.

After the material substantive terms of the Settlement were determined and agreed upon, Plaintiffs' Counsel and counsel for Defendants separately negotiated the attorneys' fees and expenses to be paid to Plaintiffs' Counsel in consideration for securing the substantial benefits for the Company.  Resource Capital has agreed to pay Plaintiffs' Counsel a fee and expense award of $550,000 (the "Fee and Expense Amount"), through its insurers.[5]  The Board, including each of

---

[5] At this stage of the settlement approval process, the Court is not asked to evaluate or approve the agreed Fee and Expense Amount beyond determining that the Settlement as a whole falls within the range that might be approved as fair and reasonable, such that notice should issue to Current Resource Capital Shareholders and a hearing set for final settlement review and approval.

its independent, non-defendant directors, has approved the Settlement and each of its terms as being in the best interests of Resource Capital and its shareholders.  The Board has acknowledged and agrees that the Settlement is fair, reasonable, and adequate, and confers substantial benefits upon Resource Capital and its shareholders.

At the preliminary approval stage, the Court need only determine that the proposed Settlement is within the range of what might be found to be fair, reasonable, and adequate, such that notice of the Settlement should be provided to Resource Capital shareholders and a hearing scheduled for consideration of final settlement approval.  The proposed Settlement plainly meets this standard.  In addition, the proposed schedule and notice are adequate to apprise shareholders of the Settlement's terms and to afford them a fair opportunity to submit objections, if any.  Accordingly, Plaintiffs respectfully request that the Court enter the [Proposed] Order Preliminarily Approving Settlement, Authorizing Notice, and Setting Settlement Hearing (the "Preliminary Approval Order") (Exhibit 1 to the Stipulation) granting preliminary approval of the proposed Settlement; directing that notice be given to Resource Capital shareholders; and scheduling a hearing on final settlement approval (the "Settlement Hearing").

## II.    OVERVIEW OF THE LITIGATION

### A.    Plaintiffs' Allegations[6]

Plaintiffs allege that members of Resource Capital's Board managed the fund in a manner that yielded to the interests of Resource America and its controlling founders, Johnathan Cohen and Edward Cohen (the "Cohens").  At the time of the Company's inception in 2005, the Board approved a Management Agreement, pursuant to which Resource Capital purportedly would pay

---

[6] This discussion is based on the allegations contained in Plaintiffs' complaints, some of which the Defendants dispute.

- 4 -

the Manager (and thereby, indirectly, the Manager's parent company, Resource America, and the Cohens) a large fee to manage the Company's loan portfolio based on the Company's reported "Equity," regardless of overall portfolio and Manager performance.  The Board agreed to terms in the Management Agreement that Plaintiffs contend made it economically onerous to terminate or modify.

Against this backdrop, Plaintiffs allege that the Board allowed the Manager to invest in risky, poorly collateralized mezzanine debt that ceased providing the Company with income in 2012.  The collateral that securitized the Mezzanine Loan consisted of thirteen hotels, three of which were located in Puerto Rico.  Following years of economic difficulties in Puerto Rico, the Mezzanine Loan ceased paying current interest and, Plaintiffs allege, should have been written down.

From November 2012 until August 2015, the Defendants reviewed the Mezzanine Loan and restructured it several times, effectively extending the maturity date and deferring interest obligations to avoid default.  The U.S.-based hotels backing the Mezzanine Loan were sold to meet payment obligations, leaving as collateral only the Puerto Rican hotels, the value of which had collapsed along with the Puerto Rican economy.

Plaintiffs allege that for over two-and-a-half years, Defendants allowed the Company's officers to characterize all of Resource Capital's commercial real estate loans, including the Mezzanine Loan, as "performing" in quarterly teleconferences with stock analysts.  After each earnings teleconference, Defendants who served on the Company's Audit Committee approved similar statements in the Company's Forms 10-K and 10-Q, filed with the U.S. Securities and Exchange Commission ("SEC"), which stated that Resource Capital's loans were "performing" and "current" and that the Company had made all necessary provisions for loan loss and impairments.

During this time, the Manager continued to receive excessive fees based on an "Equity" metric Plaintiffs allege was inflated by the failure to properly account for the Mezzanine Loan losses.

On August 4, 2015, approximately three months after indicating that all of Resource Capital's commercial real estate loans were performing, Resource Capital disclosed that it would incur a quarterly net loss of $31 million caused by the recording of an allowance for a $41.1 million loan loss on the Mezzanine Loan. The press release acknowledged that the economic and credit disruptions in Puerto Rico had finally led the Company to fully reserve the Mezzanine Loan. Resource Capital's stock fell almost 15%, erasing over $68.4 million in market capitalization. Plaintiffs allege that had Resource Capital recorded the loss in late 2012, when the Mezzanine Loan had ceased paying current interest and the value of the hotels securing the Loan was already on the brink of collapse, Resource Capital's reported Equity would have been far lower, and it would have paid approximately $4.5 million less in management fees to Manager from the fourth quarter of 2013 through the first quarter of 2015.

### B.    Procedural History

#### 1.    The Demand Refused Actions

Following the public announcement of the impairment of the Mezzanine Loan, plaintiffs Mark E. McKinney, Dave Sherek, Robert H. Spiegel, and Rick Sebenoler each made formal written demands (the "Demands") that the Board investigate the Mezzanine Loan's impairment and related alleged misrepresentations and omissions, and, if warranted, pursue claims for, inter alia, breach of fiduciary duties of loyalty and good faith against Resource Capital's officers and directors. Certain of the Demands also requested that the Board investigate and brings claims arising from related misstatements and omissions from Resource Capital's 2014 and 2015 proxy statements.

Upon receiving the Demands, the Company's Board appointed a demand evaluation committee (the "DEC") to investigate the Demands.  According to Defendants, the DEC, which consisted of three independent, outside directors who had no role in the Company's investment in the Mezzanine Loan, investigated the Demands' allegations, including reviewing documents and interviewing witnesses with the assistance of independent counsel.  The DEC concluded that the claims lacked merit and that it would not be in the Company's best interest to pursue them in litigation.  The full Board thereafter voted to accept the DEC's recommendation and refused the Demands.

On February 23, 2017, McKinney filed a shareholder derivative action, captioned *McKinney v. Cohen*, Case No. 17-cv-01381 (the "McKinney Action").  On March 17, 2017, Sherek and Spiegel filed a shareholder derivative action, captioned *Sherek v. Kessler*, Case No. 17-cv-01965 (the "Sherek Action").  On April 25, 2017, Sebenoler filed a shareholder derivative action, captioned *Sebenoler v. Beach*, Case No. 17-cv-02998 (the "Sebenoler Action").  The plaintiffs in these actions each alleged similar claims and that the Board wrongfully refused their demands, giving them standing to pursue the claims derivatively on behalf of the Company.

On May 16, 2017, the District Court entered an order consolidating the McKinney, Sherek, and Sebenoler Actions under the caption, *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Refused Actions*, Case No. 17 Civ. 1381 (LLS) (Demand Refused Actions); and directing plaintiffs to designate lead counsel or timely file competing motions for appointment of lead counsel.  On May 18, 2017, the District Court appointed Profy Promisloff & Ciarlanto, P.C. (now known as Promisloff Law, P.C.) as lead counsel in the Demand Refused Actions.

On June 30, 2017, Plaintiffs in the Demand Refused Actions ("Demand Refused Plaintiffs") filed a Verified Consolidated Shareholder Derivative Complaint (the "Consolidated

Demand Refused Complaint") asserting claims for violations of Section 14(a) of the Securities Exchange Act of 1934, breach of fiduciary duties, and unjust enrichment.  As in their individual complaints, the Demand Refused Plaintiffs alleged that they had standing to sue derivatively on behalf of the Company because the Board had wrongfully refused their respective Demands.

On September 15, 2017, the Individual Defendants and the Company filed a joint motion to dismiss the Consolidated Demand Refused Complaint, arguing, among other things, that the Consolidated Demand Refused Complaint failed to plead particularized facts showing that the Board's refusal of the Demand Refused Plaintiffs' Demands was wrongful.  On November 14, 2017, the Demand Refused Plaintiffs filed their opposition, and on December 29, 2017, the Individual Defendants and the Company filed their reply.

On February 23, 2018, the District Court granted the motion to dismiss.  On March 22, 2018, the Demand Refused Plaintiffs filed a notice of appeal.

### 2.    The Demand Futile Actions

On January 12, 2017, plaintiff Joseph Greenberg filed a shareholder derivative action, captioned *Greenberg v. Bryant*, Case No. 17-cv-00253 (the "Greenberg Action").  On January 18, 2017, plaintiff Robert A. Canoles filed a shareholder derivative action, captioned *Canoles v. Kessler*, Case No. 17-cv-00349 (the "Canoles Action").  On January 23, 2017, plaintiff James M. DeCaro filed a shareholder derivative action, captioned *DeCaro v. Bryant*, Case No. 17-cv-00474 (the "DeCaro Action").   On April 27, 2017, plaintiffs Abigail and Zachary Gehan filed a shareholder derivative action, captioned *Gehan v. Kessler*, Case No. 17-cv-03073 (the "Gehan Action").

Unlike the Demand Refused Plaintiffs, plaintiffs Greenberg, Canoles, DeCaro, Abigail Gehan, and Zachary Gehan (the "Demand Futile Plaintiffs") did not make formal written demands on the Company's Board to investigate and pursue the claims.  The Demand Futile Plaintiffs

alleged, instead, that pre-suit demands on the Board would have been futile, excusing the demand requirement under Maryland law.

On May 16, 2017, the District Court entered an order consolidating the Greenberg, Canoles, DeCaro, and Gehan Actions under the caption, *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Futile Actions*, Case No. 17 Civ. 253 (LLS) (Demand Futile Actions), and directing the Demand Futile Plaintiffs to designate lead counsel or timely file competing motions for the appointment of lead counsel.  Following briefing, on July 6, 2017, the District Court appointed Robbins Arroyo LLP as lead counsel in the Demand Futile Actions.  On August 8, 2017, at the request of plaintiffs Canoles, Abigail Gehan, and Zachary Gehan, the District Court voluntarily dismissed the Canoles and Gehan Actions.[7]

On August 21, 2017, the Demand Futile Plaintiffs filed a Verified Consolidated Stockholder Derivative Complaint (the "Consolidated Demand Futile Complaint").    The Consolidated Demand Futile Complaint asserted claims for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act on behalf of Resource Capital against the Individual and Corporate Defendants.  As in their individual complaints, the Demand Futile Plaintiffs alleged that the pre-suit demand requirement was excused as futile because a majority of the Company's directors were "so personally and directly conflicted" or "so personally or directly … committed to the decision in dispute" that they could not "reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule."  *Werbowsky v. Collomb*, 766 A.2d 123, 144 (Md. 2001).  The Demand Futile Plaintiffs alleged that the Board's decision-making evidenced a sustained a pattern of action in

---

[7] Canoles subsequently filed a virtually identical action in the Circuit Court for Baltimore County, Maryland.  This action was stayed on December 20, 2017.  The stay remains in place, and there has been no substantive litigation activity.

deference to the best interests of the Cohens, including repeated misstatements that the Mezzanine Loan was performing and overstatements of Equity that inflated the fees paid to Resource Manager. The Demand Futile Plaintiffs alleged that these facts sufficed to show that the Board was "so personally and directly conflicted or committed to" the Company's policy of maintaining the façade concerning the Mezzanine Loan that they could not be "reasonably expected" to impartially consider a demand.

On August 10, 2017, the Court entered a stipulated order deferring briefing on Rule 12(b)(6) defenses and other merits issues until after the threshold issue of derivative standing was resolved. On October 20, 2017, Defendants filed motions to dismiss the Consolidated Demand Futile Complaint on grounds that Plaintiffs failed to plead particularized facts demonstrating demand futility. On December 19, 2017, the Demand Futile Plaintiffs filed their opposition, and on February 2, 2018, the Defendants filed their replies.

On April 2, 2018, the District Court granted the Defendants' motions to dismiss and held that the Demand Futile Plaintiffs failed to allege with the required particularity that the demand requirement was excused. On May 3, 2018, the Demand Futile Plaintiffs filed a notice of appeal.

### C.    Settlement Negotiations

On May 4, 2018, in anticipation of pre-appeal mediation conferences required by the United States Court of Appeals for the Second Circuit, Plaintiffs' Counsel in the Demand Futile Actions and the Demand Refused Actions sent a joint settlement demand letter to Defendants' counsel proposing a framework for settling the Actions. Between May and August 2018, counsel for Plaintiffs and Defendants engaged in hard fought, arms'-length settlement negotiations with the assistance of CAMP mediators, pursuant to the Second Circuit's Local Rule 33.1. On August 9, 2018, the parties reached an agreement in principle on the substantive terms of a proposed settlement.

After concluding their negotiations regarding the material substantive terms of the Settlement, the parties separately negotiated an amount of attorneys' fees and expenses that would be payable, subject to the approval of the District Court, in consideration for the substantial corporate benefit secured by Plaintiffs' Counsel through the Settlement.  On November 8, 2018, the Settling Parties reached an agreement on a proposed award of attorneys' fees and expenses.

On November 12, 2018, counsel for the parties to the Derivative Actions executed a memorandum of understanding setting forth the material terms of their agreement in principle to settle the Derivative Actions, subject to the negotiation of a mutually acceptable settlement agreement and court approval.  The Board, including each of its independent, non-defendant directors, has approved the Settlement and each of its terms as being in the best interests of Resource Capital and its shareholders, and has acknowledged and agrees that the Settlement is fair, reasonable, and adequate, and confers substantial benefits upon Resource Capital and its shareholders.  The Settling Parties then negotiated the complete terms and conditions of settlement embodied in the Stipulation, which was fully executed by January 27, 2019.

## III.    GOVERNING LEGAL STANDARDS

It is well-settled that strong public policies favor the settlement of disputed claims, especially in complex class and shareholder derivative litigation.  *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1977) (settlements of shareholder derivative actions particularly favored because such litigation is "notoriously difficult and unpredictable") (citation omitted); *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (same).

The standards for preliminary approval are "not as stringent as those" for final approval. *Manual for Complex Litigation* §21.632 (4th ed. 2004).  To grant preliminary approval, the Court need only make a preliminary determination regarding the fairness, reasonableness, and adequacy of the settlement.  *In re Prudential Sec. Inc. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995).

- 11 -

The sole issue before the Court is whether the Settlement falls within the range of what could be found to be fair, adequate, and reasonable, such that it would be appropriate to give notice to the shareholders and schedule a hearing to consider final approval of the Settlement. *In re Currency Conversion Fee Antitrust Litig.*, No. MDL No. 1409, 2006 U.S. Dist. LEXIS 81440, at *13 (S.D.N.Y. Nov. 8, 2006) (court to conduct "a preliminary evaluation as to whether the settlement is fair, reasonable and adequate") (citation omitted); *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) (preliminary approval requires only a "preliminary evaluation of the fairness of the settlement, prior to notice"). The substantive determination regarding whether a proposed settlement is fair, adequate, and reasonable is to be made after notice of the Settlement has been given to shareholders and after they have been given an opportunity to voice their views regarding the Settlement. *Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974).

Preliminary approval should generally be granted where, as here, the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; has no obvious substantive deficiencies; and falls within the range of possible approval, in light of the benefits guaranteed by the settlement and the risks, cost and delays entailed in attempting to secure a better result through continued litigation. *See NASDAQ*, 176 F.R.D. at 102 (citing *Manual for Complex Litigation*, *Third*, § 30.41); *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 741 (S.D.N.Y. 1970), aff'd, 440 F.2d 1079 (2d Cir. 1971) (preliminary fairness evaluation should balance possible "'rewards of litigation' with its 'risk and cost'" against benefits guaranteed through proposed settlement) (citations omitted).

## IV.    THE SETTLEMENT MEETS THE STANDARD FOR PRELIMINARILY APPROVAL

### A.    The Settlement Confers Substantial Benefits and Falls Well Within the Range of Possible Approval

"[S]trong corporate governance is fundamental to the economic well-being and success of a corporation;" accordingly, courts have long "recognized that corporate governance reforms such as those achieved here provide valuable benefits for public companies." *In re NVIDIA Corp. Derivative Litig*, Master File No. C-06-06110-SBA, 2009 U.S. Dist. LEXIS 24973, at *11-12 (N.D. Cal. March 18, 2009); *see also Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 395 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature."); *Maher v. Zapata Corp*., 714 F.2d 436, 461 (5th Cir. 1983) ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor.").

Courts approve settlements supported by consideration in the form of corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws[.]" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005).  Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators or prosecutors." *Id*.  *See In re Pfizer Inc., S'holder Derivative Litig*., 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement of shareholder derivative action where the corporate benefits included "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246, at *9 (D.N.J. Oct. 28, 2005) (non-monetary benefits support settlement where "the relief is

intended to prevent future harm").  The Reforms guaranteed by the Settlement plainly confer this sort of substantial benefit here.

As provided by the Settlement, the Board shall implement and maintain for a period of at least three (3) years following final approval of the Settlement an array of policy, procedural, and structural governance enhancements, including: (i) a formal policy requiring that the positions of Board Chairman and Chief Executive Officer (the "CEO) be filled by different individuals at all times; (ii) the adoption of an Investment Committee Charter detailing the Investment Committee's responsibilities for approving each of the Company's proposed investments in loans and preferred equity initially valued at more than $35 million but less than or equal to $50 million; (iii) amendments to the Audit Committee Charter enhancing its responsibilities for credit risk review and reporting, including amendments designed to enhance the committee's oversight of conditions that may affect credit risk, and supervision of internal controls relating to credit risk management and disclosure; (iv) the adoption of a policy of mandatory training for all members of the Board regarding best corporate governance practices; (v) enhanced disclosures regarding the calculation of base management fees and incentive compensation in connection with the Company's quarterly and annual financial statements; and (vi) a provision of the Management Agreement stating that the Management Agreement shall not be amended in any manner that would materially increase the amount of incentive compensation during the Compliance Term without the approval of a majority of the Company's common stockholders.

The Reforms target three areas at the heart of Plaintiffs' claims:  Board and committee independence; the effectiveness of Board oversight of lending, credit risk, and credit risk reporting; and transparency and shareholder say in the operation and terms of the Management Agreement.

- 14 -

The formalized separation of the Chairman and CEO role will help ensure that a maximum degree of independence and lack of conflict of interest exists between the Board and the Company's executives and other entities.  So too will the formalized requirement that Board members not serve on the boards of more than three other unaffiliated publicly-traded entities. This speaks directly to Plaintiffs' allegations regarding control over, and overlapping business relationships between and among, members of the Board, which Plaintiffs alleged harmed the Company.

The reforms to the Investment Committee are specifically aimed at the types of investments and loans that are comparable to the Mezzanine Loan at issue in this matter.  The new Investment Committee Charter will specify that the Investment Committee will be responsible for approving all proposed investments in loans and preferred equity initially valued in excess of $35 million but less than or equal to $50 million, shall consider all material risks associated with these investments that are identified by the Manager or members of the Investment Committee, and shall receive a report from the Manager identifying any material exception to or material deviation from the Investment Committee Charter.  Early identification of loan risks and potentially problematic loans will lead to enhanced oversight, early identification of red flags, and timely identification, mitigation, and disclosure of impaired loans.

The Audit Committee enhancements build on the Investment Committee enhancements by amplifying the procedures concerning the review and assessment of ongoing credit risk problems, such as those that allegedly affected the Mezzanine Loan.  The Reforms ensure that problem loans are evaluated and reassessed on an ongoing basis, that material changes in economic conditions that materially increase credit risk are flagged, and that impacted loans are regularly assessed for possible impairment.

- 15 -

The Reforms empower shareholders with respect to the Management Agreement. First, they require enhanced disclosures designed to make clear how management fees are determined using the "Equity" calculation. The Reforms contain specific mandates for reporting the calculation of equity, a reconciliation of the Company's GAAP net income or loss allocable to common shares to its Core Earnings, and (when applicable) an explanation of how the Incentive Compensation hurdle was calculated. Second, they allow shareholders to vote on certain future material increases in incentive compensation paid under the Management Agreement. These Reforms directly address the allegations regarding the conflicting interests inherent in the Management Agreement and how those conflicts are managed going forward. The Settlement guarantees that Resource Capital and its shareholders will reap the long-term benefits of strong corporate governance, better credit risk management, timely and accurate credit risk disclosures, and greater transparency and stockholder control over management fees, which in turn will help enhance investor confidence and improve returns over time as these changes take effect.

Balanced against the delays, costs, and particularly the risks of attempting to secure additional benefits through pursuit of the appeals and further litigation and trial upon remand, the substantial benefits of the Settlement clearly fall within the range of possible approval as fair, reasonable, and adequate. *See In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d at 340 (citation omitted). To move forward in their cases, Plaintiffs would first need to prevail in their appeals pending in the Second Circuit. Even if Plaintiffs were successful in their appeals, continued litigation would be extremely complex, costly, and lengthy. *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 294 (S.D.N.Y. 1996) (unless proposed settlement clearly inadequate, approval preferable to lengthy and expensive litigation with uncertain results). Document and written discovery would be extremely costly and take years to complete. These costs and delays

would be compounded by the need to retain and guide through discovery multiple experts on liability and damages issues. If the case survived summary judgment, the challenges and costs of mounting a successful trial effort would have to be confronted. Even if liability were established, proving the amount of recoverable damages would pose significant challenges. *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *6 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable."). Success at trial would be no guarantee of recovery, either. Plaintiffs would face further risks, costs and delays in post-trial proceedings and appeals. *See, e.g., In re Apollo Grp., Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), rev'd & remanded, No. 08-6971, 2010 U.S. App. LEXIS 14478 (9th Cir. June 23, 2010) (holding evidence insufficient to support jury verdict for shareholders of $277 million). The Settlement eliminates these and other costs and risks of continued litigation, including the very real risk that these efforts would produce no recovery at all.

### B.     The Settlement Merits a Presumption of Fairness Because It Is the Product of Arms'-Length Negotiations by Experienced and Well-Informed Counsel

The Settlement was reached after extensive arms'-length negotiations between and among experienced counsel for Plaintiffs and Defendants with the assistance of CAMP mediators. As the Court observed in *City of Providence v. Aéropostale, Inc.*, No. 11 Civ. 7132 (CM) (GWG), 2014 U.S. Dist. LEXIS 64517 (S.D.N.Y. May 9, 2014), an "initial presumption of fairness and adequacy applies here because the Settlement was reached by experienced, fully-informed counsel after arm's-length negotiations and, ultimately, with the assistance of . . . , one of the nation's premier mediators in complex, multi-party, high stakes litigation . . . ." *Id.* at *11-12*; accord In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576-77 (S.D.N.Y. 2008) ("a strong presumption of fairness"

attaches to settlements negotiated at arm's-length by experienced" counsel); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "court-appointed mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

Significant weight also should be accorded to Plaintiffs' and the Company's counsels' judgment that the Settlement serves Resource Capital's and its shareholders' best interests. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation."); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 369 (S.D.N.Y. 2005) (finding a presumption of fairness where "the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation") (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000)).[8]

### C.   The Independent, Non-Defendant Directors' Exercise of Business Judgment Warrants Deference

Finally, the business judgment of the independent non-defendant directors[9] that the Settlement confers substantial benefits and serves the best interests of the Company and its shareholders deserves deference. As the Court found in connection with Defendants' motions to dismiss, courts generally defer to the business judgment of directors with respect to litigation

---

[8] While the Court need not address fees until final approval, it bears mention that arms'-length fee negotiations receive similar deference. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (negotiated fees strongly preferred) ("A request for attorney's fees should not result in a second major litigation.")  Where there is no evidence of collusion and no detriment to the parties, "the Court should give substantial weight to a negotiated fee amount." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001).

[9] The outside non-defendant directors are Jeffrey P. Cohen, Andrew L. Farkas, and Henry R. Silverman.

matters.  *See Brooks v. Am. Exp. Indus., Inc.*, No. 71 Civ. 5128, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) ("The Court is of the view that in this case, the decision of the [] board to approve this settlement is appropriately afforded certain deference; it is a business judgment with presumptive validity."); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("[C]ourts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness").  *See generally Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981).

## V.    THE PROPOSED FORM AND MEANS OF NOTICE AND SCHEDULE OF EVENTS MEET DUE PROCESS STANDARDS

Consistent with Rule 23.1 and due process standards, the proposed form of the Notice of Proposed Settlement, as well as the Summary Notice, is reasonably "calculated to apprise [current Resource Capital shareholders] of the terms of a proposed settlement and the options available in connection with the judicial proceeding." *In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993).  The Notice and Summary Notice are drafted in plain language that clearly describes the nature of the Derivative Actions; the allegations and claims; the terms of the Settlement; information regarding the agreed-to Fee and Expense Amount; the procedure for objecting to the Settlement and/or the Fee and Expense Amount; and the date, time, and place of the final approval hearing.  *See* Exhibits. 2 and 3 to the Stipulation.

The Stipulation and proposed Preliminary Approval Order state that Resource Capital will provide notice of the Settlement by filing with the SEC a Form 8-K, which shall include as attachments this Stipulation and the Notice of Proposed Settlement. Stipulation, ¶25.  The Form 8-K and its attachments will also be accessible through the Company's website throughout the entirety of the settlement approval process.  *Id.*  In addition, within ten (10) business days after the entry of the Preliminary Approval Order, Resource Capital will cause the Summary Notice to be

published in Investor's Business Daily. *Id.* Also within ten (10) business days after the entry of the Preliminary Approval Order, Plaintiffs' Counsel will cause the Notice of Proposed Settlement to be posted on their respective firm websites. Stipulation, ¶26.

The proposed method of notice to shareholders here satisfies Rule 23.1 and due process standards in derivative actions brought by shareholders on behalf of public corporations. *See Arace v. Thompson*, No. 08 CIV. 7905 (DC), 2011 U.S. Dist. LEXIS 93105, at *11 (S.D.N.Y. Aug. 17, 2011) ("[T]he publication of the notice in the September 25, 2009 edition of the *Investor's Business Daily*— 'a nationally-circulated business-oriented publication catering to investors'— sufficiently apprised Wachovia shareholders of the nature of the proposed settlement, the upcoming public hearing on the matter, and the opportunity to object.") (citing *Marsden v. Select Med. Corp.*, No. 04 Civ. 4020 (JCJ), 2005 U.S. Dist. LEXIS 714 (E.D. Pa. Jan. 18, 2005)); *see also In re Metro. Life Derivative Litig.*, 935 F. Supp. at 294 n.10 (approving published notice of derivative settlement).[10]

As to scheduling, in connection with preliminary approval of the proposed Settlement, Plaintiffs respectfully request that the Court establish: (i) dates by which notice of the Settlement

---

[10] Use of a Form 8-K together with publication in business periodicals and on company websites is the accepted practice in shareholder derivative actions. Personal notice is unnecessary because, unlike a shareholder class action, the settlement of a shareholder derivative action resolves claims belonging to, and secures a recovery for, the corporation, not individual class members. *See In re Rambus Inc. Derivative Litig.*, No. 5:06-cv-03513-JF, slip op., ¶8 (N.D. Cal. Oct. 30, 2008) (approving notice by filing on Form 8-K, Business Wire press release, and posting on company's website), Sanders Decl., Ex. 2; *In re: MoneyGram Int'l, Inc. Derivative Litig.*, No. 0:09-cv-03208-DSD-JJG, slip op., ¶3 (D. Minn. Apr. 1, 2010) (same), Sanders Decl., Ex. 3; *In re Comverse Tech., Inc. Derivative Litig.*, No. 2:06-cv-01849-NGG -RER, slip op., ¶¶10-11 (E.D.N.Y. Apr. 6, 2010) (approving notice by filing on Form 8-K, publication in *The Wall Street Journal* and posting on company's website), Sanders Decl., Ex. 4; *In re Marvell Tech. Grp. Ltd. Derivative Litig.*, No. 5:06-cv-03894-RMW, slip op., ¶4 (N.D. Cal. May 21, 2009) (same), Sanders Decl., Ex. 5; *Wandel v. Brenneman et al.*, No. 2006 Civ. 117491, slip op., ¶7 (Ga. Super. Ct. Apr. 3, 2008) (approving notice by filing on Form 8-K and publication in *Investor's Business Daily*), Sanders Decl., Ex. 6.

will be distributed to Resource Capital shareholders; (ii) the date by which Resource Capital shareholders may comment on the Settlement; and (iii) the date of a Settlement Hearing at which the Court will consider whether final approval of the proposed Settlement should be granted. As set forth in the Preliminary Approval Order, submitted as Exhibit 1 to the Stipulation, Plaintiffs propose the following:

| | |
|---|---|
| Filing of Notice of Proposed Settlement and Stipulation along with a Form 8-K with the SEC, and posting Notice and Stipulation to Company's website | 10 business days after the Court enters the Preliminary Approval Order |
| Summary Notice of Proposed Settlement published in Investors' Business Daily | 10 business days after Court enters the Preliminary Approval Order |
| Notice of Proposed Settlement to be posted on the websites of Robbins Arroyo LLP, and Promisloff Law, P.C. | 10 business days after the Court enters the Preliminary Approval Order |
| Filing of Motion for Final Approval of Proposed Settlement | 28 calendar days before Settlement Hearing |
| Last day for current Resource Capital shareholders to file written objections to the proposed Settlement and provide written notice of intent to appear at the Settlement Hearing | 21 calendar days before Settlement Hearing |
| Filing of Reply for Final Approval of Proposed Settlement | 7 calendar days before Settlement Hearing |
| Settlement Hearing | Approximately 60 calendar days after entry of Preliminary Approval Order |

This proposed schedule is similar to those used in other derivative settlements and ensures that all Resource Capital shareholders have an opportunity to review and comment on the Settlement, consistent with due process standards.

- 21 -

## VI.   CONCLUSION

The proposed Settlement guarantees substantial benefits for Resource Capital and its shareholders in the form of governance and oversight enhancements that directly address the alleged wrongdoing, improve credit risk management and disclosures, and afford a far greater degree of transparency with respect to the calculation of management fees and shareholder involvement in decisions to materially increase incentive compensation going forward. Considered in the context of the tremendous costs and risks that would be entailed in any attempt to improve on the result through further litigation, it is an excellent result that falls well within the range of what might be considered fair, reasonable, and adequate, and should be preliminarily approved.

Dated: March 1, 2019

**ROBBINS ARROYO LLP**

By: s/ Craig W. Smith
Brian J. Robbins
Craig W. Smith
Ashley R. Rifkin
Shane P. Sanders
5040 Shoreham Place
San Diego, CA 92122
(619) 525-3990
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
arifkin@robbinsarroyo.com
ssanders@robbinsarroyo.com

*Lead Counsel for Plaintiffs in the Demand Futile Actions*

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: s/ Curtis V. Trinko
Curtis V. Trinko, Esq.
16 West 46th St, 9th Flr.
New York, NY 10036
Telephone: (212) 490-9550
Facsimile: (212) 986-0158
ctrinko@trinko.com

- 22 -

*Liaison Counsel for Plaintiffs in the Demand Refused Actions*

**PROMISLOFF LAW, P.C.**
David M. Promisloff
5 Great Valley Parkway, Suite 210
Malvern, PA 19355
(215) 259-5156
david@prolawpa.com

*Lead Counsel for Plaintiffs in the Demand Refused Actions*

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
300 Mt. Lebanon Boulevard
Suite 206-B
Pittsburgh, PA 15234-1507
Telephone: (412) 391-5164
Facsimile: (412) 471-1033

**JOHNSON FISTEL, LLP**
W. Scott Holleman
99 Madison Avenue
5th Floor
New York, NY 10016
Telephone: (212) 802-1486
Facsimile: (212) 602-1592
ScottH@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA  30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**BERNSTEIN LIEBHARD LLP**
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

- 23 -

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

*Additional Counsel for Appellants-Plaintiffs*

- 24 -