UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | Civil Action No.: 17 Civ. 253 (LLS) |
| IN RE RESOURCE CAPITAL CORP. | : | |
| SHAREHOLDER DERIVATIVE | : | |
| LITIGATION DEMAND FUTILE ACTIONS | : | |
| | : | |
| | : | |
| | : | |
| IN RE RESOURCE CAPITAL CORP. | : | Civil Action No.: 17 Civ. 1381 (LLS) |
| SHAREHOLDER DERIVATIVE | : | |
| LITIGATION DEMAND REFUSED | : | |
| ACTIONS | : | |
| | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
<u>DERIVATIVE SETTLEMENT</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   OVERVIEW OF THE LITIGATION ...............................................................4

    A.    Plaintiffs' Allegations...............................................................................4

    B.    Procedural History ....................................................................................6

        1.    The Demand Refused Actions .......................................................6

        2.    The Demand Futile Actions ..........................................................8

    C.    Settlement Negotiations ..........................................................................10

    D.    Preliminary Approval..............................................................................11

III.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ..........12

    A.    Legal Standards Governing Final Approval ...........................................12

    B.    The Settlement Merits a Presumption of Fairness Because It Is the Product of Arm's-Length Negotiations by Experienced and Well-Informed Counsel........13

    C.    Evaluation of the Relevant Factors Demonstrates the Fairness, Reasonableness, and Adequacy of the Settlement ................................................16

        1.    The Settlement Confers Substantial Benefits on Resource Capital and Its Stockholders................................................................17

        2.    Continued Litigation Would Be Risky, Costly, and Time-Consuming .................................................................................21

        3.    The Reaction of Resource Capital's Stockholders Further Supports Final Approval of the Settlement................................26

    D.    The Independent, Non-Defendant Directors' Exercise of Business Judgment Warrants Deference ................................................................27

IV.   THE negotiated FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE ................................................................................................28

    A.    Legal Standards Governing Attorneys' Fees and Expenses...................29

    B.    The *Goldberger* Factors Confirm the Reasonableness of the Negotiated Fee and Expense Amount ......................................................30

1.      The Fee and Expense Amount Is Reasonable in Light of the
        Benefits Conferred ........................................................................30

2.      The Skill Demonstrated by Plaintiffs' Counsel Supports the Agreed
        Fee and Expense Amount ............................................................32

3.      The Contingency Risk Borne by Plaintiffs' Counsel Supports the
        Agreed Fee and Expense Amount ...............................................32

4.      The Substantial Time and Expense Devoted to the Litigation
        Supports the Agreed Fee and Expense Amount ........................33

5.      Public Policy Supports the Agreed Fee and Expense Amount .................35

C.      The Service Awards to Plaintiffs Are Reasonable .................................................36

V.      CONCLUSION .............................................................................................37

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299 (1985)...........................................................................................33

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993)..............................................................................17

*Boland v. Boland*,
    31 A.3d 529 (2011) ...................................................................................23, 24

*Bozak v. FedEx Ground Package Sys., Inc.*,
    2014 WL 3778211 (D. Conn. July 31, 2014) ...................................................35

*Brooks v. Am. Exp. Indus., Inc.*,
    1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977)................................27

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..................................................................... *passim*

*City of Providence v. Aéropostale, Inc.*,
    2014 U.S. Dist. LEXIS 64517 (S.D.N.Y. May 9, 2014)...................................14

*Clark v. Ecolab Inc.*,
    2010 WL 1948198 (S.D.N.Y. May 11, 2010) ...................................................14

*Cohen v. Beneficial Indus. Loan Corp.*,
    337 U.S. 541 (1949)...........................................................................................36

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005).................................................18, 22, 33

*Cty. of York Emps. Ret. Plan & Schwartz v. Jung*,
    Index No. 651304/2010 (N.Y. Sup. Ct. N.Y. Cty. May 26, 2016) ...................34

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)..........................................................................14, 17

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)...........................................................................................25

*Dubin v. E.F. Hutton Grp., Inc.*,
    845 F. Supp. 1004 (S.D.N.Y. 1994)..................................................................35

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)...................................................................... *passim*

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..........................................................................................30

*In re Advanced Battery Techs., Inc. Secs. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014) .....................................................................14

*In re Agent Orange Prod. Liab. Litig.*,
    818 F.2d 226 (2d Cir. 1987)..............................................................................35

*In re AOL Time Warner S'holder Derivative Litig.*,
    2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)........................................... *passim*

*In re AOL Time Warner S'holder Derivative Litig.*,
    2010 WL 363113 (S.D.N.Y. Feb. 1, 2010)......................................................36

*In re Apollo Grp., Inc. Sec. Litig.*,
    2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL
    5927988 (9th Cir. June 23, 2010) .....................................................................26

*In re Apple Computer, Inc., Derivative Litig.*,
    2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ..................................................17

*In re Ashanti Goldfields Sec. Litig.*,
    2005 WL 3050284 (E.D.N.Y. Nov. 15, 2005)..................................................32

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000)................................................................13

*In re Bear Stearns Companies. Sec., Derivative & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012)..............................................................29

*In re Cedant Corp. Derivative Action Litig.*,
    232 F. Supp. 2d 327 (D.N.J. 2002) ..................................................................37

*In re Comverse Tech., Inc. Sec. Litig.*,
    2010 WL 2653354 (E.D.N.Y. June 24, 2010) .................................................35

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
    248 F.R.D. 483 (E.D. Mich. 2008) ..................................................................27

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12*
    *Litig.*,
    447 F. Supp. 2d 612 (E.D. La. 2006)...............................................................15

*In re Elan Sec. Litig.*,
    385 F. Supp. 2d 363 (S.D.N.Y. 2005)..............................................................13

*In re FAB Universal Corp. S'holder Derivative Litig.*,
  148 F. Supp. 3d 277 (S.D.N.Y. 2015)..............................................................25

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ..................................................34

*In re Lloyd's Am. Tr. Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).........................................25, 35

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) .....................................................................36

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ...........................................................................15

*In re Metro. Life Derivative Litig.*,
  935 F. Supp. 286 (S.D.N.Y. 1996) ........................................................... *passim*

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .....................................................................35

*In re NVIDIA Corp. Derivative Litig*,
  2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009)...............................18

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...........................................................27

*In re Oracle Sec. Litig.*,
  852 F. Supp. 1437 (N.D. Cal. 1994) ...........................................................28, 31

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) .............................................................................22

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997).......................13

*In re Pfizer Inc., S'holder Derivative Litig.*,
  780 F. Supp. 2d 336 (S.D.N.Y. 2011).........................................................17, 18

*In re Presidential Life Sec.*,
  857 F. Supp. 331 (S.D.N.Y. 1994) ..................................................................37

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
  2008 WL 185809 (D.N.J. Jan. 14, 2008)..........................................................31

*In re Schering-Plough/Merck Merger Litig.*,
  2010 WL 1257722 (D.N.J. Mar. 26, 2010)........................................................29

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)........................................................13, 14

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)..........................24

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986)............................32

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)..............................................................35

*In re Xcel Energy, Inc. Sec. Derivative & "ERISA" Litig.*,
    364 F. Supp. 2d 980 (D. Minn. 2005)................................................................37

*Ingram v. The Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001)......................................................................29

*Int'l Distrib. Ctrs, Inc. v. Walsh Trucking Co., Inc.*,
    62 B.R. 723 (S.D.N.Y. 1986)...........................................................................32

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991).........................................................................................36

*Kautz v. Sugarman*,
    456 F. App'x 16 (2d Cir. 2011) ......................................................................23

*Lewis v. Anderson*,
    692 F.2d 1267 (9th Cir. 1982) .......................................................................17

*Lewis v. Newman*,
    59 F.R.D. 525 (S.D.N.Y. 1973) ......................................................................22

*Lizondro–Garcia v. Kefi LLC*,
    2014 WL 4996248 (S.D.N.Y. Oct. 7, 2014) ....................................................36

*Luciano v. Olsten Corp.*,
    109 F.3d 111 (2d Cir. 1997)............................................................................34

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ....................................................................18, 30

*McDaniel v. Cty. of Schenectady*,
    595 F.3d 411 (2d Cir. 2010)............................................................................29

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)..........................................................................17, 18, 28, 30

*Republic Nat'l Life Ins. Co. v. Beasley*,
  73 F.R.D. 658 (S.D.N.Y. 1977) ...........................................................................12

*Sauby v. City of Fargo*,
  2009 WL 2168942 (D.N.D. July 16, 2009) ........................................................37

*Schimmel v. Goldman*,
  57 F.R.D. 481 (S.D.N.Y. 1973) ...........................................................................12

*Seidl v. Am. Century Companies, Inc.*,
  713 F. Supp. 2d 249 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir.
  2011) .....................................................................................................................23

*Shapiro v. JPMorgan Chase & Co.*,
  2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ...................................................29

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassinni*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003)......................................................12, 13, 27

*Surowitz v. Hilton Hotels Corp.*,
  383 U.S. 363 (1966)..............................................................................................36

*Tandycrafts, Inc. v. Initio Partners*,
  562 A.2d 1162 (Del. 1989) ..................................................................................28

*Unite Nat'l Ret. Fund v. Watts*,
  2005 WL 2877899 (D.N.J. Oct. 28, 2005).........................................................18, 19, 31

*Unitrin, Inc. v. Am. Gen. Corp.*,
  651 A.2d 1361 (Del. 1995) ..................................................................................28

*Velez v. Novartis Pharm. Corp.*,
  2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010)...................................................21, 26, 35

*W. Va. v. Chas. Pfizer & Co.*,
  314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ........................22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)...............................................................................13, 35

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)...................................................................................12

*Werbowsky v. Collomb*,
  766 A.2d 123 (Md. 2001) .....................................................................................9, 23

*Zapata Corp. v. Maldonado*,
  430 A.2d 779 (Del. 1981) ....................................................................................28

## I.       INTRODUCTION

Plaintiffs respectfully submit this Memorandum of Law in Support of Motion Final Approval of the Derivative Settlement ("Settlement").[1]   The Settlement resolves stockholder derivative claims brought on behalf of nominal defendant Resource Capital Corp. ("Resource Capital" or the "Company") against certain of its current and former directors and officers,[2] and corporate defendants Resource America, Inc. ("Resource America") and Resource Capital Manager, Inc. (the "Manager").[3]   Specifically, the Settlement resolves the claims pending in the derivative actions captioned *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Refused Actions*, Case No. 17 Civ. 1381 (LLS) (the "Demand Refused Actions"), and *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Futile Actions*, Case No. 17 Civ. 253 (LLS) (the "Demand Futile Actions") (collectively, the "Actions").   The Settlement should be finally approved because it is the result of a fair process and is substantively fair, reasonable and adequate.

The Settlement is the product of extensive arm's-length negotiations between the Settling Parties, which were overseen by court-appointed mediators as part of the Court's Civil Appeals

---

[1]  The Settlement's terms are set forth in the Stipulation and Agreement of Settlement ("Stipulation") executed by the Parties on January 27, 2019, attached to the Declaration of Shane P. Sanders in Support of Unopposed Motion for Preliminary Approval of Derivative Settlement, Exhibit 1 filed with the Court on March 1, 2019 (ECF No. 128-1).  All capitalized terms that are not otherwise defined shall have the same definitions as set forth in the Stipulation.

[2]  "Individual Defendants" refers to Walter T. Beach, Eldron C. Blackwell, David E. Bloom, David J. Bryant, Edward E. Cohen, Jonathan Z. Cohen, Richard L. Fore, William B. Hart, Gary Ickowicz, Steven J. Kessler, Murray S. Levin, P. Sherrill Neff, and Stephanie H. Wiggins.

[3]  Resource Capital is now known as Exantas Capital Corp., and the Manager is now known as Exantas Capital Manager, Inc.  We retain the references to "Resource Capital" and "Manager," consistent with prior pleadings.  Resource America and the Manager are collectively referred to as the "Corporate Defendants."  "Defendants" refer to the Individual Defendants, the Corporate Defendants, and the Company, collectively.

Mediation Program ("CAMP").   The Settlement confers substantial benefits upon Resource Capital and its stockholders by obligating the Board of Directors (the "Board") to adopt corporate governance reforms that substantially enhance the rigor and independence of Board oversight and decision-making with respect to the evaluation and approval of proposed investments and the ongoing evaluation and supervision of credit risk (the "Reforms").   Among other measures, the Settlement provides for: (a) the adoption of enhanced director independence standards, including a formal policy requiring the positions of Board Chairman and Chief Executive Officer ("CEO") to be filled by different individuals at all times; (b) the adoption of an Investment Committee Charter detailing the responsibilities of the Board's Investment Committee for approving each of the Company's proposed investments in loans and preferred equity initially valued in excess of $35 million but less than or equal to $50 million; (c) amendments to the Audit Committee Charter enhancing, among other things, its oversight of conditions that may affect credit risk, including changes in economic and business conditions, the volume and severity of past due loans, and changes in underwriting standards, concentrations in the portfolio, and the regulatory environment; and supervision of the Company's related internal controls relating to credit risk management and disclosure, including review and approval of the Company's procedures for monitoring loans and the Company's practices relating to recognition of impairments, loan losses, write downs and allowances, and provisions for loan losses; (d) mandatory training for all members of the Board regarding best corporate governance practices; (e) substantially enhanced disclosure requirements regarding the amounts of base management fees and incentive compensation paid to the Manager under Resource Capital's Management Agreement with the Manager; and (f) the requirement that any proposed

amendment to the Management Agreement that would materially increase the amount of incentive compensation paid to the Manager be approved by a majority of common stockholders.

The Reforms confer substantial benefits by addressing the alleged weaknesses in the Company's processes and procedures concerning its investment portfolio, disclosure practices, and executive and Board-level oversight that Plaintiffs contend permitted the alleged wrongdoing to occur and damage Resource Capital.  Operating together, the Reforms will materially reduce the probability of recurrence of similar or related alleged wrongdoing and damages in the future; produce better investment and risk management decisions overall; facilitate timely and accurate disclosure of credit risk, loan impairment, and loan losses; provide far greater transparency regarding the actual costs of the Manager's services; and allow stockholders to veto any decision to materially increase incentive compensation paid to the Manager.  Weighed against the substantial risks, costs and delays entailed in pursuing further litigation in an attempt to improve on the result secured through compromise, the Settlement's guarantee of substantial benefits in the form of strong corporate governance, enhanced Board oversight of credit risk and related disclosures, and greater transparency and stockholder control over management fees is fair, reasonable and adequate.

After the Parties reached agreement on the material substantive terms of the Settlement, the Parties separately negotiated the attorneys' fees and expenses to be paid to Plaintiffs' Counsel in consideration for their efforts and the significant risks taken in securing the substantial benefits for the Company on a wholly contingent basis.  Resource Capital has agreed to pay Plaintiffs' Counsel a fee and expense award of $550,000 (the "Fee and Expense Amount"), through its insurers.  The Board, including each of its independent, non-defendant directors, has approved the Settlement and each of its terms, including the Fee and Expense Amount, as in the

best interests of Resource Capital and its stockholders, based on its determination that the Settlement confers substantial benefits upon Resource Capital and its stockholders.

For the foregoing reasons, Plaintiffs respectfully submit that the Settlement is a sound resolution of this complex derivative litigation and merits final approval in all respects.

## II.   OVERVIEW OF THE LITIGATION

### A.   Plaintiffs' Allegations[4]

Plaintiffs allege that members of Resource Capital's Board managed the fund in a manner that yielded to the interests of Resource America and its controlling founders, Johnathan Z. Cohen and Edward E. Cohen (the "Cohens").  Smith Decl., ¶8.[5]  At the time of the Company's inception in 2005, the Board approved a Management Agreement, pursuant to which Resource Capital purportedly would pay the Manager (and thereby, indirectly, the Manager's parent company, Resource America, and the Cohens) a large fee to manage the Company's loan portfolio based on the Company's reported "Equity," regardless of the Manager's investment performance.  *Id.*  The Board agreed to the Management Agreement terms Plaintiffs contend made it economically onerous to terminate or modify.  *Id.*

Against this backdrop, Plaintiffs allege that the Board allowed the Manager to invest in risky, poorly collateralized mezzanine debt that ceased providing the Company with income in 2012.  Smith Decl., ¶9.  The collateral that securitized the Mezzanine Loan consisted of thirteen hotels, three of which were located in Puerto Rico.  Following years of economic difficulties in

---

[4] This discussion is based on the allegations contained in Plaintiffs' complaints, some of which the Defendants dispute.

[5] "Smith Decl." refers to the Declaration of Craig W. Smith in Support of the Motion for Final Approval of Derivative Settlement, filed concurrently herewith.

Puerto Rico, the Mezzanine Loan ceased paying current interest and, Plaintiffs allege, should have been written down.  *Id.*

From November 2012 until August 2015, the Defendants reviewed the Mezzanine Loan and restructured it several times, effectively extending the maturity date and deferring interest obligations to avoid default.  Smith Decl., ¶10.  The U.S.-based hotels backing the Mezzanine Loan were sold to meet payment obligations, leaving as collateral only the Puerto Rican hotels, the value of which had collapsed along with the Puerto Rican economy.  *Id.*

Plaintiffs allege that for over two-and-a-half years, Defendants allowed the Company's officers to characterize all of Resource Capital's commercial real estate loans, including the Mezzanine Loan, as "performing" in quarterly teleconferences with stock analysts.  Smith Decl., ¶11.  After each earnings teleconference, Defendants who served on the Company's Audit Committee approved similar statements in the Company's Forms 10-K and 10-Q, filed with the U.S. Securities and Exchange Commission ("SEC"), which stated that Resource Capital's loans were "performing" and "current" and that the Company had made all necessary provisions for loan loss and impairments.  *Id.*  During this time, the Manager continued to receive excessive fees based on an "Equity" metric Plaintiffs allege was inflated by Defendants' failure to properly account for Mezzanine Loan losses.  *Id.*

On August 4, 2015, approximately three months after indicating that all of Resource Capital's commercial real estate loans were performing, Resource Capital disclosed its allowance for a $41.1 million loan loss on the Mezzanine Loan, resulting in a quarterly net loss of $31 million.  Smith Decl., ¶12.  The press release acknowledged that economic and credit disruptions in Puerto Rico required the Company to fully reserve the Mezzanine Loan.  *Id.*  Resource Capital's stock fell almost 15%, erasing over $68.4 million in market capitalization.  Plaintiffs

allege that had Resource Capital recorded the loss in late 2012, when the Mezzanine Loan had ceased paying current interest and the value of the hotels securing the Loan was already on the brink of collapse, Resource Capital's reported Equity would have been far lower, reducing the management fees paid to the Manager by approximately $4.5 million from the fourth quarter of 2013 through the first quarter of 2015.  *Id.*

### B.    Procedural History

#### 1.    The Demand Refused Actions

Following the public announcement of the impairment of the Mezzanine Loan, plaintiffs Mark E. McKinney ("McKinney"), Dave Sherek ("Sherek"), Robert H. Spiegel ("Spiegel"), and Rick Sebenoler ("Sebenoler") each made formal written demands (the "Demands") that the Board investigate the Mezzanine Loan's impairment and related alleged misrepresentations and omissions, and, if warranted, pursue claims for, inter alia, breach of fiduciary duties of loyalty and good faith against Resource Capital's officers and directors.  Smith Decl., ¶13.  Certain of the Demands also requested that the Board investigate and bring claims arising from related misstatements and omissions from Resource Capital's 2014 and 2015 proxy statements.  *Id.*

Upon receiving the Demands, the Board appointed a demand evaluation committee (the "DEC") to investigate the Demands.  Smith Decl., ¶14.  According to Defendants, the DEC, which consisted of three independent, outside directors who had no role in the Company's investment in the Mezzanine Loan, investigated the Demands' allegations, including reviewing documents and interviewing witnesses with the assistance of independent counsel.  *Id.*  The DEC concluded that the claims lacked merit and that it would not be in the Company's best interest to pursue them in litigation.   *Id.*   The full Board thereafter voted to accept the DEC's recommendation and refused the Demands.  *Id.*

On February 23, 2017, plaintiff McKinney filed a shareholder derivative action, captioned *McKinney v. Cohen*, Case No. 17-cv-01381 (the "McKinney Action").  Smith Decl., ¶15.  On March 17, 2017, plaintiffs Sherek and Spiegel filed a shareholder derivative action, captioned *Sherek v. Kessler*, Case No. 17-cv-01965 (the "Sherek Action").  *Id.*  On April 25, 2017, plaintiff Sebenoler filed a shareholder derivative action, captioned *Sebenoler v. Beach*, Case No. 17-cv-02998 (the "Sebenoler Action").  *Id.*  The plaintiffs in these actions each alleged similar claims and that the Board wrongfully refused their demands, giving them standing to pursue the claims derivatively on behalf of the Company.  *Id.*

On May 16, 2017, the District Court entered an order consolidating the McKinney, Sherek, and Sebenoler Actions under the caption, *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Refused Actions*, Case No. 17 Civ. 1381 (LLS) (the Demand Refused Actions), and directing plaintiffs to designate lead counsel or timely file competing motions for appointment of lead counsel.  Smith Decl., ¶16.  On May 18, 2017, the District Court appointed Profy Promisloff & Ciarlanto, P.C. (now known as Promisloff Law, P.C.) as lead counsel in the Demand Refused Actions.  *Id.*

On June 30, 2017, plaintiffs in the Demand Refused Actions ("Demand Refused Plaintiffs") filed a Verified Consolidated Shareholder Derivative Complaint (the "Consolidated Demand Refused Complaint"), asserting claims for violations of section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breach of fiduciary duties, and unjust enrichment, and alleging that they had standing to sue derivatively on behalf of the Company because the Board had wrongfully refused their Demands.  Smith Decl., ¶17.

On September 15, 2017, the Individual Defendants and the Company filed a joint motion to dismiss the Consolidated Demand Refused Complaint, arguing, among other things, that the

- 7 -

Consolidated Demand Refused Complaint failed to plead particularized facts showing that the Board's refusal of the Demand Refused Plaintiffs' Demands was wrongful. Smith Decl., ¶18. On November 14, 2017, the Demand Refused Plaintiffs filed their opposition, and on December 29, 2017, the Individual Defendants and the Company filed their reply. *Id.*

On February 23, 2018, the District Court granted the motion to dismiss. Smith Decl., ¶19. On March 22, 2018, the Demand Refused Plaintiffs filed a notice of appeal. *Id.*

### 2. The Demand Futile Actions

On January 12, 2017, plaintiff Joseph Greenberg ("Greenberg") filed a shareholder derivative action, captioned *Greenberg v. Bryant*, Case No. 17-cv-00253 (the "Greenberg Action"). Smith Decl., ¶20. On January 18, 2017, plaintiff Robert A. Canoles ("Canoles") filed a shareholder derivative action, captioned *Canoles v. Kessler*, Case No. 17-cv-00349 (the "Canoles Action"). *Id.* On January 23, 2017, plaintiff James M. DeCaro ("DeCaro") filed a stockholder derivative action, captioned *DeCaro v. Bryant*, Case No. 17-cv-00474 (the "DeCaro Action"). *Id.* On April 27, 2017, plaintiffs Abigail and Zachary Gehan filed a shareholder derivative action, captioned *Gehan v. Kessler*, Case No. 17-cv-03073 (the "Gehan Action"). *Id.*

Unlike the Demand Refused Plaintiffs, plaintiffs Greenberg and DeCaro (the "Demand Futile Plaintiffs"), as well as plaintiffs Canoles, Abigail Gehan, and Zachary Gehan, did not make formal written demands on the Company's Board to investigate and pursue the claims. Smith Decl., ¶21. They alleged, instead, that pre-suit demands on the Board would have been futile, excusing the demand requirement under Maryland law. *Id.*

On May 16, 2017, the District Court entered an order consolidating the Greenberg, Canoles, DeCaro, and Gehan Actions under the caption, *In re Resource Capital Corp. Shareholder Derivative Litigation Demand Futile Actions*, Case No. 17 Civ. 253 (LLS) (the Demand Futile Actions), and directing the Demand Futile Plaintiffs to designate lead counsel or

timely file competing motions for the appointment of lead counsel.  Smith Decl., ¶22.  Following briefing, on July 6, 2017, the District Court appointed Robbins Arroyo LLP as lead counsel in the Demand Futile Actions.  *Id.*  On August 8, 2017, at the request of plaintiffs Canoles, and Abigail and Zachary Gehan, the District Court voluntarily dismissed the Canoles and Gehan Actions.[6]  *Id.*

On August 21, 2017, the Demand Futile Plaintiffs filed a Verified Consolidated Stockholder Derivative Complaint (the "Consolidated Demand Futile Complaint").  Smith Decl., ¶23.  The Consolidated Demand Futile Complaint asserted claims for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of section 14(a) of the Exchange Act on behalf of Resource Capital against the Individual and Corporate Defendants.  *Id.*  As in their individual complaints, the Demand Futile Plaintiffs alleged that the pre-suit demand requirement was excused as futile because a majority of the Company's directors were "so personally and directly conflicted" or "so personally or directly … committed to the decision in dispute" that they could not "reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule."  *Werbowsky v. Collomb*, 766 A.2d 123, 144 (Md. 2001); *see also* Smith Decl., ¶23.  The Demand Futile Plaintiffs alleged that the Board's decision-making evidenced a sustained pattern of action in deference to the best interests of the Cohens, including repeated misstatements that the Mezzanine Loan was performing and overstatements of Equity that inflated the fees paid to the Manager.  *Id.*  The Demand Futile Plaintiffs alleged that these facts sufficed to show that the Board was "so personally and directly conflicted or

---

[6] Plaintiff Canoles subsequently filed a virtually identical action in the Circuit Court for Baltimore County, Maryland, which was stayed on December 20, 2017.  The stay remains in place, and there has been no substantive litigation activity.  Smith Decl., n.5.

committed to" the Company's policy of maintaining the façade concerning the Mezzanine Loan that they could not be "reasonably expected" to impartially consider a demand.  *Id.*

On August 10, 2017, the Court entered a stipulated order deferring briefing on Rule 12(b)(6) defenses and other merits issues until after the threshold issue of derivative standing was resolved.  Smith Decl., ¶24.  On October 20, 2017, Defendants filed motions to dismiss the Consolidated Demand Futile Complaint on grounds that Demand Futile Plaintiffs failed to plead particularized facts demonstrating demand futility.  *Id.*  On December 19, 2017, the Demand Futile Plaintiffs filed their opposition, and on February 2, 2018, the Defendants filed their replies.  *Id.*

On April 2, 2018, the District Court granted the Defendants' motions to dismiss and held that the Demand Futile Plaintiffs failed to allege with the required particularity that the demand requirement was excused.  Smith Decl., ¶25.  On May 3, 2018, the Demand Futile Plaintiffs filed a notice of appeal.  *Id.*

### C.    Settlement Negotiations

On May 4, 2018, in anticipation of pre-appeal mediation conferences required by the United States Court of Appeals for the Second Circuit, Plaintiffs' Counsel in the Demand Futile Actions and the Demand Refused Actions sent a joint settlement demand letter to Defendants' counsel proposing a framework for settling the Actions.  Smith Decl., ¶26.  Between May and August 2018, counsel for Plaintiffs and Defendants engaged in hard fought, arm's-length settlement negotiations with the assistance of CAMP mediators, pursuant to Second Circuit Local Rule 33.1.  *Id.*  On August 9, 2018, the Parties reached an agreement in principle on the substantive terms of a proposed settlement.  *Id.*

After concluding their negotiations regarding the material substantive terms of the Settlement, the Parties separately negotiated an amount of attorneys' fees and expenses that

would be payable, subject to the approval of this Court, in consideration for the substantial corporate benefit secured by Plaintiffs' Counsel through the Settlement.  Smith Decl., ¶27.  On November 8, 2018, the Settling Parties reached an agreement on a proposed award of attorneys' fees and expenses.  *Id.*

On November 12, 2018, counsel for the parties to the Derivative Actions executed a memorandum of understanding setting forth the material terms of their agreement in principle to settle the Derivative Actions, subject to the negotiation of a mutually acceptable settlement agreement and court approval of the settlement.  Smith Decl., ¶28.  The Board, including each of its independent, non-defendant directors, has approved the Settlement and each of its terms as being in the best interests of Resource Capital and its stockholders, and has acknowledged and agrees that the Settlement is fair, reasonable, and adequate, and confers substantial benefits upon Resource Capital and its stockholders.  *Id.*  The Settling Parties then negotiated the complete terms and conditions of Settlement embodied in the Stipulation, which was fully executed by January 27, 2019.  *Id.*

### D.    Preliminary Approval

On March 1, 2019, Plaintiffs moved for an indicative ruling stating that the Court would grant preliminary approval upon remand from the Second Circuit Court of Appeals, which this Court issued on March 7, 2019.  Smith Decl., ¶29.  On March 22, 2019, the Second Circuit Court of Appeals issued an order remanding the Derivative Actions for the limited purpose of allowing this Court to consider whether to approve the Settlement.  *Id.*

On March 22, 2019, this Court issued an order granting preliminary approval of the Settlement; directing the issuance of notice to stockholders; and setting May 17, 2019, as the hearing date for consideration of final approval of the Settlement ("Preliminary Approval Order").  ECF No. 134; *see also* Smith Decl., ¶30.  The Notice of Proposed Settlement was

provided in accordance with the Preliminary Approval Order.  *Id.*  The deadline for stockholder objections is April 26, 2019.  Preliminary Approval Order, ¶¶8-9; *see also* Smith Decl., ¶30.  As of the date of this filing, no stockholders have objected to the Settlement.  *Id.*

## III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.   Legal Standards Governing Final Approval

Rule 23.1 of the Federal Rules of Civil Procedure provides that the Derivative Actions may only be settled with the Court's approval.  The determination as to whether a settlement should be approved is left to the sound discretion of this Court.  *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassinni*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003).  "'The central question … is whether the compromise is fair, reasonable and adequate.'"  *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. 1996) (omission in original).  Final approval is warranted if "the compromise 'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'"  *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006).

Public policy strongly favors settlements of complex litigation, and, in particular, of stockholder derivative litigation, because it is "'notoriously difficult and unpredictable.'"  *Id.* at *3; *see Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (same); *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973) (same).  Additional "weighty justifications" include "the reduction of litigation and related expenses."  *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982).

The Court is not to try the issues or decide the merits of the case.  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) (hereinafter, "*Grinnell*"), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ("settlement hearing must not be turned into a trial or a rehearsal of the trial").  To the contrary, there is a "strong

initial presumption" that a proposed settlement negotiated at arm's-length is fair and reasonable. *Strougo*, 258 F. Supp. 2d at 257.

Here, the adversarial negotiation process and the substantive terms of the Settlement support a finding that it is fair, reasonable, and adequate.

**B.     The Settlement Merits a Presumption of Fairness Because It Is the Product of Arm's-Length Negotiations by Experienced and Well-Informed Counsel**

"[A] strong presumption of fairness attaches" to settlements negotiated at arm's-length by experienced and well-informed counsel. *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008); s*ee Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("A 'presumption of fairness, adequacy, and reasonableness may attach to a … settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'"); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts"); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000) (settlement that "is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex ... litigation … will enjoy a presumption of fairness"); *Metro. Life*, 935 F. Supp. at 294 (counsel's recommendation "entitled to 'considerable weight'" where settlement "[wa]s the result of extensive arm's-length negotiations among counsel … experienced in litigating derivative suits and class actions" and who had "thoroughly investigated and evaluated plaintiffs' claims"); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 369 (S.D.N.Y. 2005) (presumption of fairness attaches where "the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation").

The participation of experienced mediators in the settlement negotiations bolsters this presumption. *Telik*, 576 F. Supp. 2d at 576 (collecting cases); *City of Providence v. Aéropostale, Inc.*, 2014 U.S. Dist. LEXIS 64517, at *11-12 (S.D.N.Y. May 9, 2014) ("initial presumption of fairness and adequacy applies here because the Settlement was reached by experienced, fully-informed counsel after arm's-length negotiations and, ultimately, with the assistance of ..., one of the nation's premier mediators in complex, multi-party, high stakes litigation"); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "court-appointed mediator's involvement in ... settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

"Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *Clark v. Ecolab Inc*., 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) (alterations in original); *In re Advanced Battery Techs., Inc. Secs. Litig.*, 298 F.R.D. 171, 174 (S.D.N.Y. 2014) (same).

The presumption of fairness applies here because the Settlement is the product of extensive arm's-length negotiations by well-informed, skilled, and experienced counsel with the assistance of CAMP mediators, pursuant to the Second Circuit's Local Rule 33.1. Smith Decl., ¶31.

Plaintiffs' Counsel have decades of experience in stockholder representative litigation, and have an extensive track record of substantial recoveries for corporations and their shareholders. *See* Smith Decl. ¶32; *see also* Exhibit A, Firm Resume of Robbins Arroyo LLP; Exhibit A, Firm Resume of Promisloff Law, P.C. attached to the Declaration of David M. Promisloff in Support of Demand Refused Plaintiffs' Motion for Final Approval of Derivative Settlement filed concurrently herewith ("Promisloff Decl.,"). Defendants were vigorously

represented by Covington & Burling LLP, Schlam, Stone & Dolan LLP, and Proskauer Rose LLP—all preeminent corporate defense firms.  Resource Capital's Board, with the advice of its counsel, exercised its business judgment in determining that the Settlement is fair, reasonable, and adequate; confers substantial benefits upon Resource Capital and its stockholders; and is in the best interests of the Company.  Stipulation, ¶7.

Plaintiffs' Counsel's judgment that the value of the benefits guaranteed by the Settlement far outweigh the prospects for securing superior relief through further litigation is well-informed. Ultimately, "the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it."  *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620-21 (E.D. La. 2006); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("'"formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement"").

Here, the Parties had sufficient knowledge of the facts and a sufficient basis on which to evaluate both the merits of the claims and defenses in the Derivative Actions, as well as the proposed settlement terms.  Smith Decl., ¶33.  The Settlement was negotiated only after Plaintiffs conducted a diligent investigation into the facts and legal claims, including, inter alia: (i) review and analysis of Resource Capital's press releases, public statements, and filings with the SEC; (ii) review and analysis of dozens of securities analysts' reports, advisories, and media reports about the Company; (iii) review and analysis of the pleadings in the Securities Litigation; (iv) close analysis of Maryland substantive law and pleading standards governing the claims and

potential defenses thereto; (v) careful analysis of the Board's demand refusal letters; (vi) preparation and filing of initial and consolidated complaints in the Demand Refused and Demand Futile Actions; (vii) preparation and filing of oppositions to Defendants' motions to dismiss in the Derivative Actions; (viii) research and evaluation of the facts and legal issues relevant to the appeal of the orders granting the motions to dismiss; (ix) thorough research and analysis of the Company's corporate governance structures and policies during the relevant period and evaluation of corporate governance and oversight literature and best practices among companies in similar fields; (x) extensive damages analyses; (xi) preparation of the comprehensive joint settlement demand; (xii) evaluation of facts gleaned in months of settlement negotiations with Defendants' counsel regarding the strengths and weakness of the claims and defenses, and governance, oversight, and Management Agreement matters; (xiii) participation in formal mediation sessions; and (xiv) negotiation of the terms of a written memorandum of understanding embodying the principal substantive settlement terms, and the comprehensive formal Stipulation of Settlement. *Id.*; Stipulation, ¶3.

### C. Evaluation of the Relevant Factors Demonstrates the Fairness, Reasonableness, and Adequacy of the Settlement

The Second Circuit's opinion in *Grinnell* set out the factors to be considered in evaluating class action settlements. 495 F.2d at 462-63. Courts evaluating derivative settlements under *Grinnell* consider: (i) the reasonableness of the recovery in light of the risks of establishing liability and damages, and the ability of the defendants to withstand a greater judgment; (ii) the complexity, expense, and likely duration of the litigation; (iii) the stage of the proceedings and discovery; and (iv) the reaction of stockholders to the proposed settlement. *AOL Time Warner*, 2006 WL 2572114, at *3-6 (applying *Grinnell* factors in stockholder derivative action); *see also*

*D'Amato*, 236 F.3d at 86 (applying *Grinnell* factors).  These factors weigh heavily in favor of final approval of the Settlement.

       1.       **The Settlement Confers Substantial Benefits on Resource Capital and Its Stockholders**

In determining whether to approve a stockholder derivative settlement, "[t]he principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (omission in original); *see In re Apple Computer, Inc., Derivative Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) ("principal factor to consider … is the benefit to [the real party in interest] as compared to the risks posed by derivative litigation").  Weighed against the substantial risk that continued litigation would yield no benefit while imposing substantial costs on Resource Capital, the recovery here is plainly fair, reasonable, and adequate.  *See Grinnell*, 495 F.2d at 462.

Courts widely recognize that "a corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970); *see AOL Time Warner*, 2006 WL 2572114, at *4 (non-monetary benefits alone can be "substantial enough to merit [settlement] approval"); *Lewis v. Anderson*, 692 F.2d 1267, 1271 (9th Cir. 1982) ("[w]hile less tangible than the recovery of money damages," corporate governance reforms that remedy alleged wrongdoing are "sufficiently beneficial to a corporation" to warrant settlement approval and fee award).  A non-monetary benefit is sufficient to support a settlement where it "'accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest.'" *Mills*, 396 U.S. at 396; *see In re Pfizer Inc., S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y.

2011) (reforms "provide considerable corporate benefits ... in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have ... caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (corporate therapeutics designed "to prevent future harm" confer substantial benefit sufficient to support settlement and fee award).

"Strong corporate governance is fundamental to the economic well-being and success of a corporation[;]" accordingly, courts have long "recognized that corporate governance reforms such as those achieved here provide valuable benefits for public companies." *In re NVIDIA Corp. Derivative Litig*, 2009 U.S. Dist. LEXIS 24973, at *11-12 (N.D. Cal. Mar. 18, 2009); *see also Mills*, 396 U.S. at 395 ("[A] corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature."); *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor.").

Courts approve settlements supported by consideration in the form of corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws[.]" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005). Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators or prosecutors." *Id*. *See Pfizer*, 780 F. Supp. 2d at 342 (approving settlement of shareholder derivative action where the corporate benefits included "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in

- 18 -

recent years, caused extensive harm to the company"); *Unite Nat'l*, 2005 WL 2877899, at \*2 (non-monetary benefits support settlement where "the relief is intended to prevent future harm").

The Reforms guaranteed by the Settlement plainly confer this sort of substantial benefit here.  As provided by the Settlement, the Board shall implement and maintain for a period of at least three (3) years following final approval of the Settlement an array of policy, procedural, and structural governance enhancements, including: (i) a formal policy requiring that the positions of Board Chairman and CEO be filled by different individuals at all times; (ii) the adoption of an Investment Committee Charter detailing the Investment Committee's responsibilities for approving each of the Company's proposed investments in loans and preferred equity initially valued at more than $35 million but less than or equal to $50 million; (iii) amendments to the Audit Committee Charter enhancing its responsibilities for credit risk review and reporting, including amendments designed to enhance the committee's oversight of conditions that may affect credit risk, and supervision of internal controls relating to credit risk management and disclosure; (iv) the adoption of a policy of mandatory training for all members of the Board regarding best corporate governance practices; (v) enhanced disclosures regarding the calculation of base management fees and incentive compensation in connection with the Company's quarterly and annual financial statements; and (vi) a provision of the Management Agreement stating that the Management Agreement shall not be amended in any manner that would materially increase the amount of incentive compensation during the Compliance Term without the approval of a majority of the Company's common stockholders.  Smith Decl., ¶34.

The Reforms target three areas at the heart of Plaintiffs' claims:  Board and committee independence; the effectiveness of Board oversight of lending, credit risk, and credit risk

reporting; and transparency and stockholder say in the operation and terms of the Management Agreement. Smith Decl., ¶35.

The formalized separation of the Chairman and CEO role will help ensure that a maximum degree of independence and lack of conflict of interest exists between the Board and the Company's executives and other entities. So too will the formalized requirement that Board members not serve on the boards of more than three other unaffiliated publicly-traded entities. This speaks directly to Plaintiffs' allegations regarding control over, and overlapping business relationships between and among, members of the Board, which Plaintiffs alleged harmed the Company. Smith Decl., ¶36.

The Reforms to the Investment Committee are specifically aimed at the types of investments and loans that are comparable to the Mezzanine Loan at issue in this matter. The new Investment Committee Charter will specify that the Investment Committee will be responsible for approving all proposed investments in loans and preferred equity initially valued in excess of $35 million but less than or equal to $50 million, shall consider all material risks associated with these investments that are identified by the Manager or members of the Investment Committee, and shall receive a report from the Manager identifying any material exception to or material deviation from the Investment Committee Charter. Early identification of loan risks and potentially problematic loans will lead to enhanced oversight, early identification of red flags, and timely identification, mitigation, and disclosure of impaired loans. Smith Decl., ¶37.

The Audit Committee enhancements build on the Investment Committee enhancements by amplifying the procedures concerning the review and assessment of ongoing credit risk problems, such as those that allegedly affected the Mezzanine Loan. The Reforms ensure that

problem loans are evaluated and reassessed on an ongoing basis, that material changes in economic conditions that materially increase credit risk are flagged, and that impacted loans are regularly assessed for possible impairment.  Smith Decl., ¶38.

The Reforms empower stockholders with respect to the Management Agreement.  First, they require enhanced disclosures designed to make clear how management fees are determined using the "Equity" calculation.  The Reforms contain specific mandates for reporting the calculation of equity, a reconciliation of the Company's GAAP net income or loss allocable to common shares to its Core Earnings, and (when applicable) an explanation of how the Incentive Compensation hurdle was calculated.  Second, they allow stockholders to vote on certain future material increases in incentive compensation paid under the Management Agreement.  These Reforms directly address the allegations regarding the conflicting interests inherent in the Management Agreement and how those conflicts are managed going forward.  Smith Decl., ¶39.

The Settlement guarantees that Resource Capital and its stockholders will reap the long-term benefits of strong corporate governance, better credit risk management, timely and accurate credit risk disclosures, and greater transparency and stockholder control over management fees. In addition to significantly reducing the probability of recurrence of the alleged wrongdoing and damages, the Reforms will lay the necessary foundation for restoring investor confidence in the Company and its Manager, and improve returns through better risk management over time. Smith Decl., ¶40.

### 2. Continued Litigation Would Be Risky, Costly, and Time-Consuming

One important purpose of settlement is to avoid the inherent uncertainty, risks, costs, and delays in attempting to improve on the result through further litigation.  *See Velez v. Novartis Pharm. Corp.*, 2010 WL 4877852, at *14 (S.D.N.Y. Nov. 30, 2010) ("As federal courts in this Circuit have consistently recognized, litigation inherently involves risks, and the purpose of

settlement is to avoid uncertainty."). These concerns are particularly significant in complex stockholder derivative litigation. *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("the odds of winning [a] derivative lawsuit [a]re extremely small"); *AOL Time Warner*, 2006 WL 2572114, at *3 ("Moreover, because shareholder derivative actions are 'notoriously difficult and unpredictable, ... settlements are favored.") (omission in original); *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973) ("It must be recognized that stockholder litigation is notably difficult and notoriously uncertain."); *Cohn*, 375 F. Supp. 2d at 852 ("Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'"). Unless a proposed settlement is clearly inadequate, final approval is preferable to the pursuit of complex, costly, time-consuming litigation with uncertain results. *See Grinnell*, 495 F.2d at 455 ("The proposed settlement cannot be judged without reference to the strength of plaintiffs' claims. The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.'"); *Metro. Life*, 935 F. Supp. at 294 ("In view of the effort and expense that would be required to take this case to and through trial, settlement would undoubtedly be in the best interest of all the parties and the policyholders."); *W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("no matter how confident one may be of the outcome of the litigation, such confidence is often misplaced").

The likely complexity, expense, and duration of further litigation, and the significant risk that it would produce no benefit at all for Resource Capital, weigh strongly in favor of final approval, here. Smith Decl., ¶41.

To move forward in their cases, Plaintiffs would first need to prevail in their appeals pending in the Second Circuit. Smith Decl., ¶42. To preserve corporate directors' prerogative to

exercise their business judgment with respect to proposed litigation, courts and legislatures have developed stringent derivative pleading standards for both demand futile- and demand refused-based actions that are among the most difficult pleading hurdles in law. Maryland law imposes among the most challenging derivative pleading standards. *See, e.g.*, *Seidl v. Am. Century Companies, Inc.*, 713 F. Supp. 2d 249, 260 n.15 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir. 2011) (strict standards applicable in other states would "excuse[] demand where Maryland [law] would not"). The odds that the Court of Appeals would reverse this Court's ruling that the public record facts alleged in the Consolidated Demand Futile Complaint meet Maryland's "very limited exception" (*Werbowsky*, 766 A.2d at 144) to the rule that stockholders must make a demand on the board before bringing suit derivatively are extremely low. *See* ECF No. 117. As the Second Circuit has recognized, "demand is rarely, if ever, properly excused under Maryland law." *Kautz v. Sugarman*, 456 F. App'x 16, 19 (2d Cir. 2011). The odds that the Court of Appeals would reverse this Court's determination that the facts do not demonstrate that the Board wrongfully refused the demands made in the Demand Refused Actions are similarly low. *See* Demand Refused Actions, ECF No. 42. S*ee, e.g.*, *Boland v. Boland*, 31 A.3d 529, 548 (2011) ("It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.").

Even in the unlikely event Plaintiffs succeeded on appeal, continued litigation would be extremely complex, costly, and lengthy. *See* *Metro. Life*, 935 F. Supp. at 293-94 ("Continued litigation of this case would put a strain on all the parties. This consolidated federal case is

already substantially more than two years old. Four state court cases are also pending.  If these cases must be litigated, several more years of litigation would be required.…  [T]he deposition phase of the case would be extremely expensive and time-consuming.  The factual issues are complex and the documents … are voluminous.  In view of the effort and expense that would be required to take this case to and through trial, settlement would undoubtedly be in the best interest of all the parties....").  Smith Decl., ¶43.

Plaintiffs cannot assume that "smoking gun" evidence would be found demonstrating each Individual Defendants' breach of fiduciary duty.  Instead, Plaintiffs must assume that they would face the tremendously difficult, costly and time-consuming task of building a circumstantial case from a mountain of complex corporate documents and deposition testimony from a myriad of party and non-party witnesses.  Smith Decl., ¶44.  It is by no means certain that Plaintiffs could secure evidence sufficient to overcome motions for summary judgment predicated on the business judgment rule, which affords directors the presumption that they acted on an informed basis and in the good faith belief that the actions taken were in the best interest of the company.  *See Boland*, *supra*, 31 A.3d at 548; *see also In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (The business judgment rule "is a presumption that 'in making a business decision the directors of a corporation acted on an informed basis, ... and in the honest belief that the action taken was in the best interests of the company [and its shareholders,]'" and "[w]hen a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste.").  Summary judgment motions predicted on the exculpation and indemnification rights Resource Capital grants its directors also pose a serious threat because Plaintiffs could establish liability only by proving intentional misconduct

and disloyalty.  *See, e.g.*, Resource Capital Bylaws, Article XII ("Indemnification and Advance of Expenses"); Resource Capital Articles of Incorporation, Section 4.5 ("Indemnification"); C&A § 2-405.2; § 5-418 of the Courts and Judicial Proceedings Article (corporations may exculpate directors from personal liability for damages except where there is "active and deliberate dishonesty" or an improper benefit or profit received).[7]

The challenges involved in proving damages are equally daunting.  *In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions.  The reaction of a jury to such complex expert testimony is highly unpredictable.").  Plaintiffs face a substantial risk that they would be precluded from even presenting expert damages testimony.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 585 (1993).

Given the applicable legal standards, the complexity of the evidence, and the vagaries of litigation and trial, the odds of success are low.  *See In re FAB Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 281-82 (S.D.N.Y. 2015) ("The doctrine of demand futility, the business judgment rule, and the generally uncertain prospect of establishing a breach of fiduciary duties combine to make shareholder derivative suits an infamously uphill battle for plaintiffs.").

Moreover, the insurance coverage is limited and subject to multiple defendants' claims. The many available defenses to insurance coverage, such as limitations for intentional and/or bad

---

[7] *See* Resource Capital Corp., Current Report (Form 8-K), at Exhibit 3.1 (Feb. 4, 2014) available online at https://www.sec.gov/Archives/edgar/data/1332551/000133255114000003/exhibit3_1.htm (last visited Apr. 19, 2019; *see also* Resource Capital Corp., Current Report (Form 8-K), at Exhibit 3.1 (Sept. 1, 2015) available online at https://www.sec.gov/Archives/edgar/data/1332551/000133255115000032/exh31rsoarticlesofamendment.htm (last visited Apr. 19, 2019).

faith conduct, pose additional challenges.  Litigation would expose Resource Capital, the real party in interest, to the burden of advancing enormous defense costs with no guarantee that a verdict for Plaintiffs would redeem those costs or defeat their indemnification obligations.  Even a favorable verdict could lead to difficult, costly and time-consuming collections actions against the Individual Defendants.  Smith Decl., ¶47.

And, of course, victory at trial is no guarantee that the judgment would not be reversed on appeal.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (holding evidence insufficient to support jury verdict for stockholders of $277 million).

The Settlement eliminates these and other risks and costs of continued litigation, including the very real risk of no recovery for Resource Capital, and it permits management to return its full attention to restoring the Company's reputation among investors and generating value for its stockholders, which "strongly militates in favor of the Settlement."  *Novartis Pharm.*, 2010 WL 4877852, at *13 ("'Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of post-trial motions and appeals.'"); *AOL Time Warner*, 2006 WL 2572114, at *5 ("the prosecution of this action would require the Company to incur substantial costs"; settlement "will allow the Company to direct its full attention to its substantive business"); *Metro. Life*, 935 F. Supp. at 294 ("In view of the effort and expense that would be required to take this case to and through trial, settlement would undoubtedly be in the best interest of all the parties….").

### 3.   The Reaction of Resource Capital's Stockholders Further Supports Final Approval of the Settlement

The deadline for stockholders to object to the proposed Settlement is April 26, 2019.  To date, counsel has not heard from any stockholder indicating that they are not satisfied with this

Settlement.  Smith Decl., ¶30.  This is significant, especially considering that Resource Capital is owned by thousands of stockholders, including a number of sophisticated institutions, (e.g., Blackrock Inc., The Vanguard Group, Inc., HBK Investments, L.P.).[8]  *Id.*  Even where a handful of objectors appears, this factor weighs in favor of final approval.  *See Grinnell*, 495 F.2d at 463 ("reaction of the class to the settlement" can support approval); *Strougo*, 258 F. Supp. 2d at 258 ("It has been repeatedly held that 'one indication of the fairness of a settlement is the lack of or small number of objectors.'"); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 498-99 (E.D. Mich. 2008) (small number of objections indicate settlement's adequacy); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (three objections out of tens of thousands of stockholders "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members'").[9]

### D.   The Independent, Non-Defendant Directors' Exercise of Business Judgment Warrants Deference

The independent non-defendant directors'[10] determination that the Settlement confers substantial benefits and best serves the Company's and its stockholders interests deserves great deference.  As the Court found in connection with Defendants' motions to dismiss the Derivative Actions, courts generally defer to the business judgment of directors with respect to litigation matters.  *See Brooks v. Am. Exp. Indus., Inc*., 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) ("The Court is of the view that in this case, the decision of the [] board to approve

---

[8] *See* Yahoo! Finance, Major Holders, https://finance.yahoo.com/quote/XAN/holders?p=XAN (last visited Apr. 18, 2019).

[9] Later filed objections, if any, will be addressed in briefs to be filed on May 10, 2019. Preliminary Approval Order, ¶10.

[10] The outside non-defendant directors are Jeffrey P. Cohen, Andrew L. Farkas, and Henry R. Silverman.

this settlement is appropriately afforded certain deference; it is a business judgment with presumptive validity."); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness"). *See generally Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981). The directors' determination here should be afforded substantial weight in evaluating the Settlement for approval.

## IV. THE NEGOTIATED FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE

Pursuant to the "substantial benefit" doctrine, counsel who prosecute a stockholder derivative action that generates substantial benefits for the corporation are entitled to an award of reasonable attorneys' fees and expenses commensurate with the benefits' value and the risks of proceeding on a contingency basis. *See Mills*, 396 U.S. at 394-96. "[A] corporation may receive a 'substantial benefit' from a [stockholder's action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature.... [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all stockholders[.]" *Id. See also In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445-50 (N.D. Cal. 1994) (changes in governance or operating procedures likely to produce monetary benefits or cost avoidance are "'fund creating actions'" meriting award of attorneys' fees and expenses) (quoting *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164-65 (Del. 1989)).

As a result of Plaintiffs' Counsel's efforts, Resource Capital will enjoy long-term benefits flowing from the Reforms secured by the Settlement. Smith Decl., ¶52. The Reforms will help to prevent a recurrence of similar wrongdoing in the future, improve risk management and related disclosures, enhance transparency and stockholder input into the management fee, and lay the foundation for restoring investor confidence necessary to attract new capital. *See* discussion

at Section III.C.1.  The agreed upon Fee and Expense Amount of $550,000 is fair and reasonable in relation to the probable range of value of the Reforms, and the complexity of the matter, the litigation risks, and the substantial time and expenses Plaintiffs' Counsel devoted to the Derivative Actions on a fully contingent basis.  Smith Decl., ¶52.

A.     Legal Standards Governing Attorneys' Fees and Expenses

In fashioning fee awards, courts in this Circuit consider: (i) the value of the benefit or recovery in relation to the amount of the fee; (ii) the magnitude and complexity of the litigation; (iii) the litigation risk (i.e., the contingent nature of the fee); (iv) the quality of representation; (v) public policy considerations; and (vi) time and expenses incurred.  *Goldberger*, 209 F.3d at 50; *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 423 (2d Cir. 2010).

Here, the Court is not being called upon to fashion a fee and expense award.  Rather, it is being asked to determine whether the Fee and Expense Amount agreed to by well-represented parties in arm's-length negotiations and approved by the Board and its independent, non-defendant directors falls within the range of reasonableness.  While the *Goldberger* factors help frame the analysis, the Court's role is more limited.  Where the parties reach agreement on the award through separate arm's-length negotiations conducted after the material substantive terms of the settlement are determined, the Court should give "substantial weight" to the negotiated fee amount.  *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001).  *See Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *25 (S.D.N.Y. Mar. 24, 2014) ("That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness."); *In re Bear Stearns Companies. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (fact that requested fee was product of negotiations supports approval); *In re Schering-Plough/Merck Merger Litig.*, 2010 WL 1257722, at *18 (D.N.J. Mar. 26, 2010) (negotiation of requested fee before a respected mediator weights in favor of approval).  Indeed,

the United States Supreme Court has endorsed the determination of attorneys' fees through agreement as the ideal to which litigants should strive. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("Ideally ... litigants will settle the amount of a fee.").

The Parties' agreement and the Board's approval of the Fee and Expense Amount merit substantial deference. Resource Capital and their D&O insurers are by all counts extremely sophisticated parties. They were represented in the fee negotiations by skilled and experienced counsel. The negotiations were conducted at arm's-length after the material substantive terms of the Settlement had been determined. Smith Decl., ¶54. Unlike in class actions, where the diverging interests of class counsel and absent class members at the fee stage warrant closer judicial scrutiny, in this stockholder derivative matter, Resource Capital participated in the negotiations, was represented by counsel, and had every incentive to negotiate the lowest reasonable fee for the services rendered by Plaintiffs' Counsel. Smith Decl., ¶54. Accordingly, the Parties' conclusion that the agreed Fee and Expense Amount is fair and reasonable is entitled to substantial deference.

> **B.      The *Goldberger* Factors Confirm the Reasonableness of the Negotiated Fee and Expense Amount**

> > **1.      The Fee and Expense Amount Is Reasonable in Light of the Benefits Conferred**

Counsel responsible for a corporation's decision to adopt corporate governance enhancements that address the deficiencies alleged to have permitted the wrongdoing and designed to prevent recurrence of the same or similar wrongdoing are entitled to a fee award reflecting the significant economic value conferred. *See Mills*, 396 U.S. at 396 ("'corporate therapeutics' … furnish a benefit to all shareholders" warranting fee award); *Maher*, 714 F.2d at 461 & n.43 (improvements in "the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely

judgment in its favor.…   The evaluation of such an economic impact is necessarily judgmental and imprecise and normally does not lend itself to meaningful quantification," but that does not "obviate[] the desirability of an express range of recovery analysis" for purposes of awarding fees); *Oracle*, 852 F. Supp. at 1445-50 (similar).

As discussed in detail in Section III.C.1., the Settlement directly addresses the alleged wrongdoing, targeting three areas that are at the heart of Plaintiffs' claims:   (i) Board and committee independence; (ii) the effectiveness of Board oversight of lending, credit risk, and credit risk reporting; and (iii) transparency and stockholder say in the operation and terms of the Management Agreement.   As discussed, the Reforms will not only prevent recurrence of the alleged wrongdoing ("cost-avoidance"), they will improve risk management and disclosure, enhance transparency and stockholder input, and improve investor confidence over time as the Reforms take effect and come to be appreciated by the market.   Smith Decl., ¶55.   The cumulative value of the Reforms easily justifies the negotiated Fee and Expense Amount.   *See, e.g.*, *In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 WL 185809, at *1, *5 (D.N.J. Jan. 14, 2008) (awarding $9.5 million fee based on benefits conferred by governance reforms) ("This litigation provides an example of how derivative actions that result in the adoption of rigorous compliance standards confer tangible benefits to the corporation and its shareholders.… The adoption of the corporate governance and compliance mechanisms required by the settlement can prevent breakdowns in oversight that would otherwise subject the company to the risk of regulatory action, or uncover and remedy a problem at the early stages before it becomes the subject of a government investigation.   Effective corporate governance can also affect stock price by bolstering investor confidence and improving consumer perceptions."); *Unite Nat'l*, 2005 WL 2877899, at *5 (awarding $9.2 million fee for governance reforms) ("[T]he great

benefit conferred … as a result of the new corporate governance principles provided for in the settlement agreement … will serve to prevent and protect [the company] from the reoccurrence of certain alleged wrongdoings.").

### 2. The Skill Demonstrated by Plaintiffs' Counsel Supports the Agreed Fee and Expense Amount

Courts reward counsel who bring complex matters to a successful early resolution. *See, e.g.*, *In re Ashanti Goldfields Sec. Litig.*, 2005 WL 3050284, at *4 (E.D.N.Y. Nov. 15, 2005) ("The 'quality of representation' factor is designed to reward 'particularly resourceful' legal work that 'secures a substantial benefit … with a minimum of time invested.'"); *Int'l Distrib. Ctrs, Inc. v. Walsh Trucking Co., Inc.*, 62 B.R. 723, 737 (S.D.N.Y. 1986) (same). "The quality of opposing counsel is also important in evaluating the quality of plaintiff's counsels' work." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *Grinnell*, 495 F.2d at 471 (same). As discussed, this was a complex matter, involving many difficult factual and legal issues. While Plaintiffs were unable to meet Maryland's exceedingly stringent pleading standards for establishing derivative standing, they showed great skill in using the reduced leverage available on appeal to negotiate a strong package of valuable corporate therapeutics. Defendants were well-represented by pre-eminent corporate defense firms, whose lawyers zealously defended their clients' interests. Smith Decl., ¶56.

### 3. The Contingency Risk Borne by Plaintiffs' Counsel Supports the Agreed Fee and Expense Amount

The proposed award is particularly reasonable in light Plaintiffs' Counsel's risk of non-payment. *See Goldberger*, 209 F.3d at 54 (risk of non-payment important factor in determining attorneys' fees); *Grinnell*, 495 F.2d at 471 ("Perhaps the foremost of [the less objective] factors is the attorney's 'risk of litigation,' i.e., the fact that, despite the most vigorous and competent of efforts, success is never guaranteed."). Had Plaintiffs' Counsel failed to secure a substantial

benefit for Resource Capital, they would have recovered nothing for the time and expenses invested in this complex and risky litigation.  Smith Decl., ¶57.  As discussed, Plaintiffs' Counsel faced tremendous litigation risks in pursuing the Derivative Actions.  *Id.*  These risks and the benefits secured for Resource Capital and its stockholders fully justify the proposed award.  *See, e.g.*, *Cohn*, 375 F. Supp. 2d at 863, 865-66 ("[I]t is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation.… [B]ecause of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained.  The attorneys' fees awarded should reflect this goal.") (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985)).

4. **The Substantial Time and Expense Devoted to the Litigation Supports the Agreed Fee and Expense Amount**

Plaintiffs' Counsel devoted a total of 3046.25 hours to the litigation over the course of more than two years.  This time was spent on tasks that led directly to the recovery, including: (i) reviewing and analyzing Resource Capital's press releases, public statements, and filings with the SEC; (ii) reviewing and analyzing securities analysts' reports and advisories and media reports about the Company; (iii) reviewing and analyzing the pleadings contained in the Securities Litigation; (iv) researching the applicable federal and Maryland law with respect to the claims alleged in the Derivative Actions and the potential defenses thereto; (v) preparing and filing initial complaints and consolidated complaints in the Derivative Actions; (vi) preparing and filing oppositions to Defendants' motions to dismiss; (vii) researching and evaluating factual and legal issues relevant to the appeal of the orders granting the motions to dismiss; (viii) engaging in settlement negotiations with Defendants' counsel regarding the specific facts of the

Derivative Actions, the perceived strengths and weakness of the Derivative Actions, and other issues in an effort to facilitate negotiations; (ix) conducting extensive damages analyses and research into the Company's corporate governance structure and Management Agreement in connection with the Parties' settlement efforts; (x) preparing a comprehensive written settlement demand and modified demands over the course of the Parties' settlement negotiations; (xi) participating in formal mediation sessions; and (xii) negotiating the terms of a written memorandum of understanding embodying the principal substantive settlement terms, as well as the comprehensive final Stipulation of Settlement.  Smith Decl., ¶58; Stipulation, ¶3.[11]

---

[11] A lodestar cross-check is unnecessary because the agreed Fee and Expense Amount would not confer a windfall.  *Goldberger*, 209 F.3d at 48-50.  Regardless, a cross-check confirms the reasonableness of the agreed fee amount.  The firms of Robbins Arroyo, LLP, Promisloff Law, P.C., Johnson Fistel, LLP, and The Weiser Law Firm, P.C. report lodestar totaling $1,457,180.75, based on hourly rates that range from $600 to $945 for partners to $175 to $575 for associates and professional staff.  Smith Decl., ¶¶62-63; Promisloff Decl., ¶4.  Plaintiffs' Counsel's hourly rates "should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"  *Luciano v. Olsten Corp*., 109 F.3d 111, 115 (2d Cir. 1997) (alteration in original).  Plaintiffs' Counsel's hourly rates are commensurate with market rates in New York and nationwide for counsel of comparable skill and experience.  Smith Decl., ¶61.  *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *14 & n.8 (S.D.N.Y. Dec. 19, 2014) (acknowledging reasonableness, in 2014, of hourly rates of up to $875 and stating that "'the best indicator of the "market rate" in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that defend class actions on a regular basis'").  Plaintiffs' Counsel are among the leading plaintiffs' firms in the shareholder derivative space and have a demonstrated track record of obtaining substantial recoveries for corporations and shareholders, supporting reasonableness of the hourly rates utilized here.  *See* Smith Decl., Exhibit A at 15-17 (discussing Craig Smith's experience and achievements), 18-19 (discussing Shane Sanders' experience and achievements).  Indeed, Plaintiffs' Counsel have been awarded substantial attorneys' fees in courts in this Circuit and other courts in this market based on the same or comparable hourly rates as those reported here.  *See, e.g*., Smith Decl., Exhibit B, Affirmation of Craig W. Smith in Support of Plaintiffs' Motion for Final Approval of Settlement and Request for Attorneys' Fees and Reimbursement of Expenses, ¶¶5-9, *Cty. of York Emps. Ret. Plan & Schwartz v. Jung*, Index No. 651304/2010 (N.Y. Sup. Ct. N.Y. Cty. May 26, 2016); *see also* Smith Decl., Exhibit C, Order and Judgment, *Cty. of York Emps. Ret. Plan & Schwartz v. Jung*, Index No. 651304/2010 (N.Y. Sup. Ct. N.Y. Cty. Aug. 1, 2016); Smith Decl., Exhibit D, Declaration of Craig W. Smith in Support of Plaintiffs' Motion for Final Approval of Settlement,

Plaintiffs' Counsel incurred $24,824.79 in expenses performing these tasks. Smith Decl., ¶58. These expenses were necessary to effectively prosecute and resolve the case on favorable terms, would have been billed in non-contingency matters, and are therefore properly reimbursed. *Id*., ¶60; *see Novartis Pharm*., 2010 WL 4877852, at *24 ("'It is well-established that counsel who create a common fund … are entitled to the reimbursement of [all reasonable] litigation costs and expenses.'") (omission in original).

### 5. Public Policy Supports the Agreed Fee and Expense Amount

"[T]his action [is] 'worthy of judicial encouragement'" through the award of the negotiated Fee and Expense Amount. *Dubin v. E.F. Hutton Grp., Inc.*, 845 F. Supp. 1004, 1018 (S.D.N.Y. 1994) (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987)). Derivative actions, like the instant cases, play an important role in "protect[ing] the

---

¶¶76-80, *In re Fifth Street Finance Corp. S'holder Derivative Litig.*, Lead Case No. 3:15-cv-01795-RNC (D. Conn. Nov. 15, 2016); Smith Decl., Exhibit E, Order Approving Settlement, *In re Fifth Street Finance Corp. S'holder Derivative Litig.*, Lead Case No. 3:15-cv-01795-RNC (D. Conn. Dec. 13, 2016). Efficient case management, including the utilization of associates and corporate research staff where appropriate, achieved a low weighted average rate of $465 for counsel for the Demand Futility Plaintiffs, and $497 for counsel for the Demand Refused Plaintiffs. Smith Decl., ¶62; Promisloff Decl., ¶4. The negotiated $550,000 Fee and Expense Amount represents a fractional/negative lodestar multiplier of 0.36—well below the range deemed reasonable in this type of litigation. *See Wal-Mart Stores*, 396 F.3d at 123 (affirming multiplier of 3.5); *Bozak v. FedEx Ground Package Sys., Inc.*, 2014 WL 3778211, at *7 (D. Conn. July 31, 2014) ("'Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers.'"); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) (awarding fee representing 2.78 multiplier) (counsel who litigate "complex case under a contingency fee arrangement … are entitled to a fee in excess of the lodestar"); *Novartis Pharm.*, 2010 WL 4877852, at *23 (awarding multiplier of 2.4, which "falls well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit") (collecting cases approving multipliers from 2.09 to 5.5); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (awarding multiplier of 4); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier and noting multipliers between 3 and 4.5 are common); *Lloyd's Am. Tr.*, 2002 WL 31663577, at *27 ("multiplier of 2.09 is at the lower end of the range of multipliers awarded by courts within the Second Circuit").

interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991); *see also Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966) ("derivative suits have played a rather important role in protecting shareholders of corporations from the designing schemes and wiles of insiders"); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949) (derivative action is "the chief regulator of corporate management … without it there would be little practical check on [management] abuses").  The Derivative Actions substantially benefitted Resource Capital and its stockholders.  This would not have been possible had courts in previous cases not properly incentivized skilled and experienced counsel to focus their practice on high-risk stockholder derivative litigation.  This Court should follow suit.  *See In re AOL Time Warner S'holder Derivative Litig.*, 2010 WL 363113, at *23 (S.D.N.Y. Feb. 1, 2010) (fee award should incentivize "future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis").

### C.     The Service Awards to Plaintiffs Are Reasonable

Plaintiffs respectfully request that the Court approve nominal service awards of $3,000 for each named plaintiff – to be paid from the Fee and Expense Amount – in recognition of their role in creating substantial benefits for Resource Capital and its stockholders.  Stipulation at 19.  Among other things, Plaintiffs reviewed and authorized the filing of the complaints, and stayed informed throughout the course of the litigation, through numerous communications with their counsel, regarding the progress, status, and direction of the litigation and settlement negotiations.  *See* Smith Decl., ¶68; Promisloff Decl., ¶6; *Lizondro–Garcia v. Kefi LLC*, 2014 WL 4996248, at *9 (S.D.N.Y. Oct. 7, 2014) (service awards common in stockholder representative actions); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) (service awards reimburse representatives for assuming leadership's risks and burdens); *In re Cedant Corp. Derivative*

*Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (service awards recognize plaintiffs' public service).   The Service Awards are well within the range approved by courts as fair and reasonable, and should be approved.  *See, e.g.*, *Sauby v. City of Fargo*, 2009 WL 2168942, at *1 (D.N.D. July 16, 2009) (upholding service awards of $5,000 and $10,000 because, among other things, "[service] awards are not intended to 'compensate' plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action"); *Geare v. Begley*, No. 11-cv-09074, Final Order and Judgment, ¶3 (N.D. Ill. Jan. 23, 2015) (awarding service awards of $3,000 per plaintiff), Smith Decl., Exhibit F; *In re Xcel Energy, Inc. Sec. Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (approving service award of $100,000 to be distributed among eight lead plaintiffs) ("if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted").  The modest service awards are reasonable in light of Plaintiffs' role in securing confer substantial benefits for the Company, and, because they are drawn from the Fee and Expense Amount, they would not reduce the benefit enjoyed by the Company.  *See In re Presidential Life Sec.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (incentive awards "need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorneys' fees").

## V.    CONCLUSION

The Settlement is fair, reasonable, and adequate and should be approved in all respects.


Dated: April 19, 2019                          Respectfully submitted,

                                               **ROBBINS ARROYO LLP**

                                               By: S/ Shane P. Sanders _____

Brian J. Robbins
Craig W. Smith
Ashley R. Rifkin
Shane P. Sanders
5040 Shoreham Place
San Diego, CA 92122
(619) 525-3990
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
arifkin@robbinsarroyo.com
ssanders@robbinsarroyo.com

*Lead Counsel for Plaintiffs in the Demand
Futile Actions*

**PROMISLOFF LAW, P.C.**
By: S/ David M. Promisloff
David M. Promisloff
5 Great Valley Parkway, Suite 210
Malvern, PA 19355
(215) 259-5156
david@prolawpa.com

*Lead Counsel for Plaintiffs in the Demand
Refused Actions*

**LAW OFFICE OF ALFRED G. YATES,
JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
300 Mt. Lebanon Boulevard
Suite 206-B
Pittsburgh, PA 15234-1507
Telephone: (412) 391-5164
Facsimile: (412) 471-1033

**LAW OFFICES OF CURTIS V.
TRINKO, LLP**
Curtis V. Trinko
16 West 46th St, 9th Flr.
New York, NY 10036
Telephone: (212) 490-9550
Facsimile: (212) 986-0158
ctrinko@trinko.com

**JOHNSON FISTEL, LLP**
W. Scott Holleman
99 Madison Avenue

- 38 -

5th Floor
New York, NY 10016
Telephone: (212) 802-1486
Facsimile: (212) 602-1592
ScottH@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA  30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**BERNSTEIN LIEBHARD LLP**
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2019, I authorized the electronic filing of the foregoing

MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR FINAL

APPROVAL OF DERIVATIVE SETTLEMENT, and all attachments thereto, with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List for this action.

**PROMISLOFF LAW, P.C.**
By: /s/ David M. Promisloff
David M. Promisloff
5 Great Valley Parkway, Suite 210
Malvern, PA 19355
(215) 259-5156
david@prolawpa.com

*Lead Counsel for Plaintiffs in the Demand
Refused Actions*